SONAL N. MEHTA (SBN 222086)
  Sonal.Mehta@wilmerhale.com
WILMER CUTLER PICKERING
  HALE AND DORR LLP
950 Page Mill Road
Palo Alto, California 94303
Telephone:  (650) 858-6000
Facsimile:  (650) 858-6100

DAVID Z. GRINGER (*pro hac vice*)
  David.Gringer@wilmerhale.com
WILMER CUTLER PICKERING
  HALE AND DORR LLP
1875 Pennsylvania Ave NW
Washington, DC 20006
Telephone:  (202) 663-6000
Facsimile:  (202) 663-6363

*Attorneys for Defendant*
FACEBOOK, INC.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| REVEAL CHAT HOLDCO, LLC, a Delaware limited liability company, USA TECHNOLOGY AND MANAGEMENT SERVICES, INC. (d/b/a Lenddo USA), a Delaware corporation, CIR.CL, INC., a dissolved Delaware corporation, and BEEHIVE BIOMETRIC, INC., a dissolved Delaware corporation,<br><br>Plaintiffs,<br><br>v.<br><br>FACEBOOK, INC., a Delaware corporation,<br><br>Defendant. | Case No. 5:20-CV-00363-BLF<br><br>**DEFENDANT FACEBOOK INC.'S NOTICE OF MOTION AND MOTION TO DISMISS; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEREOF**<br><br>Hearing Date: June 11, 2020<br>Time: 9:00 AM<br>Judge: Hon. Beth Labson Freeman |

1

### TABLE OF CONTENTS

2

Page

3 INTRODUCTION ................................................................................................................. 1

4 BACKGROUND ................................................................................................................... 3

ARGUMENT ......................................................................................................................... 5

5 I.      Plaintiffs' Claims Are Time-Barred ........................................................................... 6

6        A.      The Statute Of Limitations And Laches Bar Plaintiffs' Claims ..................... 6

7        B.      No Tolling Theory Applies .............................................................................. 8

8 II.     Plaintiffs Have Not Plausibly Alleged Antitrust Injury ........................................... 10

9        A.      Plaintiffs Fail To Allege Causal Antitrust Injury ......................................... 11

10        B.      Plaintiffs Have Not Alleged Antitrust Injury In The "Social Advertising"
                 Market .............................................................................................................. 13

11        C.      Plaintiffs Lack Antitrust Standing To Bring Their Monopolization And
                 Attempted Monopolization Claims (Counts I and II) ...................................... 14

12        D.      Plaintiffs Lack Antitrust Injury To Bring Their Section 1 Claim (Count
13                III) .................................................................................................................... 15

        E.      Plaintiffs Did Not Suffer Antitrust Injury From the Acquisitions And
14                Integration Of Instagram And WhatsApp (Counts IV and V) .......................... 16

15 III.    Plaintiffs Have Failed To State A Claim .................................................................. 17

        A.      The Product Markets Alleged Are Implausible .............................................. 17
16
                1.      The "Social Data" Market .................................................................... 18
17
                2.      The "Social Advertising" Market .......................................................... 20
18        B.      Plaintiffs Fail To State Monopolization And Attempted Monopolization
                 Claims .............................................................................................................. 21
19
        C.      Plaintiffs Fail To State A Section 1 Claim .................................................... 25
20        D.      Plaintiffs' Claim For Injunctive Relief Must Be Dismissed ......................... 25

21 CONCLUSION ................................................................................................................... 255

22

23

24

25

26

27

28

1

# TABLE OF AUTHORITIES

2

Page(s)

**CASES**

3

*Alaska Airlines, Inc. v. United Airlines, Inc.,*
    948 F.2d 536 (9th Cir. 1991) .............................................................................1

4

5

*America Online, Inc. v. GreatDeals.Net,*
    49 F. Supp. 2d 851 (E.D. Va. 1999) ...............................................................20

6

7

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009)...........................................................................................5

8

*Aspen Skiing Co. v. Aspen Highlands Skiing Co.,*
    472 U.S. 585 (1985)..................................................................................22, 23

9

10

*Associated General Contractors of California, Inc. v. California State Council of
    Carpenters,* 459 U.S. 519 (1983)........................................................10, 15, 17

11

*Atlantic Richfield Co.v. USA Petroleum Corp.,*
    495 U.S. 328 (1990)........................................................................................12

12

13

*Bay Area Surgical Management LLC v. Aetna Life Insurance Co.,*
    166 F. Supp. 3d 988 (N.D. Cal. 2015) (Freeman, J.)......................................18

14

15

*Bell Altantic Corp. v. Twombly,*
    550 U.S. 544 (2007)...........................................................................................5

16

17

*Beneficial Standard Life Insurance Co. v. Madariaga,*
    851 F.2d 271 (9th Cir. 1988) ..........................................................................10

18

*Big Bear Lodging Ass'n v. Snow Summit, Inc.,*
    182 F.3d 1096 (9th Cir. 1999) ........................................................................15

19

20

*Bourns, Inc. v. Raychem Corp.,*
    331 F.3d 704 (9th Cir. 2003) ....................................................................12, 15

21

22

*Brantley v. NBC Universal, Inc.,*
    675 F.3d 1192 (9th Cir. 2012) ..........................................................................5

23

24

*California Computer Products, Inc. v. IBM Corp.,*
    613 F.2d 727 (9th Cir. 1979) ..........................................................................10

25

*Cargill, Inc. v. Monfort of Colorado, Inc.,*
    479 U.S. 104 (1986)....................................................................................1, 15

26

27

*Conmar Corp. v. Mitsui & Co. (U.S.A.), Inc.,*
    858 F.2d 499 (9th Cir. 1988) ........................................................................8, 9

28

*Copperweld Corp. v. Independence Tube Corp.*,
    467 U.S. 752 (1984)........................................................................................15

*Danjaq LLC v. Sony Corp.*,
    263 F.3d 942 (9th Cir. 2001) ..........................................................................7, 8

*Federal Home Loan Bank Board v. Elliott*,
    386 F.2d 42 (9th Cir. 1967) .................................................................................7

*Feitelson v. Google Inc.*,
    80 F. Supp. 3d 1019 (N.D. Cal. 2015) ..................................5, 10, 13, 14, 15, 17

*FTC v. PepsiCo, Inc.*,
    477 F.2d 24 (2d Cir. 1973)................................................................................10

*Geneva Pharmaceuticals Technology Corp. v. Barr Laboratories Inc.*,
    386 F.3d 485 (2d Cir. 2004)..............................................................................10

*Glen Holly Entertainment, Inc. v. Tektronix, Inc.*,
    343 F.3d 1000 (9th Cir. 2003) ..........................................................................13

*Hicks v. PGA Tour, Inc.*,
    897 F.3d 1109 (9th Cir. 2018) ...............................................17, 18, 19, 20, 21

*Huynh v. Chase Manhattan Bank*,
    465 F.3d 992 (9th Cir. 2006) ...............................................................................7

*In re Musical Instruments & Equipment Antitrust Litigation*,
    798 F.3d 1186 (9th Cir. 2015) ..........................................................................25

*In re Super Premium Ice Cream Distribution Antitrust Litigation*,
    691 F. Supp. 1262 (N.D. Cal. 1988) .................................................................21

*International Telephone and Telegraph Corp. v. General Telephone and
    Electronics Corp.*, 518 F.2d 913 (9th Cir. 1975) ...........................................6, 8

*Kendall v. Visa U.S.A., Inc.*,
    518 F.3d 1042 (9th Cir. 2008) ..........................................................................25

*Kinderstart.com, LLC v. Google, Inc.*,
    2007 WL 831806 (N.D. Cal. Mar. 16, 2007)....................................................20

*Kloth v. Microsoft Corp.*,
    444 F.3d 312 (4th Cir. 2006) ...................................................................7, 14, 17

*Kourtis v. Cameron*,
    419 F.3d 989 (9th Cir. 2005) ...............................................................................7

*Lucas Automotive Engineering, Inc. v. Bridgestone/Firestone, Inc.*,
    140 F.3d 1228 (9th Cir. 1998) ...................................................12, 15, 16, 17

iii

*Mangindin v. Washington Mutual Bank*,
637 F. Supp. 2d 700 (N.D. Cal. 2009) ................................................................25

*Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*,
475 U.S. 574 (1986) ..............................................................................................13

*MetroNet Services Corp. v. Qwest Corp.*,
383 F.3d 1124 (9th Cir. 2004) ........................................................................21, 25

*Midwestern Machinery Co. v. Northwest Airlines, Inc.*,
392 F.3d 265 (8th Cir. 2004) ..................................................................................7

*Newcal Industries, Inc. v. Ikon Office Solution*,
513 F.3d 1038 (9th Cir. 2008) ........................................................................17, 19

*NicSand, Inc. v. 3M Co.*,
507 F.3d 442 (6th Cir. 2007) ................................................................................12

*Novell, Inc. v. Microsoft Corp.*,
731 F.3d 1064 (10th Cir. 2013) ......................................................................23, 24

*NSS Labs, Inc. v. Symantec Corp.*,
2019 WL 3804679 (N.D. Cal. Aug. 13, 2019) ......................................................17

*Olin Corp. v. Federal Trade Commission*,
986 F.2d 1295 (9th Cir. 1993) ..............................................................................19

*Oliver v. SD-3C LLC*,
751 F.3d 1081 (9th Cir. 2014) ............................................................................6, 7

*Oltz v. St. Peter's Community Hospital*,
861 F.2d 1440 (9th Cir. 1988) ..............................................................................17

*Olympia Equipment Leasing Co. v. Western Union Telegraph Co.*,
797 F.2d 370 (7th Cir. 1986) ................................................................................23

*Omega Environmental, Inc. v. Gilbarco, Inc.*,
127 F.3d 1157 (9th Cir. 1997) ..............................................................................16

*Pace Industries, Inc. v. Three Phoenix Co.*,
813 F.2d 234 (9th Cir. 1987) ..................................................................................6

*Pacific Bell Telephone Co. v. Linkline Communications, Inc.*,
555 U.S. 438 (2009) ..............................................................................................22

*Planet Drum Foundations v. Hart*,
2017 WL 4236932 (N.D. Cal. Sept. 24, 2017) ......................................................7

*Pool Water Products v. Olin Corp.*,
258 F.3d 1024 (9th Cir. 2001) ..............................................................................16

*Ryan v. Microsoft Corp.*,
      147 F. Supp. 3d 868 (N.D. Cal. 2015) ...............................................................9

*Schor v. Abbott Laboratories*,
      457 F.3d 608 (7th Cir. 2006)) ............................................................................22

*Sidibe v. Sutter Health*,
      4 F. Supp. 3d 1160 (N.D. Cal. 2013) ................................................................19

*Somers v. Apple, Inc.*,
      729 F.3d 953 (9th Cir. 2013) .............................................................................11

*Stackla, Inc. v. Facebook Inc.*,
      2019 WL 4738288 (N.D. Cal. Sept. 27, 2019) .........................................4, 24

*Swartz v. KPMG LLP*,
      476 F.3d 756 (9th Cir. 2007) ...............................................................................9

*Taleff v. Southwest Airlines Co.*,
      828 F. Supp. 2d 1118 (N.D. Cal. 2011),
      *aff'd* 554 F. App'x 598 (9th Cir. 2014)...............................................................8

*Tanaka v. University of Southern California*,
      252 F.3d 1059 (9th Cir. 2001) ....................................................................19, 20

*Taylor v. Sturgell*,
      553 U.S. 880 (2008)...............................................................................................7

*United States v. Microsoft Corp.*,
      253 F.3d 34 (D.C. Cir. 2001) ..............................................................................10

*United States v. Topco Associates, Inc.*,
      405 U.S. 596 (1972)...............................................................................................1

*Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP*,
      540 U.S. 398 (2004).............................................................................21, 22, 25

*Viamedia, Inc. v. Comcast Corp.*,
      2020 WL 879396 (7th Cir. Feb. 24, 2020) ........................................................22

*Von Saher v. Norton Simon Museum of Art at Pasadena*,
      592 F.3d 954 (9th Cir. 2010) ...............................................................................6

*Wood v. Santa Barbara Chamber of Commerce, Inc.*,
      705 F.2d 1515 (9th Cir. 1983) .............................................................................8

**DOCKETED CASES**

*Ackers v. Google LLC*, 5:19-cv-05537-BLF, ECF No. 26 (N.D. Cal. Jan. 2, 2020) ....................13

FACEBOOK'S NOTICE OF AND MOTION TO DISMISS; MEMORANDUM IN SUPPORT THEREOF

**STATUTES, RULES, AND REGULATIONS**

Fed. R. Civ. P. 9(b) ...................................................................................................9

Fed. R. Civ. P. 12(b)(6)..................................................................................1, 5, 6, 11

Clayton Antitrust Act, 15 U.S.C. §§ 12-27 (1914) ............................................ *passim*

Sherman Antitrust Act, 15 U.S.C. §§ 1-7 (1890).................................................6, 10, 19

**OTHER AUTHORITIES**

Alexei Oreskovic, *Facebook Says WhatsApp deal cleared by FTC*, REUTERS
     (Apr. 10, 2014), https://tinyurl.com/wkm7tgg.................................................4, 9

Federal Trade Commission, *FTC Closes Its Investigation Into Facebook's
     Proposed Acquisition of Instagram Photo Sharing Program* (Aug. 22, 2012),
     https://tinyurl.com/stxz53r ..............................................................................4, 9

HERBERT HOVENKAMP & PHILLIP E. AREEDA, ANTITRUST LAW, Wolters Kluwer
     (Vol. 11A, 4th ed. 2014) ...............................................................................9, 20

1

### NOTICE OF MOTION AND MOTION TO DISMISS

2   PLEASE TAKE NOTICE THAT, on June 11, 2020 at 9:00 a.m. or as soon thereafter as

3   the matter may be heard, in Courtroom 3 of the U.S. District Court for the Northern District of

4   California, San Jose Division, at 280 South 1st Street, San Jose, California, this Motion to

5   Dismiss filed by defendant Facebook, Inc. will be heard.  Pursuant to Fed. R. Civ. P. 12(b)(6),

6   Facebook moves to dismiss the Complaint in the above-captioned action on the grounds that

7   plaintiffs' claims are time-barred, no plaintiff has suffered antitrust injury, plaintiffs have failed

8   to allege plausible product markets, and plaintiffs have otherwise failed to state claims upon

9   which relief can be granted.  Facebook's Motion to Dismiss is based on this Notice of Motion

10  and the supporting Memorandum of Points and Authorities.

11

### STATEMENT OF REQUESTED RELIEF

12   Pursuant to Federal Rule of Civil Procedure 12(b)(6), Facebook requests that the Court

13  dismiss plaintiffs' claims with prejudice.

14

### MEMORANDUM OF POINTS AND AUTHORITIES

15

### INTRODUCTION

16   The antitrust laws promise each business "the freedom to compete."  *United States v.*

17  *Topco Associates, Inc.*, 405 U.S. 596, 610 (1972).  Competition can and does produce firms that

18  succeed and, sometimes, firms that fail.  So long as that success and failure stems from

19  competition on the merits, the antitrust laws remain silent.  Thus, the antitrust laws recognize

20  both that a "firm that creates a valued service or product should not be punished … merely

21  because the firm finds itself to be the holder of a natural monopoly," *Alaska Airlines, Inc. v.*

22  *United Airlines, Inc.*, 948 F.2d 536, 548 (9th Cir. 1991), and that "the antitrust laws do not

23  require the courts to protect [] businesses from the loss of profits due to continued

24  competition[.]"  *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 116 (1986).

25   As plaintiffs allege, Facebook "rose to prominence in the face of fierce of competition."

26  Compl. ¶ 35.  No one would say plaintiffs—four "app developers," two of whom no longer exist,

27  a third whose current status is unspecified, and a fourth who makes "loans to customers in the

28

1

1   Philippines," *id.* ¶¶18-25—"rose to prominence."  In a meandering 110-page Complaint,

2   plaintiffs contend that they depended on Facebook Application Programming Interfaces ("APIs")

3   with the expectation that their applications (or "apps") could somehow mimic Facebook's

4   success.  Plaintiffs also complain that Facebook did not enter into a contract allowing them

5   access to the APIs but did enter into such contracts with better-known app developers.  And

6   plaintiffs hypothesize that Facebook monitored its competitors and acquired two of the more

7   serious ones in 2012 and 2014.  In the absence of these acquisitions, plaintiffs guess, either of the

8   acquired firms might have emerged as alternatives to Facebook.

9       Each of these theories fails as matter of law because it is at odds with the core principle

10   that antitrust law protects *competition* and not competitors.  Given just how far afield plaintiffs'

11   theories go, it is unsurprising that they have failed to state a claim on multiple grounds.

12       First, plaintiffs waited too long to sue.  Each of the complained of acts occurred between

13   five and eight years ago.  Because there is a four-year statute of limitations period for antitrust

14   damage claims, all of plaintiffs' claims must be dismissed to the extent they seek damages.

15   Plaintiffs' request for injunctive relief fares no better because courts import the same statutory

16   four-year damages period to assess laches in the antitrust context.

17       Second, plaintiffs completely fail to allege the nature of any injury caused by any of the

18   challenged conduct.  Indeed, plaintiffs tell us next-to-nothing about themselves, their business

19   plans, their position in the market before the challenged acts occurred (many of which appear to

20   have occurred before they even existed), and why any of the challenged acts caused them

21   *antitrust* injuries.  That most of the named plaintiffs have failed is unfortunate, but nothing in the

22   Complaint permits a plausible inference that but for Facebook's conduct, the outcome would be

23   any different, or even that Facebook's conduct was a contributing factor in plaintiffs' demise.

24       Third, plaintiffs fail to allege a plausible product market—a necessary predicate for each

25   of plaintiffs' theories.  Given the reality that Facebook faces robust competition, which would be

26   fatal to their case, plaintiffs have sought to define markets around "social data" and "social

27   advertising."  But to state a claim, relevant markets must be alleged with sufficient detail to make

28

FACEBOOK'S NOTICE OF AND MOTION TO DISMISS; MEMORANDUM IN SUPPORT THEREOF

their contours known and must be defined to include all economic substitutes.  Plaintiffs fail on both counts.  Taking "data" and "advertising" and inserting the word "social" in front of them may be a way to gerrymander markets to make Facebook appear to have a larger market share than reality, but it is not a viable way to define relevant markets.

Fourth, because the antitrust laws prize competition and not forced sharing or retroactive second-guessing, each of plaintiffs' theories fails to state a claim, even if the Complaint's far-fetched allegations are accepted as true.  It is not unlawful monopolization to refuse to share infrastructure—built through innovation and at-risk investment—with your competitors on terms they desire.  It is not an illegal agreement to *decline* to contract with certain firms.  And it is not an antitrust violation to acquire companies where the theory of liability is that, had the years-old acquisitions not happened, the acquired firms would have helped plaintiffs compete.  Finally, plaintiffs' "injunctive relief" cause of action must also be dismissed because no such right of action exists in federal courts.

Plaintiffs' allegations fall well short of stating viable antitrust claims and should be dismissed.  Because each claim is time-barred, there is no reason to grant leave to amend.

### BACKGROUND

Facebook operates a portfolio of products.  These include "core Facebook," the photo- and video-sharing app Instagram, and the messaging app WhatsApp.  Compl. ¶ 28.  Since its inception, when Mark Zuckerberg developed core Facebook in a college dorm room, Facebook has evolved into a multi-billion-dollar, publicly traded company that has over two billion users worldwide.  Compl. ¶¶ 27, 35-44.

The Complaint alleges that beginning in 2007, Facebook allowed application developers to the integrate their apps with core Facebook.  Compl. ¶¶ 51, 90-102.  One way that it did so was by providing developers with access to certain APIs, which allowed developers to "query the Facebook network for information."  *Id.* ¶ 92.  These included the "Friends API," which "let third-party developers … search[] through a user's friends, as well as their friends of friends," and the "News Feed API," which let such developers see "the stream of information that flowed

1   through a user's news feed, such as a post about a friend of the user getting engaged or sharing a

2   news article." *Id.* ¶¶ 118-119.

3          In April 2012, Facebook acquired Instagram.  Compl. ¶ 260.  Since the acquisition,

4   Facebook has invested in and grown Instagram, such that Instagram now has a billion users.  *Id.*

5   ¶¶ 260, 263-265.  Facebook acquired WhatsApp in February 2014.  *Id.* ¶ 290.  Both acquisitions

6   were reviewed and cleared by federal regulators.  Federal Trade Commission, *FTC Closes Its*

7   *Investigation Into Facebook's Proposed Acquisition of Instagram Photo Sharing Program* (Aug.

8   22, 2012), https://tinyurl.com/stxz53r ("Instagram Press Release"); Alexei Oreskovic, *Facebook*

9   *Says WhatsApp deal cleared by FTC*, REUTERS (Apr. 10, 2014), https://tinyurl.com/wkm7tgg

10  ("WhatsApp Article").

11         Managing API access is a critical tool that Facebook uses to "decisively police the

12  integrity of its platforms," in which "the public has a strong interest."  *Stackla, Inc. v. Facebook*

13  *Inc.*, 2019 WL 4738288, at *6 (N.D. Cal. Sept. 27, 2019).  Consistent with this interest, in April

14  2014, Facebook publicly announced that it was changing its policy with respect to third-party

15  developer access to the Friends and News Feed APIs for the core Facebook app.  Compl. ¶ 202.

16  The Complaint alleges that after the April 2014 announcement and through April 2015,

17  Facebook entered into a series of agreements—labeled in the Complaint "Whitelist and Data

18  Sharing Agreements"—under which certain app developers were permitted ongoing access to

19  these APIs.  *Id.* ¶¶ 207-216.  By April 2015, according to plaintiffs, the Friends and News Feed

20  APIs were available only to developers that had a separate agreement with Facebook.  *Id.* ¶ 205.

21         In March 2019, Facebook publicly announced plans to "integrate the backends" of

22  Instagram and WhatsApp with core Facebook.  Compl. ¶ 301.  This integration will "implement

23  a unitary form of end-to-end encryption" across the products and "make them interoperable"

24  with core Facebook.  *Id.* ¶ 301.

25         In January 2020, plaintiffs filed suit on behalf of a purported "developer class."  Compl. ¶

26  389.  Plaintiffs allege that Facebook's limiting of access to its Friends and News Feed APIs

27  almost five years ago constitutes *both* monopolization and attempted monopolization of the

28

4

1   purported U.S. and global "social data" and "social advertising" markets. *Id.* ¶¶ 364-371.  They

2   further claim that Facebook's alleged execution of the so-called Whitelist and Data Sharing

3   agreements—which also took place almost five years ago—is a "hub-and-spoke scheme" in

4   restraint of trade. *Id.* ¶¶ 217, 372.  Finally, they say that the 2012 and 2014 acquisitions of

5   Instagram and WhatsApp substantially lessened competition in, and amount to monopolization

6   of, the purported markets. *Id.* ¶¶ 428, 433.  They seek treble damages, the divestiture of

7   Instagram and WhatsApp, and an order compelling non-party Zuckerberg to "divest himself of

8   incontestable control over the company." *Id.* ¶¶ 31, 449-450.

9                                              **ARGUMENT**

10          On a Rule 12(b)(6) motion to dismiss in the private antitrust litigation context, "it is one

11  thing to be cautious before dismissing an antitrust complaint in advance of discovery, but quite

12  another to forget that proceeding to antitrust discovery can be expensive.  As such, a district

13  court must retain the power to insist upon some specificity in pleading before allowing a

14  potentially massive factual controversy to proceed." *Feitelson v. Google Inc.*, 80 F. Supp. 3d

15  1019, 1025-1026 (N.D. Cal. 2015) (Freeman, J.) (quotations and citations omitted).  Thus, "a

16  complaint's allegation of a practice that may or may not injure competition is insufficient to

17  'state a claim to relief that is plausible on its face.'" *Brantley v. NBC Universal, Inc.*, 675 F.3d

18  1192, 1198 (9th Cir. 2012) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see

19  also Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ("Where a complaint pleads facts that are 'merely

20  consistent with' a defendant's liability, 'it stops short of the line between possibility and

21  plausibility of entitlement to relief.'"  (quoting *Twombly*, 550 U.S. at 557)).

22          This Court should dismiss each of plaintiffs' claims.  First, every claim is time-barred

23  because the challenged conduct occurred over four years ago.  Second, plaintiffs have not alleged

24  antitrust injury.  Third, plaintiffs fail to state a claim on the merits:  The product markets they

25  allege are implausible, and they advance theories that are either incoherent, implausible, or both.

26

27

28

1    I.    PLAINTIFFS' CLAIMS ARE TIME-BARRED

2          A.    The Statute Of Limitations And Laches Bar Plaintiffs' Claims

3          Private lawsuits seeking damages for alleged violations of Sections 1 and 2 of the

4    Sherman Act and Section 7 of the Clayton Act are subject to a four-year statute of limitations.

5    *See* 15 U.S.C. §15b.  While there is no statute of limitations for antitrust claims seeking

6    injunctive relief, such claims "are subject to the equitable defense of laches."  *Oliver v. SD-3C*

7    *LLC*, 751 F.3d 1081, 1085 (9th Cir. 2014) (citing *International Tel. & Tel. Corp. v. General Tel.*

8    *& Electronics Corp. ("ITT")*, 518 F.2d 913, 926 (9th Cir. 1975)).  Courts use the Clayton Act's

9    four-year statute of limitations for damages claims as a "guideline" for "comput[ing] [] the

10   laches period" in suits for injunctive relief.  *ITT*, 518 F.2d at 926.  Thus, in "applying laches"

11   courts "look to the same legal rules that animate the four-year statute of limitations."  *Oliver*, 751

12   F.3d at 1086.  Here, plaintiffs' damages claims are time-barred by the four-year statute of

13   limitations and their requests for injunctive relief are similarly precluded by the doctrine of

14   laches.  The lawsuit should therefore be dismissed.

15         Subject to inapplicable exceptions, a "cause of action in antitrust accrues each time a

16   plaintiff is injured by an act of the defendant and the statute of limitations runs from the

17   commission of the act."  *Pace Indus., Inc. v. Three Phoenix Co.*, 813 F.2d 234, 237 (9th Cir.

18   1987).  The Complaint itself only challenges four independent acts—to plaintiffs a "scheme"—

19   as violative of the antitrust laws:  The April 2012 acquisition of Instagram, Compl. ¶ 260, the

20   February 2014 acquisition of WhatsApp, *id.* ¶ 290, entry into a series of "data sharing"

21   agreements from April 2014 to April 2015, *id.* ¶ 207, and Facebook's April 2015 modification of

22   its API policy, *id.* ¶ 205.  Each challenged act occurred five to eight years before the Complaint

23   was filed and is alleged to have caused injury to the plaintiffs at the time of the action.  *Id.* ¶¶

24   141, 220, 268, 292-293.  Accordingly, the statute of limitations has run.  And because "[a] claim

25   may be dismissed under Rule 12(b)(6) on the ground that it is barred by the applicable statute of

26   limitations [] when 'the running of the statute is apparent on the face of the complaint,'"  *Von*

27   *Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 969 (9th Cir. 2010) (quoting

28

1  *Huynh v. Chase Manhattan Bank*, 465 F.3d 992, 997 (9th Cir. 2006)), plaintiffs' damages claims

2  should be dismissed.

3          For similar reasons, plaintiffs' requests for injunctive relief are barred by laches.  Laches

4  "bars the claims of a plaintiff who with full knowledge of the facts, acquiesces in a transaction

5  and sleeps upon his rights."  *Kourtis v. Cameron*, 419 F.3d 989, 1000 (9th Cir. 2005), *abrogated*

6  *on other grounds by Taylor v. Sturgell*, 553 U.S. 880, 904 (2008).  Thus, "a suit seeking

7  equitable relief will be barred if a party has inexcusably delayed pursuing his claim and his

8  adversary has been prejudiced as a result."  *Oliver*, 751 F.3d at 1085 n.4.  A court can grant a

9  motion to dismiss based on a laches defense "when the defense of laches is clear on the face of

10  the complaint, and where it is clear that the plaintiff can prove no set of facts to avoid the

11  [defense]."  *Planet Drum Found. v. Hart*, 2017 WL 4236932, at *7 (N.D. Cal. Sept. 24, 2017);

12  *see also Kloth v. Microsoft Corp.*, 444 F.3d 312, 325 (4th Cir. 2006) (affirming dismissal of

13  plaintiffs' claims for injunctive relief under the doctrine of laches, because "the plaintiffs failed

14  to pursue their injunctive claims with diligence and that their failure prejudiced [defendants]");

15  *Federal Home Loan Bank Bd. v. Elliott*, 386 F.2d 42, 56 (9th Cir. 1967) (affirming dismissal on

16  grounds of laches where shareholders waited three months to challenge transaction).  That is the

17  case here.

18          First, plaintiffs' years-long delay in bringing this action was inexcusable.  In assessing a

19  laches defense, "the relevant delay is the period from when the plaintiff knew (or should have

20  known) of the allegedly [unlawful] conduct, until the initiation of the lawsuit[.]"  *Danjaq LLC v.*

21  *Sony Corp.*, 263 F.3d 942, 952 (9th Cir. 2001).  Here, plaintiffs should have known of each

22  challenged act immediately after it happened.  For example, the Instagram and WhatsApp

23  acquisitions were highly publicized transactions.  *See Midwestern Machinery Co. v. Northwest*

24  *Airlines, Inc.*, 392 F.3d 265, 272 (8th Cir. 2004) ("Mergers occur in the public eye and at a

25  reasonably certain date.").  And Facebook publicly announced its API policy change a full year

26  before it went into effect for existing developers, Compl. ¶ 202, and it is implausible that

27  plaintiffs, each of which allege they relied on these APIs, *id.* ¶¶ 18-25, were unaware that they

28

had lost access to this supposedly important source of data, or that they were not invited to participate in a contract that would have allowed them continued access. *See also id.* ¶ 190 (claiming that plaintiff Cir.cl was among (many) applications "targeted … individually").

Second, this unreasonable delay in filing a lawsuit prejudiced Facebook. "The bare fact of delay creates a rebuttable presumption of prejudice." *ITT*, 518 F.2d at 926. Prejudice exists where the defendant "took actions or suffered consequences that it would not have, had the plaintiff brought suit promptly." *Danjaq*, 263 F.3d at 955. Actions giving rise to prejudice include "continuing investments and outlays … in connection with the operation of its business." *Id.* The complaint makes clear that plaintiffs cannot rebut this presumption. For example, as plaintiffs allege, Facebook undertook to monetize Instagram, Compl. ¶ 263, and the product is now a key component of Facebook's business, *id.* ¶¶ 264-267, 270. This Court should not permit "plaintiffs to sleep through their [purported] competitors' [alleged] antitrust violations and then sue many years later," as "[t]he potential for economic disruption is so great" from a belated suit of this nature. *ITT*, 518 F.2d at 927.[1]

### B.     No Tolling Theory Applies

Plaintiffs appear to be acutely aware that their allegations are time-barred. Plaintiffs thus seek to toll the limitations and laches periods through allegations of fraudulent concealment set forth in a total of two paragraphs of the Complaint. Compl. ¶¶ 386-387. These threadbare attempts are unavailing. Fraudulent concealment only operates to toll the limitations and laches periods if plaintiffs can allege that Facebook "affirmatively misled [them], and that [plaintiffs] had *neither actual nor constructive knowledge* of the facts giving rise to the claim despite [their] diligence in trying to uncover those facts." *Id.* (quoting *Conmar Corp. v. Mitsui & Co. (U.S.A.), Inc.*, 858 F.2d 499, 502 (9th Cir. 1988)) (emphasis in original); *Wood v. Santa Barbara Chamber*

---

[1] At a minimum, plaintiffs' request for the "fairly extraordinary remedy" of divestiture is "'barred as a matter of law'" based on "plaintiffs' delay in bringing their suit." *Taleff v. Southwest Airlines Co.*, 828 F. Supp. 2d 1118, 1124-1125 (N.D. Cal. 2011), *aff'd* 554 F. App'x 598 (9th Cir. 2014) (granting motion to dismiss private challenge under § 7 of Clayton Act).

1   *of Commerce, Inc.*, 705 F.2d 1515, 1521 (9th Cir. 1983) (fraudulent concealment "requires a

2   showing both that the defendant used fraudulent means to keep the plaintiff unaware of his cause

3   of action, and also that the plaintiff was, in fact, ignorant of the existence of his cause of action").

4   Both "the circumstances of the concealment and the facts supporting [plaintiffs'] due diligence"

5   must be pled with particularity in accordance with Federal Rule of Civil Procedure 9(b).

6   *Conmar*, 858 F.2d at 502; *Ryan v. Microsoft Corp.*, 147 F. Supp. 3d 868, 886 (N.D. Cal. 2015).

7         Plaintiffs' two paragraphs of fraudulent concealment allegations fail Rule 9(b)'s

8   requirements.  The Complaint vaguely alludes to "NDAs," "assertions of privilege and

9   confidentiality," and unspecified "lies" to third parties.  Compl. ¶ 386.  But to satisfy Rule 9(b),

10  "[p]laintiffs must allege 'an account of the time, place, and specific content of the false

11  representations as well as the identities of the parties to the misrepresentations.'"  *Ryan*, 147 F.

12  Supp. 3d at 886 (quoting *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007)).  Plaintiffs'

13  concealment allegations, many of which appear to refer to actions otherwise never mentioned in

14  the Complaint, "lack sufficient specificity to give [Facebook] notice of the particular misconduct

15  alleged to have been fraudulent." *Id.* at 887.

16        In any event, plaintiffs do not allege that Facebook concealed *anything* relevant to their

17  claims.  The acquisitions of Instagram and WhatsApp were publicly announced.  Instagram Press

18  Release, *supra*; WhatsApp Article, *supra*; *see also* Areeda & Hovenkamp, *Antitrust Law*, ¶

19  1205b (2014) ("A merger is a public act, and there is little basis for such limitation-tolling

20  doctrines as fraudulent concealment.").  With regard to the allegations surrounding the alleged

21  change of Facebook's API policy, the Complaint acknowledges that Facebook publicly

22  announced the change, and that details were made available on its "changelog."  Compl. ¶ 202.

23  To the extent plaintiffs were dependent upon the APIs in question, it is implausible that plaintiffs

24  would not have known they had lost access to this data or that they had not been invited to

25  contract for continued access.  *Id.* ¶¶ 19, 21, 23, 25; *see also id.* ¶ 119 (firms relying on APIs

26  "*abruptly* left with none of the social data they needed to function") (emphasis added), ¶¶ 153,

27  155 (describing firms' reactions to, and attempts to contract for continued access after, API

28

9

1  policy changes).  Thus, the face of the Complaint makes clear that plaintiffs had knowledge of

2  each of these facts, defeating any assertion of fraudulent concealment.  *Hexcel*, 681 F.3d at 1060;

3  *Beneficial Standard Life Ins. Co. v. Madariaga*, 851 F.2d 271, 275 (9th Cir. 1988) ("The plaintiff

4  is deemed to have had constructive knowledge if it had enough information to warrant an

5  investigation which, if reasonably diligent, would have led to the discovery[.]").

6       Furthermore, the "internal Facebook documents and communications" that appear in the

7  Complaint, Compl. ¶ 386, have no bearing on the merits of the claims.  This information speaks

8  only to Facebook's alleged "purpose and intent to engage in anticompetitive conduct."  *Id.* ¶ 387.

9  However, the focus of antitrust law is "upon the effect of [the alleged] conduct, not upon the

10  intent behind it."  *United States v. Microsoft Corp.*, 253 F.3d 34, 59 (D.C. Cir. 2001).  Indeed, "it

11  is elementary that [one merging party's] intentions in acquiring [the other merging party] are not

12  to be considered in determining whether a Section 7 Clayton Act violation occurred[.]"  *FTC v.*

13  *PepsiCo, Inc.*, 477 F.2d 24, 30 (2d Cir. 1973).  The same is true with respect to violations of

14  Sections 1 and 2 of the Sherman Act.  *E.g.*, *California Computer Prods., Inc. v. IBM Corp.*, 613

15  F.2d 727, 735 (9th Cir. 1979) (Section 2); *Geneva Pharms. Tech. Corp. v. Barr Labs. Inc.*, 386

16  F.3d 485, 507 (2d Cir. 2004) (Section 1).  The Complaint makes clear that plaintiffs were aware

17  of the alleged conduct and its alleged market effects.  Thus, plaintiffs' assertions about

18  Facebook's supposed concealment of an anticompetitive intent are both baseless and irrelevant

19  and cannot justify their delay in bringing their claims.

20  **II.    PLAINTIFFS HAVE NOT PLAUSIBLY ALLEGED ANTITRUST INJURY**

21       "Congress did not intend to allow every person tangentially affected by an antitrust

22  violation to maintain an action."  *Associated Gen. Contractors of Calif., Inc. v. California State*

23  *Council of Carpenters* ("*AGC*"), 459 U.S. 519, 535 (1983).  Rather, "[a]cknowledging that

24  Clayton Act § 4 and § 16 are written in broad terms, the Supreme Court has recognized the

25  importance of determining whether private parties are the appropriate plaintiffs to enforce the

26  antitrust laws by inquiring into their "antitrust standing" to seek relief under those sections."

27  *Feitelson*, 80 F. Supp. 3d at 1026 (citing *AGC*, 459 U.S. at 529-535).  A plaintiff's failure to

28

1   plausibly allege antitrust injury compels dismissal under Fed. R. Civ. P. 12(b)(6).  *Somers v.*

2   *Apple, Inc.*, 729 F.3d 953, 962 (9th Cir. 2013).

3          The Ninth Circuit has recognized that antitrust injury has five elements: "(1) unlawful

4   conduct, (2) causing an antitrust injury to the plaintiff, (3) that flows from that which makes the

5   conduct unlawful, [] (4) that is of the type the antitrust laws were intended to prevent," and (5)

6   that plaintiff is "consumer … or a competitor of the alleged violator in the restrained market."

7   *Somers*, 729 F.3d at 963.

8          Plaintiffs' purported injuries—all allegedly suffered as supposed competitors to, not

9   consumers of, Facebook in the purported markets—fail to satisfy these minimal requirements.

10   The Complaint fails to explain how Facebook's supposedly anticompetitive conduct caused any

11   of plaintiffs' alleged injuries—a defect that defeats all of plaintiffs' claims.  And plaintiffs do not

12   allege that they suffered *any* injury at all in one of the two markets they allege: the "social

13   advertising" market.  Furthermore, the alleged injuries relevant to plaintiffs' Sections 2 and 7

14   claims are entirely speculative, and no injury flows from any of the conduct forming the basis of

15   their Sections 1 and 7 claims.

16          **A.       Plaintiffs Fail To Allege Causal Antitrust Injury**

17          The Complaint merely recites the elements of the injury required to obtain relief under

18   Section 4 of the Clayton Act:  an injury to "business or property," Compl. ¶¶ 411, 419, 426, 431,

19   440; *see* 15 U.S.C. § 15(a) ("any person who shall be injured in his business or property … may

20   sue …"), and makes the conclusory assertions that plaintiffs "had their business and assets

21   destroyed" and "have been excluded from the Relevant Markets," Compl. ¶ 385.  But plaintiffs

22   never allege any facts to support that they were, in fact, excluded from either of the alleged

23   markets, let alone that they were excluded by Facebook's alleged conduct.  And some of

24   plaintiffs' conclusory allegations are contradicted by other statements in the Complaint.  For

25   example, plaintiff Lenddo alleges that it is presently "a market leader in alternative credit scoring

26   and identify verification." *Id.* ¶ 21.  This allegation cannot be reconciled with plaintiffs' theory

27   of exclusion.  And at bottom, plaintiffs' "naked assertion[s] of antitrust injury" are "not enough."

28

FACEBOOK'S NOTICE OF AND MOTION TO DISMISS; MEMORANDUM IN SUPPORT THEREOF

1    *NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 451 (6th Cir. 2007).  Rather, an antitrust claimant must

2    put forth "factual allegations plausibly suggesting (not merely consistent with) antitrust injury."

3    *Id*.  Plaintiffs have completely failed to do so.

4            What is more, plaintiffs fail to explain why, absent Facebook's alleged conduct, they

5    "would [not] have suffered the same injur[ies]."  *Lucas Auto. Eng'g, Inc. v.*

6    *Bridgestone/Firestone, Inc.*, 140 F.3d 1228, 1233 (9th Cir. 1998).  The Complaint does allege

7    that each plaintiff's business relied on Facebook data in some manner or form.  Compl. ¶¶ 19,

8    21, 23, 25.  However, after an extensive description of Facebook's purportedly anticompetitive

9    scheme to exclude rivals from the market—during the course of which only one plaintiff is

10   mentioned by name, in passing, *id.* ¶ 190—plaintiffs simply allege that they were injured, *id.* ¶¶

11   384-385.  The unstated implication seems to be that, because plaintiffs were dependent on

12   Facebook data and Facebook stopped providing them that data, Facebook necessarily caused

13   their injuries.  But plaintiffs never allege facts establishing, as they must, that their purported

14   injury was "attributable to an anticompetitive aspect of the practice under scrutiny."  *Atlantic*

15   *Richfield Co. v. USA Petroleum Corp.*, 495 U.S. 328, 344 (1990).  For instance, plaintiffs do not

16   describe why their businesses were unable to survive or compete effectively because of

17   Facebook's alleged exclusionary conduct, or by the same token, any facts to support a claim that

18   they would have had any likelihood of successfully competing had all of the challenged conduct

19   *not* occurred.  *See Bourns, Inc. v. Raychem Corp.*, 331 F.3d 704, 711 (9th Cir. 2003) ("Only an

20   actual competitor or one ready to be a competitor can suffer antitrust injury.").

21           And plaintiffs do not plausibly allege that they were unable to compete by means other

22   than reliance on Facebook data.  To the contrary, Plaintiffs' allegations concerning Instagram

23   and WhatsApp suggest that access to Facebook APIs is unnecessary to compete in either of the

24   purported markets.  Compl. ¶ 261 (independent competitor "Instagram posed an existential threat

25   to Facebook"); ¶ 287 ("WhatsApp was built on a social network derived directly from a

26   smartphone user's contact list.  It did not require Facebook's graph network for growth[.]").

27   Thus, Plaintiffs "[a]t most … make[] general grievances about how [Facebook's] allegedly anti-

28

1    competitive conduct may have affected [Facebook's] consumers or competitors."  Order

2    Granting Motion to Dismiss at 5, *Ackers v. Google LLC*, 5:19-cv-05537-BLF, ECF No. 26 (N.D.

3    Cal. Jan. 2, 2020).  That is not enough to allege causal antitrust injury.

4         **B.    Plaintiffs Have Not Alleged Antitrust Injury In The "Social Advertising"**
          **Market**

5

6         With respect to the purported "social advertising" market, the Complaint fails to make the

7    threshold allegation necessary to establish antitrust injury that plaintiffs are "participant[s] in the

8    same market as the alleged malefactors."  *Glen Holly Entm't, Inc. v. Tektronix, Inc.*, 343 F.3d

     1000, 1008 (9th Cir. 2003).

9

10        Plaintiffs allege that they are or were corporations that developed technology platforms

11   that utilized Facebook API data.  Compl. ¶¶ 18-25.  They purport to bring their claims on behalf

12   of a "developer" class consisting of entities "who were excluded from the Social Data Market or

13   injured by Facebook's decision to withdraw the Graph APIs[.]" *Id.* ¶ 389.  But at no point does

14   the Complaint allege that plaintiffs suffered injury as competitors or customers in the "social

     advertising" market.

15

16        *Feitelson* is instructive.  In that case, the plaintiffs alleged "that they suffered antitrust

17   injury in the form of supracompetitive pricing in Android phones" as a result of the defendant's

18   alleged monopolization of two purported "Internet search market[s]."  80 F. Supp. 3d at 1022,

19   1027-1028.  This Court held that plaintiffs had not adequately alleged antitrust injury, in part,

20   because their alleged injury occurred outside "the market in which the alleged anticompetitive

21   conduct occurred."  *Id.* at 1028.  The same is true here.  The Complaint offers no allegations of

22   harm to the plaintiffs in the social advertising market.  At best, plaintiffs make the conclusory

23   assertion that Facebook "raised prices … for social advertising," Compl. ¶ 381; but as purported

24   competitors of Facebook, plaintiffs should *welcome* higher prices.  They are certainly not injured

25   by them.  *See Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 583

26   (1986) (When allegedly anticompetitive behavior "[has] the effect of either raising market price

27   or limiting output" and is therefore "harmful to competition," it "actually *benefit[s]*

28

13

FACEBOOK'S NOTICE OF AND MOTION TO DISMISS; MEMORANDUM IN SUPPORT THEREOF

competitors.").  In other words, these are not "the appropriate plaintiffs to enforce the antitrust laws" in this purported market.  *Feitelson*, 80 F. Supp. 3d at 1026.

### C.   Plaintiffs Lack Antitrust Standing To Bring Their Monopolization And Attempted Monopolization Claims (Counts I and II)

Plaintiffs allege in a circular fashion that the "injury" flowing from Facebook's alleged exclusionary conduct is that they were excluded from the relevant markets and prevented from "staging an entry that could threaten Facebook's dominant position in the Relevant Markets." Compl. ¶ 385.  The Complaint alleges no non-conclusory facts to render this assertion plausible.

Plaintiffs have claimed to be in a vertical relationship with Facebook, wherein Facebook supplied data that plaintiffs used to offer their products.  Compl. ¶¶ 19, 21, 23, 25; *see also id.* ¶ 217 (alleging that "Whitelist and Data Sharing agreements" form "a hub and spoke scheme," which necessarily involves a vertical agreement).  But they go on to allege that they suffered injury as putative "horizontal … competitors" in the purported relevant markets when Facebook stopped making that data available.  *Id.* ¶ 368.  Plaintiffs have skipped a step.  The Complaint provides no information about their plans to successfully enter either of the relevant markets. For example, plaintiffs do not explain how their dating sites and other apps would have generated "social data" or served as a platform for "social advertising."

A purported antitrust injury cannot require a court to "create in hindsight a technological universe that never came into existence."  *Kloth* 444 F.3d at 324.  But that is precisely what plaintiffs' theory of injury requires.  The plaintiffs ask the Court to assume a world in which dating sites and other similar apps would have emerged as viable "social data" competitors and were prevented from doing so because of Facebook's API policy change.  This theory is "entirely too conclusory and speculative."  *Feitelson*, 80 F. Supp. 3d at 1029.

Moreover, the Complaint alleges that there are significant barriers to entry in both purported markets irrespective of anything Facebook has done.  These include "capital, technology and labor," "the high cost of development, data management, talent acquisition and retention, server infrastructure, development infrastructure, software technology, software libraries, and a brand and marketing presence sufficient enough to attract an engaged user base."

1    Compl. ¶¶ 352, 357.  These barriers "effectively exclude[] entry by a new competitor."  *Id.* ¶

2    353.  As an example, plaintiffs point to Google+, which failed notwithstanding "all of its

3    resources, developers and [Google's] existing user base."  *Id.* ¶ 72.  Plaintiffs effectively concede

4    that these barriers exist in both purported markets.  *Id.* ¶ 348 ("Without a critical mass of social

5    data, market participants in the Social Data and Social Advertising Markets cannot generate

6    revenue").

7          But plaintiffs do not allege that they had any of the resources that they concede are

8    necessary to enter these purported markets, let alone at a scale that would "threaten Facebook[]."

9    Compl. ¶ 385.  And it is implausible that plaintiffs' dating, financial services, and other apps

10   would have somehow managed to overcome these barriers by other means.  *See Raychem*, 331

11   F.3d at 712 ("a nascent business—one that is merely a gleam in the eye and a hope in the heart of

12   its promoters—does not possess the property to which antitrust injury can be done.").  Indeed,

13   plaintiffs allege that both "strong reach and strong engagement" among users is necessary to

14   effectively compete with Facebook, Compl. ¶ 229, but never allege that they had, or had any path

15   to attain either.  Thus, there are "no facts alleged that would render these threatened injuries

16   more concrete than hypothetical, as there are no facts alleged to indicate that [Facebook's]

17   conduct has prevented [plaintiffs] from" entering the relevant markets.  *Feitelson*, 80 F. Supp. 3d

18   at 1029.  This "injury" is insufficient because "nothing but speculation informs the claim of

19   injury by reason of the alleged" exclusionary conduct.  *ACG*, 459 U.S. at 543.

20         **D.      Plaintiffs Lack Antitrust Injury To Bring Their Section 1 Claim (Count III)**

21         To establish antitrust injury, a plaintiff "must prove that [their] alleged injury 'flows from

22   that which makes [Facebook's] acts unlawful.'"  *Lucas Auto.*, 140 F.3d at 1233 (quoting *Cargill*,

23   479 U.S. at 113).  Section 1 governs only concerted action and "does not reach conduct that is

24   wholly unilateral."  *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 768 (1984).

25   Therefore, to maintain a Section 1 claim, plaintiffs must allege an injury that flows from some

26   allegedly unlawful form of concerted action.  *Big Bear Lodging Ass'n v. Snow Summit, Inc.*, 182

27   F.3d 1096, 1102 (9th Cir. 1999).

28

1    They do not.  Plaintiffs' Section 1 claim is instead predicated on the theory that

2    Facebook's unilateral practice of "*requiring* Whitelist and Data Sharing agreements by

3    competitors [] ensured that these competitors … could not become alternative platforms for

4    developers." Compl. ¶ 372 (emphasis added).  Thus, plaintiffs' injury is not alleged to have been

5    caused by the agreements themselves.  Instead, plaintiffs argue that they were injured by

6    Facebook's alleged unilateral decision to limit API access to those developers who signed the

7    agreements.  Because the alleged injury emerges from solely unilateral conduct, plaintiffs have

8    not adequately alleged antitrust injury.  *See Pool Water Prods. v. Olin Corp.*, 258 F.3d 1024,

9    1034 (9th Cir. 2001).

10    And regardless, plaintiffs have failed to explain how the agreements themselves could

11    have plausibly caused their injuries.  There is no allegation, for example, that the agreements

12    foreclosed the signatories from providing "social data" to entities other than Facebook.  *Cf.*

13    *Omega Envtl., Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1162 (9th Cir. 1997) (a vertical agreement

14    like exclusive dealing violates § 1 only if its effect is to "foreclose competition in a substantial

15    share of the line of commerce affected[.]").  Plaintiffs thus have not established that, absent the

16    agreements, these counterparties would have served as alternative platforms upon which they

17    could have built their apps.  *Lucas Auto.*, 140 F.3d at 1233.

18    **E.    Plaintiffs Did Not Suffer Antitrust Injury From the Acquisitions And**
          **Integration Of Instagram And WhatsApp (Counts IV and V)**

19

20    Plaintiffs challenge—again as would-be competitors—Facebook's acquisitions and

21    integration of Instagram and WhatsApp.  To establish competitor standing to bring a Section 7

22    claim, plaintiffs must demonstrate that they would not "have suffered the identical 'loss'" absent

23    the challenged acquisition.  *Brunswick*, 429 U.S. at 487 (1977).  They have not done so.

24    As with their monopolization and attempted monopolization claims, plaintiffs' theory of

25    injury is entirely speculative.  The injury plaintiffs claim that they suffered is that Instagram and

26    WhatsApp do not serve as "alternative platforms upon which developers excluded by Facebook's

27    API removal could build their apps."  Compl. ¶ 376.  This claimed injury again requires the

28    Court to imagine an alternative "technological universe" wherein Instagram and WhatsApp

16

1    freely provide user data to putative competitors.  *Kloth*, 444 F.3d at 324.  But there is no

2    allegation that, if some other firm had acquired Instagram and WhatsApp, that firm would have

3    made their data available.  Nor do plaintiffs make any claim about whether standalone Instagram

4    and WhatsApp would have elected to make themselves available as alternative platforms to

5    plaintiffs—or were even capable of doing so.  Indeed, the Complaint makes clear that "Instagram

6    had not at the time of the acquisition meaningfully monetized its user engagement and social

7    data," Compl. ¶ 263, and WhatsApp's founders were averse to monetization, *see* Compl. ¶ 297.

8    Such an injury, based on "nothing but speculation," *ACG*, 459 U.S. at 543, and untethered to the

9    challenged acquisitions, is not an antitrust injury.  *Lucas Auto.*, 140 F.3d at 1228.

10         For largely the same reasons, plaintiffs lack antitrust standing to bring their Section 2

11   claims against these acquisitions and integrations.  The firms' willingness and ability to serve as

12   an alternative platform is thus entirely speculative, as is the purported injury, which thus cannot

13   provide a basis for antitrust standing.  *Feitelson*, 80 F. Supp. 3d at 1029.

14   **III.    PLAINTIFFS HAVE FAILED TO STATE A CLAIM**

15         **A.    The Product Markets Alleged Are Implausible**

16         An antitrust complaint that lacks allegations comporting with the "legal principles that

17   govern the definition of an antitrust 'relevant market'" is "facially unsustainable" and must be

18   dismissed.  *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1120 (9th Cir. 2018) (quoting *Newcal*

19   *Indus., Inc. v. Ikon Office Solution*, 513 F.3d 1038, 1045 (9th Cir. 2008)); *see also NSS Labs, Inc.*

20   *v. Symantec Corp.*, 2019 WL 3804679, at *9 (N.D. Cal. Aug. 13, 2019) (Freeman, J.).  Plaintiffs'

21   failure to allege a valid market dooms each of their claims.

22         A properly alleged product market includes both "the product at issue as well as all

23   economic substitutes for the product."  *Hicks*, 897 F.3d at 1120.  Thus, "the product market

24   includes the pool of goods or services that enjoy reasonable interchangeability of use and cross-

25   elasticity of demand."  *Oltz v. St. Peter's Cmty. Hosp.*, 861 F.2d 1440, 1446 (9th Cir. 1988).

26   "While plaintiffs need not plead a relevant market with specificity," *Hicks*, 897 F.3d at 1120,

27   they "must provide enough facts [about the relevant market] to enable the opposing party to

28

1    defend itself effectively," *Bay Area Surgical Mgmt. LLC v. Aetna Life Ins. Co.*, 166 F. Supp. 3d

2    988, 997 (N.D. Cal. 2015) (Freeman, J.) (quotations and citation omitted).  The Complaint fails

3    to meet these minimal pleading requirements with respect to both product markets alleged.  This

4    Court should reject plaintiffs' attempt to arbitrarily gerrymander a market that is "'not natural,'

5    'artificial,' and 'contorted to meet their litigation needs.'"  *Hicks*, 897 F.3d at 1121.

6              **1.      The "Social Data" Market**

7              Plaintiffs' alleged "social data" market is implausible.  As an initial matter, while the

8    Complaint offers examples of "social data," it fails to allege the contours of the market, who

9    participates in the market, and why "social data" is not interchangeable with other forms of data.

10   This is plainly insufficient.

11             To begin, the contours of the "social data" market are entirely unclear.  Plaintiffs do

12   allege that social data "arises from engagement within a social network among its users," Compl.

13   ¶ 321, but they also allege that "social data" may also include data about "web and mobile traffic

14   outside of the social network," *id.* ¶ 316.  It is thus unclear just how far beyond direct

15   engagement with the social network the "social data" penumbra extends.  Elsewhere, plaintiffs

16   indicate that social data can emerge from contacts in a smartphone (thus placing both the Apple

17   and Android operating systems in the relevant market), *id.* ¶ 287, and from sending messages to

18   friends (again, placing Apple and Android in the relevant market), *id.* ¶ 321.[2]  The Complaint

19   alleges that a credit card statement provides data, but not social data.  *Id.* ¶ 321.  Of course, this

20   one conclusory allegation hardly makes clear where the relevant market begins or ends.  *See*

21   *Newcal*, 513 F.3d at 1045 (to properly allege a relevant market, plaintiffs must "define [its]

22   boundaries").

23             Nor are plaintiffs clear about who participates in the Social Data Market.  According to

24   plaintiffs, "market participants in the Social Data Market [] sell user data," Compl. ¶ 318, and

25   "[a]ll" social data is "used to sell targeted advertising on an advertising platform," *id.* ¶ 317, but

26

27   _____

     [2] Facebook does not have monopoly power if the Apple and Google smartphone operating

28   systems are market participants.  This is also fatal to plaintiffs' claims.

1    at the same time "not all participants in the Social Data Market monetize their social data," *id.* ¶

2    325.  The Complaint thus contradicts itself as to whether monetization is required for market

3    participation.  This vague and meandering description of the market participants is insufficient.

4    *See Tanaka v. University of S. Calif.*, 252 F.3d 1059, 1063 (9th Cir. 2001) ("Failure to identify a

5    relevant market is a proper ground for dismissing a Sherman Act claim."); *Sidibe v. Sutter*

6    *Health*, 4 F. Supp. 3d 1160, 1176 (N.D. Cal. 2013) (product market implausible where "medical

7    specialties" each alleged to constitute separate product market were "not clearly defined"

8    because "each specialty market includes services performed by doctors, nurse practitioners, or

9    other non-physician providers, and may be rendered in hospitals (on an outpatient basis), in

10   ambulatory surgery centers, or in physicians' offices").

11         In any event, the market is legally insufficient as pled because it does not "encompass …

12   all economic substitutes for the product."  *Newcal*, 513 F.3d at 1045.  While plaintiffs ascribe

13   talismanic significance to the word "social," plaintiffs do not explain why—or even allege that—

14   other forms of data are not reasonably interchangeable for antitrust purposes with social data.

15   According to plaintiffs, social data is data that "reveals the preferences, affiliations, proclivities,

16   political leanings, or other attributes of the user."  Compl. ¶ 320.  But in the exercise of "judicial

17   experience and common sense," *Hicks*, 897 F.3d at 1121, it is readily apparent that data derived

18   from "unilateral user conduct" on "[m]essage boards and video sharing sites," Compl. ¶ 322,

19   among many other sources of data would also reveal such user preferences and attributes.

20   Indeed, even a credit card statement could reveal similar data if, for example, the credit card is

21   used to make political contributions.  It also defies logic to believe that there would not be

22   significant cross-elasticity of demand between data about "a user's interaction with a news

23   article" and "that user's decision to share that news article with his friends."  *Id.* ¶ 320; *see Olin*

24   *Corp. v. FTC*, 986 F.2d 1295, 1298 (9th Cir. 1993) (cross-elasticity of demand occurs where "an

25   increase in the price of one product leads to an increase in demand for another").  Plaintiffs in

26   fact concede that the former "may be valuable for" the same "advertising targeting" for which

27   they allege "social data" is used.  Compl. ¶¶ 320, 317.

28

FACEBOOK'S NOTICE OF AND MOTION TO DISMISS; MEMORANDUM IN SUPPORT THEREOF

1        The Complaint also does not plausibly allege that "social data" is economically distinct

2 from any other form of data.  For example, the conclusory assertion that "social data" is "unique"

3 because it facilitates targeted advertising based on "granular attributes," Compl. ¶ 317, is not

4 supported by any factual allegations that other forms of data fail to achieve the same level of

5 granularity.  That, too, is insufficient.  *See Tanaka*, 252 F.3d at 1063-1064 ("conclusory assertion

6 that the 'UCLA women's soccer program' is 'unique'" insufficient to support "limitation of the

7 relevant product market").

8        Finally, plaintiffs suggest that they are or were horizontal competitors of Facebook.

9 Compl. ¶ 326.  That is, plaintiffs contend that they can "replace" Facebook.  Areeda &

10 Hovenkamp ¶ 565a ("Substitutes are goods that can replace one another and compete for the

11 user's purchase.").  But the Complaint fails to allege any facts to support this conclusion.  To the

12 contrary, the plaintiffs allege that they *depended* on Facebook for critical inputs and without

13 those inputs, were unable to compete.  Compl. ¶¶ 19, 21, 23, 25; Areeda & Hovenkamp, ¶ 565a

14 (complementary products belong in different relevant markets).

15          **2.**     **The "Social Advertising" Market**

16        The "social advertising" market is similarly implausible.  "[M]any courts have rejected

17 antitrust claims reliant on proposed advertising markets limited to a single form of advertising,"

18 and this Court should do the same.  *Hicks*, 897 F.3d at 1123; *Kinderstart.com, LLC v. Google,*

19 *Inc.*, 2007 WL 831806, at *6 (N.D. Cal. Mar. 16, 2007) ("[T]here is no logical basis for

20 distinguishing the Search Ad Market from the larger market for Internet advertising … search-

21 based advertising is reasonably interchangeable with other forms of Internet advertising.");

22 *America Online, Inc. v. GreatDeals.Net*, 49 F. Supp. 2d 851, 858 (E.D. Va. 1999) (dismissing

23 plaintiff's monopolization claim in part because it attempted to "restrict the market to e-mail

24 advertising [even though] [t]here are numerous substitutes for email advertising.").  Plaintiffs'

25 circular and conclusory allegation that "social advertising"—which apparently means

26 "[a]dvertising sold on social networks"—is not interchangeable with alternative forms of

27

28

1   advertising because of "the extensive ability to target advertisements to users on social media

2   sites," Compl. ¶ 341, is insufficient to define a product market.

3       The Complaint provides no information about alternative advertising media's ability to

4   target users.  Its unstated implication—that advertisers could not and do not extensively target

5   consumers using other forms of media (e.g., by marketing through online display ads) is

6   untenable.  The allegation is therefore premised on an "implausible assumption that a distinct

7   group of" social media users "consumes no other forms of [] media or is uninfluenced by

8   advertisements in all other forms of [] media."  *Hicks*, 897 F.3d at 1122.

9       Furthermore, the relative ability of various advertising formats to target consumers is a

10  variation in product quality and is insignificant for purposes of defining an antitrust market.

11  "Courts have repeatedly rejected efforts to define markets by … product quality variances.  Such

12  distinctions are economically meaningless where the differences are actually a *spectrum* of …

13  quality differences."  *In re Super Premium Ice Cream Distrib. Antitrust Litig.*, 691 F. Supp.

14  1262, 1268 (N.D. Cal. 1988).  Plaintiffs may allege that social advertising is more effective than

15  other forms of advertising but those differences standing alone do not support a relevant market

16  limited to social advertising.

17      **B.    Plaintiffs Fail To State Monopolization And Attempted Monopolization
            Claims**

18      Plaintiffs' monopolization claims (Counts I and II) are premised on a theory—

19  contradictory to the antitrust laws—that Facebook was required to prop up potential competitors

20  by providing APIs to developers who could then create applications that might one day emerge

21  to compete with Facebook.  The Complaint admits as much, alleging that after the decision to

22  withdraw the APIs, Facebook was left with competition only from "entirely independent"

23  companies.  Compl. ¶ 373.  But "there is no duty to aid competitors."  *MetroNet Servs. Corp. v.*

24  *Qwest Corp.*, 383 F.3d 1124, 1131 (9th Cir. 2004) (quoting *Verizon Commc'ns Inc. v. Law*

25  *Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 411 (2004)).  For that reason, Section 2 does not

26  generally impose any limitations on a competitor's ability to "exercise his own independent

27  discretion as to parties with whom he will deal."  *Trinko*, 540 U.S. at 408.  Instead, "[a]s a

28

21

1    general rule, businesses are free to choose the parties with whom they deal, as well as the prices,

2    terms, and conditions of that dealing." *Pacific Bell Tel. Co. v. Linkline Commc'ns, Inc.*, 555 U.S.

3    438, 448 (2009). Central to this rule is that firms are not required to "cooperate with rivals by

4    selling them products that would help the rivals to compete." *Schor v. Abbott Laboratories,* 457

5    F.3d 608, 610 (7th Cir. 2006).

6          Courts are "very cautious" to recognize any exceptions to this principle. *Trinko*, 540 U.S.

7    at 408. The narrow exception identified in *Aspen Skiing Co. v. Aspen Highlands Skiing Co.*, 472

8    U.S. 585 (1985), which exists "at or near the outer boundary of § 2 liability," *Trinko*, 540 U.S. at

9    409, and upon which plaintiffs clearly hope to rely, is inapplicable here.

10         The Court in *Aspen Skiing* affirmed a jury verdict that the defendant had monopolized the

11   market for downhill skiing services in Aspen, Colorado by discontinuing a successful joint ticket

12   program with a nearby competitor. 472 U.S. at 605-611. As the Supreme Court explained in

13   upholding the grant of a motion to dismiss in *Trinko*, *Aspen Skiing*'s rare deviation from general

14   Section 2 principles was justified by its unusual facts. The fact that the defendant had originally

15   agreed to offer a joint lift ticket with the plaintiff suggested that the arrangement offered a net

16   benefit to the defendant—perhaps because it helped to attract skiers, who could choose among

17   many different ski areas, to Aspen. The termination of that arrangement, the particular facts

18   related to the negotiations—in which the defendant rejected favorable divisions of revenue—and

19   the fact that the defendant refused even to sell lift tickets to the plaintiff at full retail price, when

20   taken together, suggested that the defendant was willing to incur short-term losses to drive the

21   plaintiff from the market and achieve a monopoly. *See Trinko*, 540 U.S. at 409 (defendant's

22   "unilateral termination of a voluntary (and thus presumably profitable) course of dealing

23   suggested a willingness to forsake short-term profits to achieve an anticompetitive end"); *see*

24   *also Viamedia, Inc. v. Comcast Corp.*, 2020 WL 879396, at *24-*25 (7th Cir. Feb. 24, 2020)

25   (overruling dismissal of duty to deal claim but noting that dismissal *is* appropriate where there

26   are no plausible allegations that the defendant "refus[ed] to sell to rivals on the same terms as

27   other potential buyers.").

28

1    Here, plaintiffs do not allege the existence of a cooperative venture.  Instead, plaintiffs

2    complain that Facebook, after initially making certain data available to developers through APIs,

3    modified those APIs, restricting access to certain data.  But precedent demonstrates that the mere

4    withdrawal of a desired input provides no basis for an unlawful-refusal-to-deal claim.  For

5    example, in *Novell, Inc. v. Microsoft Corp.*, Microsoft gave independent software vendors access

6    to a pre-release version of Windows 95 so they could develop compatible programs, "increasing

7    the utility of the operating system for users" and "sales for Microsoft."  731 F.3d 1064, 1067

8    (10th Cir. 2013) (Gorsuch, J.).  But Microsoft later revoked this access and instead give its

9    proprietary applications the "competitive advantage" of "being the first applications useable on

10   Windows 95."  *Id.* at 1068-1069.  The Court found no Section 2 violation because nothing about

11   the "discontinuation of this arrangement suggested a willingness to sacrifice short-term profits,

12   let alone in a manner that was irrational but for its tendency to harm competition."  *Id.* at 1076.

13   Likewise, in *Olympia Equipment Leasing Co. v. Western Union Telegraph Co.*, 797 F.2d

14   370 (7th Cir. 1986) (Posner, J.), the defendant had encouraged its sales force to push

15   independently supplied terminals; this promoted equipment sales by the plaintiff, which captured

16   a substantial share while the arrangement was in place.  *See id.* at 372-73.  But defendant later

17   changed its policy, preferring to sell its own inventory, and the plaintiff's sales evaporated;

18   despite independent competitive efforts, plaintiff went out of business.  *See id.* at 373.  The

19   Seventh Circuit reversed a jury verdict in favor of the plaintiffs, rejecting the purported analogy

20   to *Aspen Skiing*.  For one thing, the Court noted that imposition of liability for withdrawing

21   assistance provided to a competitor would strongly discourage a potential defendant from

22   offering the assistance in the first place.  *See id.* at 375.  For another, there was no allegation that

23   the plaintiff could not have pursued independent competitive efforts—notwithstanding the

24   advantage of relying on the assistance of the defendant.  *See id.* at 377-78.  The allegations in

25   this case are analogous to *Novell* and *Olympia*.  It is true that Facebook's decision to change its

26   access policy may have disappointed some app developers, and even that some may have failed

27

28

23

FACEBOOK'S NOTICE OF AND MOTION TO DISMISS; MEMORANDUM IN SUPPORT THEREOF

1   as a result (although the complaint does not so allege).  But that does not suggest any profit-

2   sacrifice by *Facebook*.

3            To be sure, plaintiffs allege that Facebook hoped that developers would make

4   applications that would "increase[] the value of the [Facebook's] network."  Compl. ¶ 93.  But

5   few businesses would initiate a course of dealing except in the hope that it will be profitable.

6   Both Facebook and the developers then continued offering their respective services on an

7   independent basis.  Facebook's subsequent decision to limit developer access to the APIs is

8   unremarkable—businesses everywhere change their product offerings, initiate and end

9   commercial partnerships, and modify or abandon lines of business based on past results.

10  Particularly given the novel technology at issue and the rapidly changing environment, which the

11  Complaint repeatedly notes, it is no surprise that Facebook's platform policies changed, and that

12  those changes redounded to the disadvantage of some businesses who preferred the status quo.

13  That cannot be enough to support a claim under Section 2 under governing precedent.  Far more

14  is needed to fit plaintiffs' allegations into the "discrete category of section 2 cases attacking a

15  firm's unilateral decisions about with whom it will deal and on what terms."  *Novell,* 731 F.3d at

16  1076.

17           Plaintiffs do not clear this hurdle by making a series of conclusory allegations that

18  Facebook's "decision to remove the APIs lacked any technical or business justification other

19  than to prevent a competitor from creating a competing social network."  Compl. ¶ 172; *see also*

20  *id.* ¶¶ 164, 167, 173, 179.  In the absence of a duty to deal—and plaintiffs fail to allege the basis

21  for one—Facebook has no obligation to justify its alleged policy change.  In any event, common

22  sense and the Complaint supply such justifications in abundance.  For instance, a court in this

23  district has recently recognized the importance of "allowing Facebook to exclude those who act

24  impermissibly on its platform and jeopardize user privacy."  *Stackla*, 2019 WL 4738288, at *5.

25           Furthermore, plaintiffs also do not allege—as they must—that Facebook offers access to

26  the Friends and News Feed APIs to anyone.  Compl. ¶ 207.  "One of the reasons for a general

27  'no duty to deal' rule is that enforced sharing" is not judicially administrable where "the

28

FACEBOOK'S NOTICE OF AND MOTION TO DISMISS; MEMORANDUM IN SUPPORT THEREOF

1    defendant does not already provide the product in an existing market or otherwise make it

2    available to the public." *MetroNet*, 383 F.3d at 1133.  It would thus be impractical for the Court

3    to mandate that Facebook re-open API access to plaintiffs, as the Court would be compelled to

4    act "as [a] central planner[], identifying the proper price, quantity, and other terms of dealing—a

5    role for which [it is] ill suited." *Trinko*, 540 U.S. at 408.

6         **C.    Plaintiffs Fail To State A Section 1 Claim**

7              Plaintiffs' Section 1 claim (Count III) is an incoherent "hub-and-spoke" theory.  "A

8    traditional hub-and-spoke conspiracy has three elements: (1) a hub, such as a dominant

9    purchaser; (2) spokes, such as competing manufacturers or distributors that enter into vertical

10   agreements with the hub; and (3) the rim … which consists of horizontal agreements among the

11   spokes." *In re Musical Inst. & Equip. Antitrust Litig.*, 798 F.3d 1186, 1192 (9th Cir. 2015).

12            Plaintiffs allege the existence of agreements between Facebook and firms with which it

13   "horizontally competes."  Compl. ¶ 326.  But even assuming these could qualify as the requisite

14   vertical agreements, plaintiffs allege no agreements in the rim of the wheel.  Nor can the Court

15   infer such coordination.  "Plaintiffs must plead 'something more,' 'some further factual

16   enhancement,' a further circumstance pointing toward a meeting of the minds of the alleged

17   conspirators." *Musical Instruments*, 798 F.3d at 1193.  The Section 1 claim accordingly fails.

18        **D.    Plaintiffs' Claim For Injunctive Relief Must Be Dismissed**

19            This Court should dismiss "Count VI" for "Injunctive Relief and Divestiture."  Plaintiffs'

20   bizarre series of demands under this "count" fail to state a claim.  It is well-settled that

21   "injunctive relief" is not an independent cause of action. *E.g.*, *Mangindin v. Washington Mut.*

22   *Bank*, 637 F. Supp. 2d 700, 709 (N.D. Cal. 2009); *see also Kendall v. Visa U.S.A., Inc.*, 518 F.3d

23   1042, 1051 (9th Cir. 2008) ("Section 16 [of the Clayton Act] does not furnish an independent

24   cause of action.").  Accordingly, this purported cause of action should be dismissed.

25                                **CONCLUSION**

26            This Court should grant Facebook's motion to dismiss.

27

28

1    Dated:  March 16, 2020                    Respectfully submitted,

2

3                                              By: /s/ Sonal N. Mehta

4                                              Sonal N. Mehta (SBN: 222086)
                                               WILMER CUTLER PICKERING HALE AND
5                                              DORR LLP
                                               950 Page Mill Road
6                                              Palo Alto, California 94303
                                               Telephone:  (650) 858-6000
7                                              Facsimile:  (650) 858-6100
                                               Email:  Sonal.Mehta@wilmerhale.com
8

9                                              David Z. Gringer (*pro hac vice*)
                                               WILMER CUTLER PICKERING HALE AND
10                                             DORR LLP
                                               1875 Pennsylvania Avenue NW
11                                             Washington, DC 20006
                                               Telephone:  (202) 663-6000
12                                             Facsimile:  (202) 663-6363
                                               Email:  David.Gringer@wilmerhale.com
13

14
                                               Attorneys for Defendant Facebook, Inc.
15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## CERTIFICATE OF SERVICE

2      I hereby certify that on this 16th day of March 2020, I electronically transmitted the

3 foregoing document to the Clerk's Office using the CM/ECF System.

4

5                                        /s/ Sonal N. Mehta
                                         Sonal N. Mehta
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28