Yavar Bathaee (CA 282388)
yavar@bathaeedunne.com
Brian J. Dunne (CA 275689)
bdunne@bathaeedunne.com
Edward M. Grauman (*pro hac vice*)
egrauman@bathaeedunne.com
BATHAEE DUNNE LLP
445 Park Avenue, 9th Floor
New York, NY 10022
Tel: (332) 205-7668

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

| | |
|---|---|
| REVEAL CHAT HOLDCO, LLC, a Delaware limited liability company, USA TECHNOLOGY AND MANAGEMENT SERVICES, INC. (d/b/a Lenddo USA), a Delaware corporation, CIR.CL, INC., a dissolved Delaware corporation, and BEEHIVE BIOMETRIC, INC., a dissolved Delaware corporation, <br><br> Plaintiffs, <br><br> v. <br><br> FACEBOOK, INC., a Delaware corporation, <br><br> Defendant. | Case No.: 5:20-cv-00363-BLF <br><br> PLAINTIFFS' CORRECTED MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO FACEBOOK'S MOTION TO DISMISS THE CLASS ACTION COMPLAINT |

1

# TABLE OF CONTENTS

2    INTRODUCTION ........................................................................................................1

3    BACKGROUND .........................................................................................................1

        A.    The Mobile Threat to Facebook's Business ...........................................1

4        B.    Facebook's Profitable Platform .............................................................1

5        C.    Facebook Devises and Executes Its Anticompetitive Scheme ...........2

6        D.    The Instagram and WhatsApp Threats ..................................................4

7    ARGUMENT ...............................................................................................................5

8    I.     THE CAC PLAUSIBLY ALLEGES A SECTION 2
        MONOPOLIZATION CLAIM ..........................................................................5

9        A.    The CAC Alleges Willful Acquisition or Maintenance of
               Monopoly Power ...................................................................................5

10           1.    The CAC Alleges a Scheme to Monopolize the
11                   Relevant Markets ..........................................................5

12           2.    Facebook Cannot Dismember the API Withdrawal
                   from the Scheme ...........................................................7

13           3.    The API Withdrawal by Itself Is an Anticompetitive Refusal to Deal
14                   under *Aspen Skiing*...........................................................7

        B.    The CAC Adequately Pleads that Facebook Possessed
15               Market Power ......................................................................................10

16           1.    The Social Data Market .................................................11

17           2.    The Social Advertising Market .....................................14

        C.    The CAC Pleads Attempted Monopolization of the
18               Relevant Markets ................................................................................15

19        D.    The CAC Alleges Antitrust Injury Resulting from
               Facebook's Scheme ...........................................................................16

20    II.    THE CAC PLAUSIBLY ALLEGES A CLAIM UNDER SECTION 1 OF THE
21        SHERMAN ACT .............................................................................................17

22    III.   THE CAC PLAUSIBLY ALLEGES A CLAYTON ACT
        SECTION 7 CLAIM .......................................................................................18

23    IV.   PLAINTIFFS' CLAIMS ARE TIMELY .......................................................19

24        A.    Plaintiffs' Sherman Act Claims Are Timely Under the Fraudulent
               Concealment Doctrine ........................................................................19

25        B.    Plaintiffs' Clayton Act Section 7 and Injunctive Relief Claims
26               Are Timely ..........................................................................................24

        C.    Count V Is Indisputably Timely as to Post-January 2016
27               Conduct/Damages ..............................................................................25

28    CONCLUSION ...........................................................................................................26

PLAINTIFFS' CORRECTED MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
FACEBOOK'S MOTION TO DISMISS THE CLASS ACTION COMPLAINT

# TABLE OF AUTHORITIES

## Cases

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
  472 U.S. 585 (1985) ....................................................................*passim*

*Beneficial Standard Life Ins. Co. v. Madariaga*,
  851 F.2d 271, 275 (9th Cir. 1988) ...............................................20

*Blue Shield of Va. v. McCready*,
  457 U.S. 465 (1982) ......................................................................17

*Conmar Corp. v. Mitsui & Co. (U.S.A.), Inc.*,
  858 F.2d 499 (9th Cir. 1988) ........................................................20

*Cost Mgmt. Servs., Inc. v. Wash. Natural Gas Co.*,
  99 F.3d 937 (9th Cir. 1996) ..........................................................16

*Danjaq LLC v. Sony Corp.*,
  263 F.3d 942 (9th Cir. 2001) ........................................................24

*Free FreeHand Corp. v. Adobe Sys. Inc.*,
  852 F. Supp. 2d 1171 (N.D. Cal. 2012) ........................................25

*Hexcel Corp. v. Ineos Polymers, Inc.*,
  681 F.3d 1055 (9th Cir. 2012) .................................................20, 23

*Hicks v. PGA Tour, Inc.*,
  897 F.3d 1109 (9th Cir. 2018) ......................................................15

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*,
  125 F.3d 1195 (9th Cir. 1997) ........................................................8

*In re Glumetza Antitrust Litig.*,
  __ F. Supp. 3d __, 2020 WL 1066934 (N.D. Cal. Mar. 5, 2020) ............................23, 24

*In re NFL's Sunday Ticket Antitrust Litig.*,
  933 F.3d 1136 (9th Cir. 2019) ...........................................5, 7, 10, 17

*MetroNet Servs. Corp. v. Qwest Corp.*,
  383 F.3d 1124 (9th Cir. 2004) ........................................................8

*Midwestern Mach. Co. v. Nw. Airlines, Inc.*,
  392 F.3d 265 (8th Cir. 2004) ........................................................25

*Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*,
  472 U.S. 284 (1985) ......................................................................17

*Newcal Indus., Inc. v. Ikon Office Sol.*,
  513 F.3d 1038 (9th Cir. 2008) ......................................................13

## TABLE OF AUTHORITIES
(*continued*)

*Oliver v. SD-3C LLC*,
　　751 F.3d 1081 (9th Cir. 2014) ...................................................................... 24, 25

*Optronic Techs., Inc. v. Ningbo Summy Elec. Co., Ltd.*,
　　2019 WL 1429631 (N.D. Cal. Mar. 29, 2019) ................................................ 19

*Rebel Oil Co. v. Atl. Richfield Co.*,
　　51 F.3d 1421 (9th Cir. 1995) ......................................................................... 10

*Saint Alphonsus Medical Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*,
　　778 F.3d 775 (9th Cir. 2015) ......................................................................... 25

*Samsung Elecs. v. Panasonic Corp.*,
　　747 F.3d 1199 (9th Cir. 2014) ....................................................................... 25

*Thomsen v. W. Elec. Co.*,
　　512 F. Supp. 128 (N.D. Cal. 1981),
　　*aff'd*, 680 F.2d 1263 (9th Cir. 1982) ............................................................. 18

*United States v. E.I. du Pont de Nemours & Co.*,
　　353 U.S. 586 (1957) ....................................................................................... 18

*Viamedia, Inc. v. Comcast Corp.*,
　　951 F.3d 429 (7th Cir. 2020) ..................................................................... 7, 10

*Z Techs. v. Lubrizol Corp.*,
　　753 F.3d 594 (6th Cir. 2014) ......................................................................... 25

### Rules

FED. R. CIV. P. 9(b) ...................................................................................... 22

### Statutes

15 U.S.C. § 1 ..................................................................................... *passim*

15 U.S.C. § 2 ..................................................................................... *passim*

15 U.S.C. § 15b ................................................................................. 25

15 U.S.C. § 18 ................................................................................... 18

PLAINTIFFS' CORRECTED MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
FACEBOOK'S MOTION TO DISMISS THE CLASS ACTION COMPLAINT

**INTRODUCTION**

Facebook's Motion to Dismiss ("Motion" or "Mot.") is notable for one feat: it seeks to dismiss in its entirety a fact-laden, 451-paragraph Class Action Complaint ("CAC"), yet doesn't squarely address **any** of the specific facts underlying the CAC's well-pleaded antitrust claims. And Facebook's Motion doesn't just ignore the actual content of the CAC—it actually **affirmatively misstates** what the CAC says. About issue, after issue, after issue. This Opposition focuses on correcting the record, as the actual CAC on file in this action more than adequately pleads each challenged claim. Facebook's Motion should be denied in its entirety.

**BACKGROUND**

**A.       The Mobile Threat to Facebook's Business**

Facebook emerged from the social network wars against MySpace and Friendster victorious (CAC ¶¶ 4, 37-41, 340), with a Social Data Barrier to Entry ("SDBE") protecting its business (*id.* ¶¶ 5, 41, 44 56). The SDBE emerged from a critical mass of social data obtained by Facebook, which created a virtuous circle—the more social data Facebook obtained, the better it became at targeting content and advertising, which in turn attracted more engaged users and therefore more social data. (*Id.* ¶¶ 52-53.) This positive-feedback loop cemented Facebook's dominant position by late 2010 and allowed it to hike advertising prices, as Facebook consistently did for years. (*Id.* ¶¶ 55-60.) During the same period, a new threat to Facebook's business emerged from smart phone apps (*id.* ¶¶ 74-75), specialized applications that performed the same functions Facebook's desktop product performed (*id.* ¶¶ 78-79). Facebook's mobile app was behind and inferior (*id.* ¶¶ 86-87), and as Facebook barreled towards its 2012 initial public offering, it faced an existential threat from third-party apps, whose massive and growing user bases were generating user content and engagement with those third-party platforms (*id.* ¶¶ 83-84). Facebook quickly realized that the walled gardens of these mobile apps were rival social networks, with direct access to user address books. (*Id.* ¶¶ 6, 81.)

**B.       Facebook's Profitable Platform**

At first, Facebook enabled developers to interact with its proprietary social network, called the "Graph." (CAC ¶ 91.) This included allowing developers to use application programming

PLAINTIFFS' CORRECTED MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
FACEBOOK'S MOTION TO DISMISS THE CLASS ACTION COMPLAINT

interfaces ("APIs") on Facebook's developer platform (called "Platform") to create apps that could traverse Facebook's user network and interact with content posted on user timelines. (*Id.* ¶¶ 91-92, 109.) Developers that built mobile apps for Platform were able to buy advertising on Facebook's NEKO mobile advertising system. (*Id.* ¶ 112.) This allowed developers to advertise on Facebook itself for new users. (*Id.*) As Facebook's Michael Vernal wrote in a 2012 internal email, "[t]he biggest/most efficient market segment for advertising on mobile today is driving app installs." (*Id.* ¶ 106.) Facebook's plan by early 2012 was to grow that business, including by charging developers on a "cost-per-install" basis. (*Id.* ¶¶ 109-11.) But as Facebook publicly prepared to charge for API access through its Platform, Zuckerberg was making other plans.

## C. Facebook Devises and Executes Its Anticompetitive Scheme

Though Facebook had made substantial profits selling access to its social data through its APIs and the NEKO advertising system, it ultimately shelved plans to expand that business. (CAC ¶ 112.) By early 2012, Zuckerberg, Lessin, Vernal, and Facebook VP Javier Olivan debated a plan to prevent third-party developers from building mobile apps that could become rival social networks by engaging large, self-sustaining networks of users (which would allow these apps to make money by selling social data themselves). (*Id.* ¶ 113.) Facebook's first move was to refuse to sell social data to actively competing developers. (*Id.* ¶ 121.) In an August 2012 email, Vernal explained that Facebook would "not allow things which are at all competitive to 'buy' this data from us." (*Id.*) Facebook next turned to crippling and destroying apps that relied on its Platform.

By late 2011, Zuckerberg devised a plan to leverage the Platform to demand that potentially competitive mobile apps hand over their valuable social data, preventing them from eroding the SDBE and competing with Facebook. (CAC ¶¶ 113, 120.) Under Zuckerberg's "reciprocity" plan, Facebook evangelized the core functionality of its Platform, such as the ability to traverse a user's friend network and interact with news feeds, then leveraged reliance on that functionality to obtain "whitelisting" and data-sharing agreements from targeted developers, in which continued API access was conditioned upon handing their apps' valuable social data to Facebook. (*Id.* ¶¶ 11-12, 118, 124-26, 197-99.) This scheme ensured that Facebook's SDBE remained intact and that a potential competitor could not emerge. (*Id.* ¶¶ 12, 379-80.)

PLAINTIFFS' CORRECTED MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
FACEBOOK'S MOTION TO DISMISS THE CLASS ACTION COMPLAINT

In May 2012, Zuckerberg personally gave the go-ahead to begin shaking down developers, and his lieutenant, Vernal, communicated his orders to Facebook's senior executive team. (CAC ¶ 126.) In August 2012, Facebook VP David Fischer performed a detailed audit of mobile apps to identify "current and potential competitors," and came up with a list including "Social network apps," "Photo sharing apps," "Messaging apps," "Local apps," "Social search apps," and "Platforms." (*Id.* ¶ 127.) In other words, Facebook internally identified apps in these categories as direct competitors. (*Id.* ¶ 128.) Facebook then used its Onavo spying software to identify which of these apps were growing rapidly and thus posed a competitive threat. (*Id.* ¶¶ 157-58, 176, 227-30.) Facebook next targeted those apps for "reciprocity" agreements, while secretly preparing to remove access to core Platform APIs from any developers that did not cut a deal. (*Id.* ¶¶ 131-33.)

Facebook's senior executives and engineers knew there was no engineering or legitimate business justification for the removal of this core functionality from the Platform. (CAC ¶¶ 138, 168-74, 178.) As Platform engineer Bryan Klimt wrote internally to Ilya Sukhar in August 2013: the rumored reasons for the withdrawal were "pablum designed to make engineers think this decision has solid technical reasons"; the purported justification that the removal was meant to avoid "abuse[]" was "False"; any claim that there were alternatives to the APIs were also "False"; and none of "those reasons explains why we are doing this," because Facebook was "***doing this as a protectionist grab to make sure no one else can make a competing social network by bootstrapping with our social graph***." (*Id.* ¶¶ 168-71 (emphasis added).) Klimt further explained, "We're removing the core API in our developer platform. ***Out of concerns that someone will steal our social network product***." (*Id.* ¶ 171 (emphasis added).) Sukhar agreed, noting that he had been speaking to dozens of developers "who will get totally fucked by this and it won't even be for the right reason." (*Id.* ¶ 178.) He also noted that his "engineers think this plan is insane," and he refused "to support an all hands [meeting] to convince them otherwise." (*Id.*)

Facebook continued to perform a detailed audit to determine which categories of apps were competitive (or potentially competitive) with Facebook (CAC ¶ 177), and Facebook continued to enter into whitelisting agreements with targeted developers. (*See id.* ¶¶ 149, 188.) Many major developers, faced with possible ruin, entered into such agreements (*id.* ¶¶ 12, 195,

207-24), essentially restricting output of Social Data in exchange for Platform access. Facebook continued this practice until it finally removed core APIs from its Platform in April 2015, deliberately destroying 40,000 applications that relied on them. (*Id.* ¶¶ 160, 205.) The scheme led Facebook engineer George Lee to lament: "We sold developers a bill of goods . . . ." (*Id.* ¶ 192.)

### D.    The Instagram and WhatsApp Threats

Facebook's plan to destroy its competition had a glaring blind spot, which its spyware, Onavo, revealed. (CAC ¶¶ 248-93.) An app that did not rely on Facebook's Platform could itself become a rival platform with its own social network, and Facebook's API withdrawal would have no effect on that competitor. (*Id.* ¶¶ 274, 293.) Onavo identified the first such threat in 2011—Instagram (*id.* ¶ 262)—and it continued to monitor Instagram's rapid growth through April 2012, when Zuckerberg offered approximately $1 billion for the company. (*Id.* ¶¶ 257, 260.) The Onavo spyware also identified another looming threat—WhatsApp—and showed that the budding messaging app was rivaling Facebook's own Messenger app. In fact, WhatsApp dwarfed Messenger app by almost two-fold in terms of messages sent per day. (*Id.* ¶¶ 283-87.) Faced with another threat to its SDBE, Facebook felt compelled to buy WhatsApp for $22 billion, a staggering number for an app with functionality Facebook already had and annual revenue in the mere tens of millions of dollars. (*Id.* ¶¶ 290-91.) The Instagram and WhatsApp acquisitions massively increased Facebook's share of the Social Data and Social Advertising markets. (*Id.* ¶¶ 274, 292-93.) Facebook operated WhatsApp and Instagram without integrating them with its core product, but in March of 2019, Facebook reversed course. (*Id.* ¶¶ 15, 294.) Facebook is currently scrambling to integrate the backends of all of its products. (*Id.* ¶ 294.) Upon completion, the integration will give Facebook control over the largest, most engaged, user base and collection of Social Data in the world—with over two billion users connected through its Platform. (*Id.* ¶¶ 302-04.) That impending market unification would mean an irreversible strengthening of the SDBE, and will prevent rivals, including developers in the Class and the named Plaintiffs, for example, Lenddo (which continues to operate notwithstanding the damage Facebook wreaked on it in 2015), from reentering the market. (*Id.* ¶ 307.)

**ARGUMENT**

**I.    The CAC Plausibly Alleges a Section 2 Monopolization Claim**

To plausibly plead a monopolization claim under Section 2 of the Sherman Act, a plaintiff must allege "(a) the possession of monopoly power in the relevant market; (b) the willful acquisition or maintenance of that power; and (c) causal antitrust injury." *In re NFL's Sunday Ticket Antitrust Litig.*, 933 F.3d 1136, 1159 (9th Cir. 2019). All three elements are met here.

**A.    The CAC Alleges Willful Acquisition or Maintenance of Monopoly Power**

**1.    The CAC Alleges a Scheme to Monopolize the Relevant Markets**

The CAC sets forth a multipart scheme designed by Facebook to exclude rivals and potential rivals from the Social Data and Social Advertising markets. The CAC alleges that in 2011, Facebook faced an existential threat from mobile applications (CAC ¶¶ 6-8, 89, 114-15), which through specialized apps were providing similar functionality to Facebook's desktop product, including messaging and image sharing (*id.* ¶¶ 80-81). Facebook had been far behind in its own mobile application, and was losing ground as it approached its initial public offering. (*Id.* ¶¶ 85, 88-89.) In late 2011, Mark Zuckerberg and his senior lieutenants devised a scheme to leverage Facebook's third-party application platform to prevent rival applications from acquiring enough social data to erode the social data barrier to entry ("SDBE") protecting Facebook's business. (*Id.* ¶¶ 112-63.) Specifically, Facebook would identify and target specific categories of competitive applications and demand that those apps provide their social data to Facebook—or lose access to core functionality on Facebook's Platform, including the ability to traverse a user's friends or to read and write to user news feeds. (*Id.* ¶¶ 117-19, 132-33.) Facebook decided to withdraw access to that functionality even though it was profitably selling advertising to the developers for those applications and reaping revenue from third-party application installs resulting from that advertising. (*Id.* ¶¶ 103-11, 121-25.) Facebook also chose to forgo a planned pricing scheme for API access to accomplish Zuckerberg's directive. (*Id.* ¶¶ 111, 129-30.)

Facebook acquired spyware Onavo to monitor the usage of third-party mobile applications on cell phones, and used data it obtained from Onavo to categorize applications to be shaken down for data and mobile advertising. (CAC ¶¶ 14, 127, 128, 157-63, 176, 227-47, 260.) From

September 2012 through April 2015, Facebook spied on users (*id.* ¶ 176), targeted app developers, and sought reciprocity agreements in exchange for continued access (*id.* ¶¶ 124-63), and in April 2015, after it had obtained a critical mass of secret whitelisting and data-sharing agreements, it destroyed 40,000 applications that either posed too great of a competitive threat or that did not acquiesce to Facebook's demands. (*Id.* ¶¶ 160, 205.) Facebook, on orders from Zuckerberg and his senior executives, did so over the objections of the company's senior engineers and platform executives, who internally made clear that the Platform decisions were made in order to destroy Facebook's competition, and lacked a business or technical justification. (*Id.* ¶¶ 164-82, 185.)

The API withdrawal and whitelisting aspects of the scheme, although devastating to competitive applications, would not necessarily prevent an application that did not rely on Facebook's platform from obtaining significant amounts of social data. (CAC ¶¶ 225-26.) If an app obtained a critical mass of such data, it could erode the SDBE and become a rival social network that could harvest and monetize social data in competition with Facebook. (*Id.* ¶¶ 348-63.) Facebook therefore ordered that any competitive app be denied even the ability to purchase advertising from Facebook—at any price. (*Id.* ¶¶ 121-22.) At the same time, Facebook used app data provided by Onavo spyware to target for acquisition potentially competitive apps that were rapidly growing—a process that led Facebook to acquire Instagram and WhatsApp once Onavo showed exponential spikes in these apps' user engagement and reach. (*Id.* ¶¶ 225-93.) Facebook operated these companies independently for years, and only recently (within the past months) began integrating them with its core business, in order to consolidate its power over segmented global markets and prevent effective divestiture from potential regulatory action. (*Id.* ¶ 294-314.)

The net effect of this scheme was that (a) apps that competed or potentially competed with Facebook were excluded from relevant (*i.e.*, Social Data and Social Advertising) markets; (b) specific apps were selected by Facebook as "winners" in predetermined categories, and instead of being destroyed had their valuable social data forcibly extracted; and (c) independent apps not reliant on Facebook's Platform were acquired or otherwise removed from the competitive landscape to prevent them from becoming rival platforms themselves. (CAC ¶¶ 11-13.) This scheme allowed Facebook to maintain its monopoly of social data, which it monetized through

supracompetitive-priced advertising (*id.* ¶¶ 16, 56-58, 381), and it allowed Facebook to maintain and strengthen the SDBE protecting its business (*id.* ¶¶ 348-458). All of this plainly alleges "willful acquisition or maintenance" of monopoly power. *NFL's Sunday Ticket*, 933 F.3d at 1159.

### 2.   Facebook Cannot Dismember the API Withdrawal from the Scheme

Facebook's central Section 2 argument is an attempt to dismember the API withdrawal from the alleged scheme, and to attack that by itself as a refusal to deal. This attempt fails. As the Ninth Circuit recently reiterated in *NFL's Sunday Ticket*, courts must take a "holistic" look at an allegedly anticompetitive scheme. 933 F.3d at 1152. "[T]he law requires that the character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole." *Id.* (quotation marks omitted). Courts must "give plaintiffs the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each." *Id.* at 1152-52 (quotation marks omitted).

Here, the entire scheme must be considered together. For example, the API withdrawal cannot be considered without also considering the whitelisting and data-sharing agreements—because absent the threat of withdrawal, Facebook could not coerce competitors into handing over their valuable Social Data. Likewise, the API withdrawal cannot be dismembered from the use of Onavo to target developers for secret agreements and acquisitions, or from the anticompetitive acquisitions of Instagram and WhatsApp—because without this conduct, Facebook's API withdrawal would not protect it against competitive apps, such as Instagram, that did not rely on Facebook's Platform for their business, functionality, and user base. The law is clear that a court cannot consider a single part of this alleged conduct alone in determining whether exclusionary conduct has been alleged. *See Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 460–61 (7th Cir. 2020) (alleged tying conduct must be considered together with alleged refusal to deal conduct).

### 3.   The API Withdrawal by Itself Is an Anticompetitive Refusal to Deal under *Aspen Skiing*

In any event, the facts surrounding the API withdrawal, even by themselves, are sufficient to plead an unlawful refusal to deal under the Supreme Court's *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985), decision. There, the owner of three of four

PLAINTIFFS' CORRECTED MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
FACEBOOK'S MOTION TO DISMISS THE CLASS ACTION COMPLAINT

mountains ("the monopolist") in a Colorado Ski area entered into an agreement with the operator of the fourth mountain to jointly market lift ticket passes for all four mountains. *Id.* at 590-92. When the monopolist sought a fixed percentage of the fourth mountain's sales at prices well below the historical average, the owner of the fourth mountain refused and the monopolist terminated the profitable, jointly marketed lift ticket. *Id.* at 592-93. And, when the fourth mountain sought to purchase the monopolist's lift tickets to bundle them with its own, the monopolist refused to sell them lift tickets, even at full retail price. *Id.* at 593-94. The Supreme Court affirmed a jury verdict finding a violation of Section 2 of the Sherman Act, holding that "the evidence supports an inference that Ski Co. was not motivated by efficiency concerns and that it was willing to sacrifice short-run benefits and consumer goodwill in exchange for a perceived long-run impact on its smaller rival." *Id.* at 610–11.

In *MetroNet Servs. Corp. v. Qwest Corp.*, 383 F.3d 1124 (9th Cir. 2004), the Ninth Circuit highlighted three key facts from *Aspen Skiing*: (i) "the unilateral termination of a voluntary and profitable course of dealing," *id.* at 1132; (ii) the "willingness to sacrifice short-term benefits in order to obtain higher profits in the long run from the exclusion of competition," *id.*; and (iii) the refusal to "provide their competitors products that were already sold in a retail market to other customers," *id.* at 1133. Moreover, it is also relevant under *Aspen Skiing* whether the refusal to deal was undertaken in the "absence of a legitimate business justification." *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1209 (9th Cir. 1997). All of these key facts identified in *Aspen Skiing* and *MetroNet* are present here, as well as direct allegations that Facebook itself internally believed that the withdrawal of the APIs lacked any business or technical justification.

Specifically, the CAC alleges that from 2011 through the withdrawal of the APIs in April 2015, Facebook voluntarily entered into profitable business arrangements with third-party developers, which Zuckerberg secretly decided to destroy years before the ultimate API withdrawal. The apps developed by these developers increased the value of Facebook's network, and developers gained access to Facebook's user base through the APIs and through advertising. (CAC ¶¶ 99-102.) Facebook in fact sold advertising to mobile app developers, including on a per installation basis, and had even formulated tiered pricing for its API access. (*Id.* ¶¶ 103-11.) Per

the CAC, "[a]lthough Facebook had made significant amounts of revenue and profit selling access to its social data through its APIs and its NEKO advertising system and had planned to expand that business, it chose not to, sacrificing those significant profits." (*Id.* ¶¶ 112, 152.) Facebook decided to implement a plan that "prevented any competitive third-party application from buying social data from Facebook, either through its Platform APIs or through its advertising Platform." (*Id.* ¶ 121.) As Vernal internally explained to Lessin in August 2012, Facebook would "***not allow things which are at all competitive to 'buy' this data from us.***" (*Id.* ¶ 121 (emphasis added).) Indeed, in January 2013, Zuckerberg ordered that certain competitive app developers, such as WeChat, Kakao, and Line be blocked from using the core APIs and Facebook's advertising platform. (*Id.* ¶¶ 145-47.) This plan to forgo selling social data had been ratified by Facebook's board, which was presented in August 2012 with "various revenue models to monetize [Facebook's] Platform, including its APIs," including "charging per company, per application, per user, or per API call," but "opted to do none of those things." (*Id.* ¶¶ 129-30.)

Facebook decided instead that it would approach targeted Platform developers for secret whitelisting deals and, after years of doing so, destroy the remaining applications relying on Facebook's Friends, Newsfeed and other core APIs. "Facebook knew that these changes would eliminate the 'growth channel used by 23% of all Facebook apps' and that 89% of the top 1,000 iPhone apps relied on the full friends list, with 75% of the top 1,000 iPhone apps relying on the Friends permissions APIs." (CAC ¶ 135.) Facebook profited from the engagement generated by selling advertising to these applications, and also from using the social data those apps generated to target content and sell advertising, but Facebook destroyed all of this as part of its scheme to maintain a monopoly in the Social Data and Social Advertising markets. (*Id.* ¶¶ 11, 149, 379-80.) As the Ninth Circuit explained in *MetroNet*, these are precisely the sort of facts that give rise to an *Aspen Skiing* claim, and they are pleaded with painstaking particularity in the CAC.

The CAC also alleges that there was no legitimate business or technical justification for the API withdrawal. Facebook's ***own senior executives*** were contemporaneously clear on that point. As Facebook Platform engineer Bryan Klimt wrote in an email to Facebook's head of APIs, Ilya Sukhar: the "rumors floating around about why we are doing this [removing the APIs]" are

"clearly pablum designed to make engineers think this decision has solid technical reasons." (CAC ¶ 169.) Klimt was clear that the rumored justifications for doing so were "False," "non-sequitur[s]," and that the decision to remove APIs "so core to the developer experience" was "ridiculous on its face" and beyond "parody." (*Id.*) He explained the real reason for the withdrawal: "[W]e are doing this as a protectionist grab to make sure no one else can make a competing social network by bootstrapping our social graph." (*Id.* ¶ 171 (alteration in CAC).) Sukhar agreed, noting that the decision meant that developers "will get totally fucked by this and it won't even be for the right reason" and that his "engineers think this plan is insane" such that he refused "to support an all hands [meeting] to convince them otherwise." (*Id.* ¶ 178.) Facebook's assertion that the CAC is conclusory on this point (Mot. at 24) is thus demonstrably false. The CAC includes specific facts, ***including the statements of Facebook's own executives***, plausibly showing that the API withdrawal lacked any legitimate, non-pretextual business or technical justification for a refusal to deal (or for any rule of reason claim, for that matter), which vaults over Plaintiffs' pleading burden. *See Viamedia*, 951 F.3d at 462 ("To the extent that refusal-to-deal claims require more at the pleading stage, it is enough to allege plausibly that a refusal to deal has some of the key anticompetitive characteristics identified in *Aspen Skiing*.").

## B.    The CAC Adequately Pleads that Facebook Possessed Market Power

Market power can be shown through either "direct evidence of the injurious exercise of market power" or "circumstantial evidence pertaining to the structure of the market." *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995). Direct evidence includes "evidence of restricted output and supracompetitive prices, that is direct proof of the injury to competition which a competitor with market power may inflict, and thus, of the actual exercise of market power." *Id.* "To demonstrate market power circumstantially, a plaintiff must: (1) define the relevant market, (2) show that the defendant owns a dominant share of that market, and (3) show that there are significant barriers to entry and show that existing competitors lack the capacity to increase their output in the short run." *Id.* The CAC alleges two relevant markets: the Social Data and Social Advertising markets. The CAC plausibly pleads the existence of both markets, and plausibly pleads that Facebook had market power in each of them.

### 1.    The Social Data Market

The CAC specifically and plausibly alleges the existence and boundaries of a market for social data, which is a particular form of user data that arises from "the interaction among users" on social networks that provide users with "among other things, the ability to send each other messages, signals, such as 'likes' or 'pokes,' photos and video, view information about others in their network, and the ability to explore other connections among their friends." (CAC ¶ 316.) Social networks and applications collect this data, "including what they share, what they send each other, what they view or find interesting, and even their web and mobile traffic outside of the social network," and then monetize that data by, for example, selling "targeted advertising on an advertising platform," app installs, or API access. (*Id.* ¶ 317.) "Not all data is social data." (*Id.* ¶ 321.) Specifically, social data has a particular utility; that is, it allows "fine-tuned targeting of individuals by granular attributes." (*Id.* ¶ 317.) Social data arises only from user engagement across a network of other users, meaning that the "data valuable to participants in the Social Data Market is data resulting from user-to-user or user-to-content interactions that reveal the preferences, affiliations, proclivities, political leanings, or other attributes of the user." (*Id.* ¶ 320.) That is why a "credit card statement," while perhaps indicative of a user's "preferences and spending habits," does not create or on its own comprise social data, because "that data is not shared among a network of users." (*Id.* ¶ 321.) Likewise, "[m]essage boards and video sharing sites may not be market participants because user interactions are not through a network, but instead may be broadcasted for general consumption of anyone who accesses the site." (*Id.* ¶ 322.) Such broadcasted data "is derived from unilateral user conduct, not the propagation of a user's actions through a network." (*Id.* ¶ 322.)

The market and its boundaries are supported by Facebook's own internal documents. Facebook itself internally referred to "social data" (CAC ¶ 51), and its employees categorized market participants using real-time user engagement and reach information that Facebook covertly obtained using Onavo spyware. (*Id.* ¶¶ 127.) The CAC identifies specific products and companies that participate in the Social Data market, and painstakingly describes categories and identities of apps that ***Facebook itself*** viewed as competitors in this market. (*Id.* ¶¶ 127, 157.) For

PLAINTIFFS' CORRECTED MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
FACEBOOK'S MOTION TO DISMISS THE CLASS ACTION COMPLAINT

example, in August 2012, after being tasked by senior executives with determining which apps were competitive with Facebook and should be targeted for "reciprocity agreements," Facebook VP David Fischer observed "that a large part of the market for our network will come from current and potential competitors" and then identified categories and apps for a "ban on 'competitors.'" (*Id.* ¶ 127.) Those included "Social network apps (Google+, Twitter, Path, etc.)"; "Photo sharing apps (Picasa, Flickr, LiveShare, Shutterfly, etc.)"; "Messaging apps (WhatsApp, Viber, Imo, KakaoTalk, etc.)"; "Local apps (Google+ local, Google Offers, Yelp, yp, etc.)"; "Social search apps (HeyStaks, Wajam, etc.)"; and "Platforms (Google Play, Amazon, etc.)." (*Id.* ¶ 127.)

Facebook thus identified "its direct, horizontal competitors" in the Social Data market, and targeted them for exclusion from that market. (CAC ¶¶ 128, 134, 175, 177) Indeed, Facebook's internal concern was that apps in these categories could use access to social data provided by Facebook's Platform to begin (or expand) generating their *own* social data and, thereby, directly compete with Facebook's social network. (*See, e.g.*, *id.* ¶ 121 (Vernal: Facebook "would not allow things which are competitive to buy this data from us"); ¶ 134 (Osofsky, head of Platform: Facebook will "define competitive networks + require they have a deal with us" for "data reciprocity"); ¶ 132 (Vernal: "We are going to dramatically reduce the data we expose via the Read API . . . . We are going to limit the ability for competitive networks to use our platform without a formal deal in place . . . . We are going to require that all platform partners agree to data reciprocity."); ¶ 138 (Vernal: "[A company must share] every piece of content by that user that *can be seen by another user*. What Mark is saying is he wants certain partners (I assume not all) to give us news feeds on behalf of their users, which is kind of crazy." (emphasis added)).) Facebook's senior executives were unequivocal that when they shut down apps, they were shutting them down "because *we are ultimately competitive with all of them*." (*Id.* ¶ 162 (emphasis added).) In 2013, after identifying competing third-party apps that produced social data, Facebook's Papamiltiadis explained that these apps "overlap with Facebook products" and "could compromise our success in those areas." (*Id.* ¶ 175.) In October 2013, Purdy explained that Facebook had been internally dividing apps into "three buckets: existing competitors, possible future competitors, developers that we have alignment with on business model." (*Id.* ¶ 177.)

PLAINTIFFS' CORRECTED MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
FACEBOOK'S MOTION TO DISMISS THE CLASS ACTION COMPLAINT

Facebook now claims to be incredulous that the third-party apps identified, targeted, and attacked by Facebook are "horizontal competitors of Facebook," and argues that none of these apps could "replace" Facebook. (Mot. at 20.) But the third-party developers identified in the complaint, including Plaintiffs themselves (CAC ¶ 190), are alleged to have competed with Facebook for social data (and in the Social Data market) based on statements and analysis by ***Facebook's own senior executives***—statements made after Zuckerberg ordered an exhaustive audit of the entire gamut of third-party applications to identify and categorize Facebook's competition. Facebook also quibbles with the market definition itself, arguing by fiat that other forms of user data should be included, such as a "credit card statement." (Mot. at 18.) But this is inconsistent not only with the CAC's definition of the market, but with Facebook's own view of which apps it competed with at the time—not a single credit card is contemporaneously listed as a potential competitor during Facebook's audit to search for and destroy competitive applications. Rather, what all apps identified and targeted by Facebook had in common is that they were inherently social (*e.g.*, dating, image sharing, and messaging apps) and produced social data as a byproduct of engagement. These apps encompassed "the group or groups of sellers or producers who have actual or potential ability to deprive each other of significant levels of business" and plausibly comprised (and comprise) the participants in the Social Data market. *Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1045 (9th Cir. 2008). Facebook may believe other products should have been considered competitive, but that was not Facebook's view contemporaneous to its scheme. Facebook's own statements, as alleged in the CAC, are taken as true for the purposes of market definition, and those statements are entirely consistent with the defined market here.

The CAC also clearly alleges market power in the Social Data market. Social data is acquired from users and sold as advertising, as API access, or in other forms, such as on a per-event basis (*e.g.*, when a third-party app is installed by a user targeted with social data). (CAC ¶¶ 109-11.) Facebook repeatedly raised prices for the sale of social data through its advertising channel, and did so without sacrificing any demand. (*Id.* ¶¶ 16, 56-58 (Facebook increased prices significantly and as high as by 2.9x year after year), 381.) The CAC also alleges that through its destruction of 40,000 Platform apps and its contemporaneous whitelisting of anointed apps that

PLAINTIFFS' CORRECTED MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
FACEBOOK'S MOTION TO DISMISS THE CLASS ACTION COMPLAINT

provided Facebook with their social data, Facebook obtained control over the supply and output of social data in the Social Data market—and restricted that output. (*Id.* ¶¶ 216-24.) These facts directly plead the existence of market power. And circumstantial factors also support this conclusion. The CAC alleges that the Social Data market is protected by the SDBE, which arises from the positive-feedback loop that results when a market participant obtains a critical mass of social data. (*Id.* ¶ 348.) The CAC alleges that a critical mass of Social Data is required to attract and engage users on a social networking platform, and in turn, those users generate more social data, which allows the social network to better target content and advertising to users, which in turn attracts more users. (*Id.* ¶ 54 (Lessin explaining: "[T]he more people that use the system, the more information we have on how to make more people use the system.").)

Per the CAC, Facebook reached that critical mass after it defeated rivals MySpace and Friendster, and strengthened the SDBE through the alleged scheme. (CAC ¶¶ 348-50.) The CAC describes Google's attempt to traverse that barrier to entry, and alleges that despite bringing considerable resources to bear, including a large user base, Google's Google+ product failed to gain traction because it did not garner enough user engagement to generate the social data needed to disrupt the SDBE protecting Facebook's dominant position. (*Id.* ¶¶ 353-55.) The CAC also alleges that Facebook's properties, including Instagram, WhatsApp, Facebook Messenger, and the core Facebook product, gave Facebook a 66% share of the Social Data market. (*Id.* ¶¶ 328-29.) The CAC alleges that the market is "highly concentrated," with a staggering Herfindahl-Hirschman Index ("HHI") of 4,586. (*Id.* ¶ 330.) All of this is sufficient to plead that Facebook possessed market power in the Social Data market. Facebook offers no argument to the contrary.

## 2.      The Social Advertising Market

The CAC alternatively alleges that the Social Advertising market is the relevant market monopolized. Specifically, "Facebook's dominance can be viewed through its sales in its advertising channel." (CAC ¶ 341.) The CAC is clear that "social advertising is not fungible or interchangeable with advertising on other digital platforms" because "of the extensive ability to target advertising to users on social media sites like Facebook." (*Id.*) As the CAC explains, "[u]nlike search advertising," the other ubiquitous form of Internet advertising, "Facebook's

advertising platform allowed advertisers to target Facebook's user base by their attributes and behavior, not by a query entered into a search box." (CAC ¶ 46.) Moreover, the CAC alleges that "unlike in search, user identity [is] not only discoverable, it [is] willingly provided by users—as [is] the identity for those users' closest friends and family members." (*Id.*) Unlike any other form of advertising, including banner advertising, "the identities [can] be tracked and targeted throughout the Internet." (*Id.*) Thus, "search and banner advertising are not reasonable substitutes." (*Id.* ¶ 341.) Indeed, when Facebook audited applications using Onavo, including apps outside of its Platform, it never identified a non-social advertiser as a competitor. In fact, Facebook internally identified Google+ as a competitor, but not Google's search product. (*Id.* ¶ 353.)

As with the Social Data market, the CAC pleads all the hallmarks of market power. The CAC alleges that Facebook has an approximately 80% share of the Social Advertising market and has possessed above 70% of the market since 2015, with its revenues growing almost every year after the commencement of Facebook's anticompetitive scheme. (CAC ¶ 342-44.) The CAC alleges that the Social Advertising market includes other apps and social networks that monetize their social data as advertising, with the Facebook as the dominant player, followed by Twitter and LinkedIn. (*Id.* ¶ 346.) Among these three competitors, Facebook has 86% of the revenue share. (*Id.* ¶ 347.) The CAC is clear that Facebook raised prices in the Social Advertising market year after year, and that Facebook's dominance is protected by the same SDBE protecting the Social Data market. (*Id.* ¶ 381.) All of this is sufficient to define the market and to allege Facebook's market power therein. And because the CAC specifically alleges the boundaries of the Social Advertising market, including cross-elasticity of demand and non-fungibility of social advertising products versus other forms of Internet advertising (*id.* ¶¶ 341-47), Facebook is wrong to rely on *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109 (9th Cir. 2018)—a case in which plaintiffs failed to allege any distinction between their alleged market (live action golf endorsements) and other forms of golf advertising. *Id.* at 1122.

### C.   The CAC Pleads Attempted Monopolization of the Relevant Markets

The CAC alternatively alleges an attempted monopolization of the relevant markets. This claim requires, in addition to the elements of monopolization stated above, "specific intent to

15

PLAINTIFFS' CORRECTED MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
FACEBOOK'S MOTION TO DISMISS THE CLASS ACTION COMPLAINT

control prices or destroy competition" and a "dangerous probability of success." *Cost Mgmt. Servs., Inc. v. Wash. Natural Gas Co.*, 99 F.3d 937, 949 (9th Cir. 1996). The CAC is replete with allegations of specific intent to monopolize. For example, the CAC alleges that Mark Zuckerberg devised the scheme to withdraw the APIs and to extract data from targeted competitors (CAC ¶ 112, 117); that his executives carried out his plans (*id.* ¶¶ 124-25); that Facebook audited competing applications for targeting and used spyware on user phones to do so (*id.* ¶ 127); that Facebook's executives understood that the purpose of the scheme was for "competitive" reasons, not technical ones (*id.* ¶¶ 132, 134, 171); and that Facebook's executives misled developers in service of that scheme (*see infra* at 19-24). Next, as described above, the scheme, including the acquisitions of WhatsApp and Instagram, had a dangerous probability of success: it significantly increased Facebook's share of the relevant markets, strengthened the barrier to entry, and allowed Facebook to repeatedly raise prices without affecting demand. (*Id.* ¶¶ 56-57, 376.) All of this is sufficient to plead attempted monopolization under Section 2 of the Sherman Act.

### D.   The CAC Alleges Antitrust Injury Resulting from Facebook's Scheme

Facebook curiously challenges whether the straightforward, carefully explained anticompetitive scheme alleged in the CAC caused antitrust injury to Plaintiffs. This challenge fails. As the CAC sets forth in painstaking detail, Facebook's scheme had the purpose and effect of eliminating from the Social Data and Social Advertising markets actually and potentially competitive third-party applications, including Plaintiffs; extracting valuable social data from the remaining whitelisted apps on its platform; and using this extracted data to build up the SDBE protecting Facebook's business—thereby further preventing competition in the relevant markets, including by foreclosing would-be re-entrants like Plaintiff Lenddo. (CAC ¶¶ 364-85.) The CAC explains that the net effect of the scheme was that Platform developers—including Plaintiffs and the Class—were directly excluded from the relevant markets by Facebook's anticompetitive conduct; that entry and reentry of rival social networks and applications was hindered, and in many cases foreclosed, by the strengthening of the SDBE; and that Facebook was free to raise prices for social data and social advertising as a result, which it did year after year. (*Id.*) These detailed allegations—ignored by Facebook in its Motion—set forth paradigmatic antitrust injuries,

which flow directly from the Sherman Act and Clayton Act violations alleged in the CAC, and which indisputably harmed Plaintiffs and the class.

Facebook separately argues that the CAC fails to allege antitrust injury in the Social Advertising market because Plaintiffs are supposedly not market participants. (Mot. at 20.) This is flat wrong. Mobile apps often harvest social data from their users and do not monetize that data for years. This does not mean they could not do so, and would not be potential market entrants but for Facebook's anticompetitive conduct, which destroyed their apps. Moreover, Facebook's argument elides the CAC's actual allegations: that Plaintiffs were targeted by Facebook as part of a coordinated scheme leveraging API manipulation (including secret whitelist agreements) across an entire Platform to gain and preserve monopoly power in the Social Data and Social Advertising markets. The attack on Plaintiffs was inextricably intertwined with the whitelisting scheme. This is enough for antitrust injury, irrespective of whether the Plaintiffs were, at the time they were destroyed by Facebook's scheme, monetizing through social advertising. *See Blue Shield of Va. v. McCready*, 457 U.S. 465, 483-84 (1982).

## II.    The CAC Plausibly Alleges a Claim under Section 1 of the Sherman Act

Section 1 of the Sherman Act states that "[e]very contract, combination . . ., or conspiracy, in restraint of trade or commerce" is illegal. 15 U.S.C. § 1. A violation of this provision requires a showing of an "unreasonable restraint." *Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 289 (1985). The CAC alleges that Facebook withdrew the core APIs as to Plaintiffs and the Class while secretly entering into a series of horizontal whitelisting and data-sharing agreements with targeted developers for continued access to those APIs. This (a) eliminated other potential sources of social data and social advertising, including from Plaintiffs and the Class, and (b) ensured that Facebook controlled the social data generated by the whitelisted co-conspirators. The CAC expressly alleges the existence of these agreements (CAC ¶¶ 207-24), and pleads that the counterparties were direct competitors with Facebook—according to Facebook itself (*id.* ¶ 127-28). The claim is thus a straightforward horizontal output restriction, which is *per se* illegal. *See NFL's Sunday Ticket*, 933 F.3d at 1150 n.5. Facebook does not address any of this. Instead, it characterizes the Section 1 claim as a "bizarre hub and spoke" (Mot. at 25),

apparently to resist *per se* treatment. But even under a rule of reason analysis, the Section 1 claim stands. As the CAC explains—including through Facebook's own documents and through the words of its senior executives (*Id.* ¶¶ 168-72)—the agreements between Facebook and whitelisted developers lacked any legitimate business or technical basis, such that there were no procompetitive justifications for these agreements to outweigh their anticompetitive effects in the Social Data and Social Advertising markets. This is sufficient to state a claim under Section 1. *See Thomsen v. W. Elec. Co.*, 512 F. Supp. 128, 133 (N.D. Cal. 1981), *aff'd*, 680 F.2d 1263 (9th Cir. 1982) ("[T]o be actionable, a conspiracy must lack a legitimate business purpose and have an anti-competitive effect.").

## III.   The CAC Plausibly Alleges a Clayton Act Section 7 Claim

Section 7 of the Clayton Act prohibits transactions whose effect "may be substantially to lessen competition, or to tend to create a monopoly." 15 U.S.C. § 18. A Section 7 plaintiff must plausibly allege (1) a relevant market and (2) "a likelihood that competition may be 'foreclosed in a substantial share of . . . (that market)." *United States v. E.I. du Pont de Nemours & Co.*, 353 U.S. 586, 595 (1957); *Saint Alphonsus Medical Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 783-88 (9th Cir. 2015). Plaintiffs have done so here. First, as explained earlier in this brief, the CAC specifically and plausibly alleges two product markets that are relevant to the Instagram and WhatsApp acquisitions: the Social Data market and the Social Advertising market. (*See supra* at 10-16.) Next, the CAC plausibly alleges both: (i) a past foreclosure of competition in the Social Data and Social Advertising markets flowing from the acquisitions of Instagram and WhatsApp (CAC ¶¶ 248-93), which foreclosure of competition injured all Plaintiffs (*id.* ¶¶ 18-25, 373-81); and (ii) an ongoing, growing, and imminently irreversible foreclosure of competition in the Social Data and Social Advertising markets due to the so-called "back-end integration" of Instagram and WhatsApp with the core Facebook product (*id.* ¶¶ 294-314), which foreclosure of competition harms Plaintiff Lenddo (and others similarly situated) who wish to enter and/or increase their presence in the Social Data and Social Advertising markets (*id.* ¶¶ 20-21, 374-85). Indeed, as to Facebook's back-end integration, the CAC alleges that integrating Instagram and WhatsApp with the core Facebook product would massively and irreversibly increase

concentration in already concentrated product markets (*see id.* ¶¶ 330 (pre-integration HHI of 4586 in Social Data market), 347 (pre-integration HHI of 7685 in Social Advertising market)) by removing geographic segmentation between the respective Instagram, WhatsApp, and Facebook user bases—effectively handing Facebook a durable ***worldwide*** monopoly in the Social Data and Social Advertising markets (*id.* ¶¶ 328-40, 340-47).

Facebook does not directly challenge the adequacy of Plaintiffs' Section 7 claim, ignoring the statutory elements and presenting a conflated "Counts IV and V" antitrust injury argument that, among other problems, provably misrepresents the CAC's actual injury allegations. *Compare* CAC ¶¶ 374-85 (specific factual allegations of antitrust injury directed toward Instagram and WhatsApp acquisitions and the imminent back-end integration of these assets with the core Facebook product), *with* Mot. at 16-17 ("The injury plaintiffs claim they suffered is that Instagram and WhatsApp do not serve as 'alternative platforms upon which developers excluded by Facebook's API removal could build their apps.'"). But as explained above, Plaintiffs sufficiently allege a Section 7 claim regarding the Instagram and WhatsApp acquisitions, including plausible allegations of antitrust injury. *See Optronic Techs., Inc. v. Ningbo Sunny Elec. Co., Ltd.*, 2019 WL 1429631, at *4 (N.D. Cal. Mar. 29, 2019) (allegations that a transaction between two dominant telescope manufacturers "erected a barrier to a competitor's expansion" stated a Section 7 claim).

## IV. Plaintiffs' Claims Are Timely

Facebook's Motion begins by asserting that Plaintiffs' claims are time-barred. (Mot. at 6-10.) These arguments do not hold up to legal or factual scrutiny. Facebook materially mischaracterizes, then misapplies, the governing law on fraudulent concealment and laches—and it simply ignores nearly all of the CAC's pertinent factual allegations in doing so.

### A. Plaintiffs' Sherman Act Claims Are Timely Under the Fraudulent Concealment Doctrine

First, all of Plaintiffs' Sherman Act claims (Counts I, II, III, and V) are timely based on a straightforward application of the fraudulent concealment doctrine, which tolls the four-year limitations period under 15 U.S.C. § 15b "if the defendant fraudulently concealed the existence

PLAINTIFFS' CORRECTED MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
FACEBOOK'S MOTION TO DISMISS THE CLASS ACTION COMPLAINT

*of a cause of action* in such a way that the plaintiff, acting as a reasonable person, did not know of its existence." *Hexcel Corp. v. Ineos Polymers, Inc.*, 681 F.3d 1055, 1060 (9th Cir. 2012) (emphasis added). "The plaintiff carries the burden of pleading and proving fraudulent concealment; it must plead facts showing that the defendant affirmatively misled it, and that the plaintiff had neither actual nor constructive knowledge of the facts *giving rise to its claim* despite its diligence in trying to uncover those facts." *Id.* (quoting *Conmar Corp. v. Mitsui & Co. (U.S.A.), Inc.,* 858 F.2d 499, 501 (9th Cir. 1988) (brackets and italics removed; emphasis added)). Defendant's concealment must prevent Plaintiffs from both actually knowing and constructively knowing of their legal claims, where a "plaintiff is deemed to have had constructive knowledge if it had enough information to warrant an investigation which, if reasonably diligent, would have led to the discovery of the fraud." *Hexcel*, 681 F.3d at 1060 (quoting *Beneficial Standard Life Ins. Co. v. Madariaga*, 851 F.2d 271, 275 (9th Cir. 1988)).

Here, the CAC comfortably pleads fraudulent concealment with respect to all the Sherman Act claims. Facebook fraudulently concealed the existence of the facts giving rise to Plaintiffs' Sherman Act claims from December 2012 through November 2019—and the CAC expressly and plausibly alleges the who, what, when, where, why, and how of this concealment.

For example, as Facebook's own Motion concedes, Plaintiffs' Sherman Act claims respectively require, among other things: willfully acquired or maintained monopoly power in a relevant market (Section 2 monopolization); predatory, exclusionary, and anticompetitive conduct, plus specific intent to monopolize (Section 2 attempted monopolization); and an agreement, conspiracy, or combination between Facebook and one or more other entities that unreasonably restrained trade, with anticompetitive effects in a relevant market (Section 1 violation). As described in detail in the CAC (and in this brief), Facebook's *private* actions, communications, and agreements between 2012 and 2015 comprised an anticompetitive scheme entailing each of the above elements. But as the CAC specifically alleges—and as Facebook cannot plausibly deny—Facebook's public-facing actions between 2012 and 2019 did not *reveal to Plaintiffs* any of the above facts giving rise to their claims. (*See* CAC ¶¶ 202-06; 386-87.)

Indeed, Facebook's public-facing actions between 2012 and 2019 did not reveal to Plaintiffs anything but a seemingly legitimate (albeit abrupt and impactful) business decision by Facebook to deprecate certain Platform APIs. (*See id.*) It was not until November 2019, when NBC News published internal Facebook documents, that Plaintiffs reasonably could have determined that Facebook's jarring public actions, including its precipitous API withdrawal, were in fact part of an anticompetitive scheme devised and executed by Mark Zuckerberg himself—a scheme entailing willful acquisition and maintenance of monopoly power; predatory, exclusionary, and anticompetitive conduct and specific intent to monopolize; secret whitelist and data sharing agreements restricting social data output; and other specific facts giving rise to Sherman Act claims on behalf of the Plaintiffs.

The reason Plaintiffs went years without actual and constructive knowledge of the facts giving rise to their Sherman Act claims is no mystery: this was the result of affirmative acts by Facebook, on the orders of Mark Zuckerberg himself, to fraudulently conceal from Plaintiffs and other developers the factual particulars of Facebook's multi-year anticompetitive scheme. The CAC pleads the specifics of Facebook's fraudulent concealment in Rule 9(b)-compliant detail:

- In December 2012, after Facebook had planned to announce its decision not to allow access to Friends data through its Friends and News Feed APIs in a public blog post, Zuckerberg vetoed that decision and decided to enforce the decision selectively and covertly after deliberately analyzing Facebook's competitors. (CAC ¶ 144.)

- In January 2013, Facebook Global Operations VP Justin Osofsky pleaded with Michael Vernal, Facebook Platform Engineering VP, to make an announcement that would send a clear signal to developers, but Vernal responded that Zuckerberg had already rejected that approach. (CAC ¶ 148.) As Vernal explained, telling developers about the decision meant bearing the "very real cost" of "changing the rules" including the "PR cost" of betraying developers Facebook had induced to build for Facebook's Platform. (*Id.*)

- In March 2013, Facebook's key Platform employees, including Douglas Purdy, Director of Engineering for Platform, encouraged making an up-front announcement that the APIs would be unavailable and then negotiating a deal for access to the Platform. (CAC ¶ 154.)

Instead, Facebook continued its campaign of quietly shutting down competitors' access to APIs and then privately asking them to make a reciprocity deal. (*Id.* ¶ 155.)

- In August 2013, Senior Platform Engineer Bryan Klimt wrote a lengthy email explaining that "protectionist" competitive concerns—and not legitimate technical or business justifications—were the reason for the secret API deprecation, and emphasized that public revelation of Facebook's plans would "send a clear message to developers: Facebook Platform comes second to Facebook the Social Network Product," which was a problem because "an unstable platform isn't really a platform at all." (CAC ¶ 171; *see id.* ¶¶ 168-72.) Nonetheless, on orders from Zuckerberg himself, Facebook continued to keep its API plans—including its whitelisting and data sharing process—secret from Platform developers, and continued to use secret spyware from Onavo to conduct the key information-gathering aspect of its scheme. (CAC ¶¶ 174-80.)

- In September-December 2013, Facebook secretly negotiated with targeted developers for private whitelist and data sharing agreements, which implemented reciprocity and made Facebook a data passthrough in the Social Data market ahead of a secretly-planned API shutdown. (CAC ¶¶ 183-93.) This was all done in complete silence from Platform developers like Plaintiffs—deliberately, by Zuckerberg's own mandate. (*Id.*)

- In 2014, as the planned API deprecation drew nearer, Facebook's secrecy measures actually increased—again, at the mandate of Zuckerberg himself. (CAC ¶¶ 182-201.) Even though a January 2014 presentation for Zuckerberg summarized the secret app audit process and upcoming changes to the Platform that would make it "impossible to build" an app without a whitelist agreement from Facebook (*id.* ¶ 196), Facebook executives, including Purdy and Vernal, continued to evangelize the APIs to developers (*id.* ¶ 197).

- The real reason for the removal of the APIs was kept tightly under wraps. In April 2014, right before the announcement ahead of F8 that Facebook was "removing several rarely used API endpoints; visit our changelog for details"—which was itself false and misleading—Vernal warned Ilya Sukhar, Facebook Head of Developer Products, that if

any mention was made of the competitive reasons for the removal of APIs (as Sukhar wanted), there would be a "high likelihood of breaking into jail." (CAC ¶ 201.)

- Between May 2014 and April 2015, Facebook continued to secretly enter into whitelist and data sharing agreements with targeted parties, while publicly—and falsely—telling developers (for example, Airbiquity) that the deprecated APIs "won't be available to anyone" after April 30, 2015, and that "all similar integrations will be subject to the same deprecations/restrictions." (CAC ¶ 213; *see id.* ¶¶ 207-17.)

- Facebook's intentional concealment of the true details of its Platform scheme continued until November 6, 2019, when NBC News published a trove of internal Facebook documents and communications, revealing detailed facts about willful acquisition and maintenance of monopoly power; exclusionary and anticompetitive conduct and specific intent to monopolize; and secret whitelist agreements restraining trade in the Social Data and Social Advertising markets—which give rise to Plaintiffs' Sherman Act claims. (CAC ¶¶ 386-87.)

In view of these affirmative acts of concealment by Facebook—all specifically alleged in the CAC—Plaintiffs plainly lacked not just actual knowledge, but constructive knowledge, of Facebook's anticompetitive scheme (including the particular facts giving rise to Plaintiffs' Sherman Act claims) for years, until internal documents were revealed in November 2019. Indeed, it strains credulity to argue the scheme's factual particulars—aggressively hidden by Zuckerberg and his lieutenants for years, with the acknowledged risk of "breaking into jail" should the truth be discovered (CAC ¶ 213)—could have been discovered through any sort of "reasonable investigation" by Plaintiffs, as required for constructive notice. *See Hexcel*, 681 F.3d at 1060.

Facebook's argument that fraudulent concealment does not apply is based entirely on a misrepresentation and misapplication of the doctrine—one that elides the law's specific focus on Plaintiffs' knowledge of the facts ***giving rise to their causes of action*** (*see* Mot. at 9-10 (discussing public-facing conduct like API withdrawal)), and that willfully shuns the CAC's actual contents (*see id.* at 8-10 (ignoring each of the specific, Rule 9(b)-compliant fraudulent concealment allegations set forth in this subsection). Here, *In re Glumetza Antitrust Litigation*,

23

PLAINTIFFS' CORRECTED MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO FACEBOOK'S MOTION TO DISMISS THE CLASS ACTION COMPLAINT

__ F. Supp. 3d __, 2020 WL 1066934 (N.D. Cal. Mar. 5, 2020), is instructive. In *Glumetza*, a class action antitrust complaint plausibly alleged fraudulent concealment, tolling the statute of limitations, where "plaintiffs were on notice of *two* key aspects of [defendants'] scheme," but "had no knowledge of [another] provision" that would have been necessary for actual or constructive notice of the facts giving rise to their claims. *Id.* at \*6-7. Here, the case for applying fraudulent concealment tolling is significantly stronger: Plaintiffs knew virtually ***nothing*** about the anticompetitive particulars (from specific intent, to lack of legitimate business or technical justification, to profit sacrifice, to willfulness, to secret agreements) of Facebook's Platform scheme, and could not possibly have ***discovered*** these particulars through any "inquiry" short of obtaining access to Facebook's internal document servers—and certainly not any "reasonable inquiry." Each of the Sherman Act claims is timely under the fraudulent concealment doctrine.

### B.      Plaintiffs' Clayton Act Section 7 and Injunctive Relief Claims Are Timely

Two of Plaintiffs' claims—Count IV, alleging a Section 7 Clayton Act violation through the acquisition and integration of Instagram and WhatsApp; and Count VI, seeking injunctive relief and divestiture to remedy Facebook's ongoing antitrust violations—are directed toward prospectively remedying ongoing conduct and harm. (*See* CAC ¶¶ 428-32; 442-51.) The primary ongoing conduct sought to be remedied here is the imminent "back-end integration" of Instagram and WhatsApp—an irreversible, potentially fatal blow to competition in the social data and social advertising markets that was first announced by Mark Zuckerberg in March 2019, less than a year before this lawsuit was filed. (*Id.* ¶ 301; *see id.* ¶¶ 294-314.) The Clayton Act Section 7 and injunctive relief claims are timely on their face, as they seek prospective relief for anticompetitive conduct and harm that is not only indisputably ongoing, but was indisputably unknown by (and unknowable to) Plaintiffs until March 2019 at the earliest. (*See id.*) Facebook errs when it argues that laches—an equitable doctrine that "typically does not bar prospective injunctive relief," *Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 959 (9th Cir. 2001), and requires that a plaintiff "inexcusably delay[] pursuing [its] claim" to its adversary's prejudice, *Oliver v. SD-3C LLC*, 751 F.3d 1081, 1085 n.4 (9th Cir. 2014)—can somehow apply here, given the recency of both the conduct and initial revelations regarding Facebook's back-end integration.

Additionally, Plaintiffs' Clayton Act Section 7 claim is timely under the hold-and-use doctrine, which restarts the statute of limitations for a Clayton Act violation where "assets are used in a different manner from the way that they were used when [an] initial acquisition occurred, and that new use injures the plaintiff . . . ." *Midwestern Mach. Co. v. Nw. Airlines, Inc.*, 392 F.3d 265, 273 (8th Cir. 2004); *see also Z Techs. v. Lubrizol Corp.*, 753 F.3d 594, 604 (6th Cir. 2014); *Free FreeHand Corp. v. Adobe Sys. Inc.*, 852 F. Supp.2d 1171, 1188-90 (N.D. Cal. 2012). Here, Instagram and WhatsApp were acquired in 2012 and 2013 respectively, but were operated independently until March 2019 (CAC ¶¶ 294-301), when Zuckerberg announced that Facebook would integrate the products, including their back ends, which will result in an unprecedentedly massive, 2 billion-user social network and a further strengthening of the SDBE. (*Id.* ¶¶ 294, 301-14.) This is a paradigmatic "hold-and-use" violation, which injured—and continues to injure—Plaintiff Lenddo and similarly situated developers anew, and in doing so restarted the Clayton Act's four-year limitations period for Plaintiffs' Section 7 claim no earlier than March 2019. The CAC's Clayton Act Section 7 claim and request for injunctive relief are indisputably timely.

## C.    Count V Is Indisputably Timely as to Post-January 2016 Conduct/Damages

Finally, Plaintiffs' Sherman Act Section 2 monopolization claim in connection with the acquisition and integration of Instagram and WhatsApp (Count V)—which is already timely under the fraudulent concealment doctrine to the extent it seeks damages for conduct prior to January 16, 2016 (*see supra* § V.A.)—is *prima facie* timely with respect to conduct and damages occurring since January 16, 2016, including Plaintiffs' antitrust damages from Facebook's ongoing back-end integration efforts. *See* 15 U.S.C. § 15b. Facebook does not—and could not—argue otherwise. Notably, the recently-announced (no earlier than March 2019) and apparently ongoing back-end integration of Instagram and WhatsApp constitutes "a new and independent act that is not merely a reaffirmation of a previous act" that "inflict[s] new and accumulating injury" on at least Plaintiff Lenddo (and those similarly situated), *Samsung Elecs. v. Panasonic Corp.*, 747 F.3d 1199, 1201 (9th Cir. 2014)—and as a result, a new cause of action has accrued to Lenddo (and those similarly situated) to recover the damages caused by the back-end integration of Instagram and WhatsApp, *see Oliver*, 751 F.3d at 1086.

## CONCLUSION

Defendant's motion to dismiss the Class Action Complaint should be denied.

Dated: San Francisco, CA
     May 8, 2020

/s/ Yavar Bathaee
Yavar Bathaee (CA 282388)
yavar@bathaeedunne.com
Brian J. Dunne (CA 275689)
bdunne@bathaeedunne.com
Edward M. Grauman (*pro hac vice*)
egrauman@bathaeedunne.com
BATHAEE DUNNE LLP
445 Park Avenue, 9th Floor
New York, NY 10022
Tel: (332) 205-7668

*Attorneys for Plaintiffs*

PLAINTIFFS' CORRECTED MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
FACEBOOK'S MOTION TO DISMISS THE CLASS ACTION COMPLAINT

**CERTIFICATE OF SERVICE**

I hereby certify that on this 8th day of May 2020, I electronically transmitted the foregoing document to the Clerk's Office using the CM/ECF System.

/s/ Brian J. Dunne

PLAINTIFFS' CORRECTED MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO FACEBOOK'S MOTION TO DISMISS THE CLASS ACTION COMPLAINT