1
2
3

# UNITED STATES DISTRICT COURT

4

## NORTHERN DISTRICT OF CALIFORNIA

5

### SAN JOSE DIVISION

6
7

REVEAL CHAT HOLDCO, LLC., et al.,

8

Plaintiffs,

9

v.

10

FACEBOOK, INC.,

11

Defendant.

Case No.  20-cv-00363-BLF

**ORDER GRANTING DEFENDANT FACEBOOK, INC.'S MOTION TO DISMISS**

[Re: ECF 25]

12
13
14
15
16
17
18
19
20
21
22
23

This is a putative class action antitrust lawsuit brought by Plaintiffs Reveal Chat Holdco LLC ("Reveal Chat"), USA Technology and Management Services, Inc. ("Lenddo"), Cir.cl, Inc. ("Cir.cl"), and Beehive Biometric, Inc. ("Beehive Biometric") (collectively, "Plaintiffs") against Defendant Facebook, Inc. ("Facebook").  Before the Court is Facebook's motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) on the grounds that Plaintiffs' claims are time-barred, Plaintiffs have not suffered an antitrust injury, Plaintiffs have failed to allege plausible product markets, and Plaintiffs have otherwise failed to state a claim upon which relief can be granted.  Mot. to Dismiss ("Mot.") 1, ECF 25.  Plaintiffs oppose.  *See* Opp. to Mot. ("Opp."), ECF 43.  The Court heard oral argument on this motion on June 11, 2020.  For the reasons stated below and on the record, the Court GRANTS Facebook's motion and DISMISSES WITH LEAVE TO AMEND IN PART and DISMISSES WITHOUT LEAVE TO AMEND IN PART the Complaint.

24

## I.   BACKGROUND[1]

25
26

Facebook is a publicly-traded social media company that was founded in 2004 by Mark Zuckerberg.  Class Action Compl. ("Compl.") ¶¶ 26-26, 35, ECF 1.  Facebook provides online

27
28

[1] Plaintiffs' well-pled factual allegations are accepted as true for purposes of the motion to dismiss.  *See Reese v. BP Exploration (Alaska) Inc*., 643 F.3d 681, 690 (9th Cir. 2011).

United States District Court
Northern District of California

services to two billion users worldwide and in exchange it collects user data, which its uses to create and sell advertising services.  Compl. ¶ 27.  Additionally, Facebook operates as a platform for third-party applications and hardware.  Compl. ¶ 28.  Between 2004 and 2010, Facebook emerged as "the dominant social network in the United States."  Compl. ¶ 36.

The data that Facebook collects from users includes: information shared on personal pages, photos and profiles viewed, connections to others, things shared with others, and the content of messages to other users.  Compl. ¶ 46.  This data can be used for targeted advertising, and the social data created by Facebook's network can be monetized in a number of ways from targeted advertising and machine learning to commercializing access so that data can be mined by third parties.  Compl. ¶¶ 47-49.  "By 2010, Facebook stood alone as the dominant player in the newly emergent market for social data (the 'Social Data Market') – a market in which Facebook's own users provided Facebook with a constant stream of uniquely valuable information, which Facebook in turn monetized through the sale of social data (for example, through advertising, monetizing [Application Programming Interfaces ("APIs")], or other forms of commercializing access to Facebook's network)."  Compl. ¶ 50.

Because user data made Facebook's network more valuable and thus attracted more customers which then led to more data and more customers, a feedback loop emerged.  Compl. ¶¶ 52-54.  The feedback loop, in turn, created a barrier to entry because competing with Facebook required "a new entrant . . . to rapidly replicate both the breadth and value of the Facebook network."  Compl. ¶ 55.  This barrier to entry also allowed Facebook to control and increase prices in the Social Data and Social Advertising Markets without the pressures of price competition from existing competitors or new entrants.  Compl. ¶ 56; *see* Compl. ¶¶ 57-60.

In 2012, Facebook coined the term "Open Graph" "to describe a set of tools developers could use to traverse Facebook's network of users, including the social data that resulted from user engagement."  Compl. ¶¶ 90-92.  Open Graph contained a set of APIs, which "allowed those creating their own social applications to query the Facebook network for information."  Compl. ¶ 92.  Beginning in the fall of 2011, to address the threat posed by mobile applications, Facebook devised a scheme to attract third-party developers to build for their platform and then remove

access to the APIs that were central to these applications.  Compl. ¶ 117.  For example, the "Friends API" allowed third-party developers to search through a user's friends, as well as their friends of friends, and the "Newsfeed API" allowed third-party developers to search a user's newsfeed.  Compl. ¶¶ 117-19.  Without access to this data, third-party applications "would be abruptly left with none of the social data they needed to function."  Compl. ¶ 119.  By August 2012, Facebook planned to prevent competitive third-party applications from buying social data from Facebook.  Compl. ¶¶ 120-21.  Facebook even identified direct, horizontal competitors in the Social Data and Social Advertising Markets.  Compl. ¶ 128.  In November 2012, Facebook announced that it would block competitors or require full data reciprocity for continued access to its data.  Compl. ¶ 136.

In April 2014, Facebook announced that it would remove access to several rarely used APIs, including the Friend and Newsfeed APIs.  Compl. ¶ 202.  After this announcement and through the full removal of the APIs in April 2015, Facebook entered into Whitelist and Data Sharing Agreements with certain third-party developers that allowed continued access to the Friends or NewsFeed APIs and included a provision acknowledging that the covered APIs were not available to the general public.  Compl. ¶¶ 207-08.  These agreements "were only offered in exchange for massive purchases of Facebook's social data through mobile advertising and/or through the provision of the developer's own social data back to Facebook (so-called 'reciprocity')."  Compl. ¶ 209.

In 2012, Facebook acquired its competitor, Instagram for $1 billion.  Compl. ¶ 260.  The acquisition of "Instagram was instrumental to Facebook's explosive growth in the Social Data and Social Advertising Markets."  Compl. ¶ 270.  In 2014, Facebook acquired another competitor, WhatsApp, for $22 billion.  Compl. ¶ 290.  The acquisition of WhatsApp "further solidified Facebook's dominance in the Social Data and Social Advertising Markets."  Compl. ¶ 292.  Facebook is currently integrating the backends of its products with WhatsApp and Instagram.  Compl. ¶ 294.

Based on the above actions, Plaintiffs filed their Class Action Complaint on January 16, 2020.  The complaint alleges six causes of action for: (1) monopolization in violation of Section 2

United States District Court
Northern District of California

3

of the Sherman Antitrust Act (the "Sherman Act"), 15 U.S.C. § 2, for acquiring and maintaining a monopoly in the relevant markets for Social Data and Social Advertising; (2) violation of Section 2 of the Sherman Act for attempting to monopolize the Social Data and Social Advertising Markets; (3) violation of Section 1 of the Sherman Act under a hub-and-spoke theory because Facebook's Whitelist and Data Sharing Agreements controlled the supply of social data; (4) violation of Section 7 of the Clayton Antitrust Act (the "Clayton Act"), 15 U.S.C. § 18, for Facebook's acquisition and integration of Instagram and WhatsApp; (5) violation of Section 2 of the Sherman Act because Facebook acquired and maintained a monopoly in the Social Data and Social Advertising Markets through its acquisition and integration of Instagram and WhatsApp; and (6) a request for injunctive relief and divestiture.  Compl. ¶¶ 403-51.

## II.   LEGAL STANDARD

"A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted 'tests the legal sufficiency of a claim.'"  *Conservation Force v. Salazar*, 646 F.3d 1240, 1241-42 (9th Cir. 2011) (quoting *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001)).  When determining whether a claim has been stated, the Court accepts as true all well-pled factual allegations and construes them in the light most favorable to the plaintiff.  *Reese v. BP Exploration (Alaska) Inc*., 643 F.3d 681, 690 (9th Cir. 2011).  However, the Court need not "accept as true allegations that contradict matters properly subject to judicial notice" or "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences."  *In re Gilead Scis. Sec. Litig*., 536 F.3d 1049, 1055 (9th Cir. 2008) (internal quotation marks and citations omitted).  While a complaint need not contain detailed factual allegations, it "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is facially plausible when it "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* On a motion to dismiss, the Court's review is limited to the face of the complaint and matters judicially noticeable.  *MGIC Indem. Corp. v. Weisman*, 803 F.2d 500, 504 (9th Cir. 1986); *N. Star Int'l v. Ariz. Corp. Comm'n*, 720 F.2d 578, 581 (9th Cir. 1983).

In deciding whether to grant leave to amend, the Court must consider the factors set forth by the Supreme Court in *Foman v. Davis*, 371 U.S. 178 (1962), and discussed at length by the Ninth Circuit in *Eminence Capital, LLC v. Aspeon, Inc*., 316 F.3d 1048 (9th Cir. 2009).  A district court ordinarily must grant leave to amend unless one or more of the *Foman* factors is present: (1) undue delay, (2) bad faith or dilatory motive, (3) repeated failure to cure deficiencies by amendment, (4) undue prejudice to the opposing party, or (5) futility of amendment.  *Eminence Capital*, 316 F.3d at 1052.  "[I]t is the consideration of prejudice to the opposing party that carries the greatest weight."  *Id*.  However, a strong showing with respect to one of the other factors may warrant denial of leave to amend.  *Id.*

## III.    DISCUSSION

Facebook argues that Plaintiffs' claims are time-barred, Plaintiffs failed to plausibly allege an antitrust injury, and Plaintiffs failed to state a claim for relief.  Mot. 6-25.  The Court addresses each argument in turn.

### A.    Statute of Limitations and Doctrine of Laches

Facebook argues that Plaintiffs' claims for damages are barred by the four-year statute of limitations and Plaintiffs' requests for injunctive relief are precluded by the doctrine of laches.  Mot. 6-10.  Specifically, as to Plaintiffs' damages claims, Facebook argues that the statute of limitations for antitrust claims runs from the commission of an act that injures the plaintiff.  Mot. 6.  Facebook argues that Plaintiffs challenge four independent acts: the acquisition of Instagram in April 2012; the acquisition of WhatsApp in February 2014; the Whitelist and Data Sharing Agreements between April 2014 and April 2015; and Facebook's April 2015 modification of its API policy.  Mot. 6.  Accordingly, because these acts occurred five to eight years before the Complaint was filed, Facebook argues that the statute of limitations has run.  Mot. 6.  For similar reasons, Facebook argues that Plaintiffs' request for injunctive relief is barred by the doctrine of laches because Plaintiffs' years-long delay in bringing the action was inexcusable as each challenged act was highly publicized and because Facebook was prejudiced by the unreasonable delay.  Mot. 7-8.  Moreover, Facebook argues that fraudulent concealment does not toll the limitations or laches periods because Plaintiffs have not alleged that Facebook affirmatively

misled Plaintiffs and because Plaintiffs had actual or constructive knowledge of facts giving rise to their claims.  Mot. 8.  Facebook argues that because the acquisitions were publicly announced and because Plaintiffs were allegedly dependent on the Friends and Newsfeed APIs, Plaintiffs would have had constructive knowledge.  Mot. 9.  While Plaintiffs argue that they did not learn this information until internal documents were released, Facebook argues that such documents have no bearing on Plaintiffs' claim as intent is not the focus of antitrust law.  Mot. 10.  Facebook also notes that fraudulent concealment must be pled in accordance with Rule 9(b), which Plaintiffs fail to do, and Plaintiffs do not allege that Facebook concealed anything relevant to their claims.  Mot. 9.

Plaintiffs, on the other hand, argue that their Sherman Act claims are timely under the doctrine of fraudulent concealment; their Clayton Act claim and their claim for injunctive relief and divestiture are timely because they go toward ongoing conduct and harm; and their monopolization claim under Section 2 of the Sherman Act is timely as to Facebook's post-January 2016 conduct.  Opp. 19-25.  First, Plaintiffs argue that Facebook fraudulently concealed facts giving rise to Plaintiffs' Sherman Act claims from December 2012 through November 2019 and that none of the publicly available facts gave rise to Plaintiffs' claims.  Opp. 19-21.  Plaintiffs, therefore, argue that they lacked actual and constructive knowledge of Facebook's anticompetitive scheme.  Opp. 23-24.  Second, Plaintiffs argue that their Clayton Act and injunctive relief claims go to the back-end integration of Instagram and WhatsApp, which was unknown to Plaintiffs until March 2019.  Opp. 24.  Additionally, Plaintiffs argue that their Clayton Act claim is timely under the hold-and-use doctrine, which restarts the statute of limitations for Clayton Act violations where a plaintiff asserts that that the acquisitions are used in a different manner than they were used when they were acquired and the new uses injure the plaintiff.  Opp. 25.  Finally, Plaintiffs argue that their monopolization claim under Section 2 of the Sherman Act is timely with respect to conduct and damages occurring since January 16, 2016.  Opp. 25.

Plaintiffs argue that the doctrine of laches does not apply to their claims for prospective injunctive relief and their claims are timely under the doctrines of fraudulent concealment, continuing violation, and hold-and-use, even though they acknowledge that the initial events

giving rise to these claims occurred more than four years ago.  Accordingly, the Court addresses, in turn, Plaintiffs' arguments as to the doctrine of laches before turning to each tolling theory.

### 1.  Doctrine of laches

"[T]he deadline for suits for equitable relief under the antitrust laws is governed by laches, and . . . the four-year statute of limitations in 15 U.S.C. § 15b furnishes a guideline for computation of the laches period."  *Samsung Elecs. Co. v. Panasonic Corp.*, 747 F.3d 1199, 1205 (9th Cir. 2014).  Relying on *Danjaq LLC v. Sony Corp.*, 263 F.3d 942 (9th Cir. 2001), Plaintiffs argue that the doctrine of laches does not apply to bar prospective injunctive relief, and therefore their claim under Section 7 of the Clayton Act (Count IV) and their claim for injunctive relief (Count VI) are timely as they seek prospective relief for anticompetitive conduct.  Opp. 24. Specifically, Plaintiffs argue that Facebook errs in arguing that the doctrine of laches "can somehow apply here, given the recency of both the conduct and initial revelations regarding Facebook's back-end integration."  Opp. 24.

First, the Court notes that *Danjaq* is a copyright infringement case, and Plaintiffs do not articulate why *Danjaq* should apply in the antitrust context.  Second, while recognizing that "laches typically does not bar prospective injunctive relief," the Ninth Circuit noted in *Danjaq* that "the rule is not . . . an absolute one."  *Id.* at 959.  Indeed, the *Danjaq* court held that the doctrine of laches barred prospective injunctive relief where the feared infringements were identical to the alleged past infringements.  *Id.* at 960.  Finally, the Ninth Circuit further noted "the general rule that laches does not bar future injunctive relief stems from . . . prejudice to the defendant occasioned by the plaintiff's past delay, but almost by definition, the plaintiff's past dilatoriness is unrelated to a defendant's ongoing behavior that threatens future harm."  *Id.* at 959-60.  Here, Plaintiffs' past delay is related to Facebook's ongoing behavior.  Plaintiffs challenge Facebook's 2012 and 2014 acquisitions of Instagram and WhatsApp and seek prospective relief as to Facebook's recent decision to integrate Instagram and WhatsApp.  Facebook's allegedly recent decision to integrate Instagram and WhatsApp, however, is related to Plaintiffs' past delay in that Facebook's integration of these companies is part and parcel of acquiring a company. Accordingly, the Court finds that the doctrine of laches applies to the instant case.

### 2. Fraudulent concealment

"A statute of limitations may be tolled if the defendant fraudulently concealed the existence of a cause of action in such a way that the plaintiff, acting as a reasonable person, did not know of its existence." *Hexcel Corp. v. Ineos Polymers, Inc.*, 681 F.3d 1055, 1060 (9th Cir. 2012). "The plaintiff carries the burden of pleading and proving fraudulent concealment." *Id.* (brackets and internal quotation marks omitted). "To plead fraudulent concealment, the plaintiff must allege that: (1) the defendant took affirmative acts to mislead the plaintiff; (2) the plaintiff did not have 'actual or constructive knowledge of the facts giving rise to its claim'; and (3) the plaintiff acted diligently in trying to uncover the facts giving rise to its claim." *In re Animation Workers Antitrust Litig.*, 123 F. Supp. 3d 1175, 1194 (N.D. Cal. 2015) (quoting *Hexcel Corp.*, 681 F.3d at 1060)). Thus, "[a] fraudulent concealment defense requires a showing both that the defendant used fraudulent means to keep the plaintiff unaware of his cause of action, and also that the plaintiff was, in fact, ignorant of the existence of his cause of action." *Wood v. Santa Barbara Chamber of Commerce, Inc.*, 705 F.2d 1515, 1521 (9th Cir. 1983). "The plaintiff is deemed to have had constructive knowledge if it had enough information to warrant an investigation which, if reasonably diligent, would have led to discovery of the fraud." *Beneficial Standard Life Ins. Co. v. Madariaga*, 851 F.2d 271, 275 (9th Cir. 1988). "It is enough that the plaintiff should have been alerted to facts that, following duly diligent inquiry, could have advised it of its claim." *Hexcel Corp.*, 681 F.3d at 1060 (internal quotation marks omitted).

"Moreover, allegations of fraudulent concealment must be pled with particularity." *Ryan v. Microsoft Corp.*, 147 F. Supp. 3d 868, 885 (N.D. Cal. 2015). "Conclusory statements are not enough." *Conmar Corp. v. Mitsui & Co. (U.S.A.),* 858 F.2d 499, 502 (9th Cir. 1988). "However, it is generally inappropriate to resolve the fact-intensive allegations of fraudulent concealment at the motion to dismiss stage, particularly when the proof relating to the extent of the fraudulent concealment is alleged to be largely in the hands of the alleged conspirators." *In re Animation Workers*, 123 F. Supp. 3d at 1194.

Here, Plaintiffs allege that Facebook fraudulently concealed "specific facts of its anticompetitive conduct from Plaintiffs until November 6, 2019," "[t]hrough NDAs; through

overbroad and/or improper assertions of privilege and confidentiality; through lies to regulators, to the press, to developers, and to the public; and through other means and mechanisms of intentionally suppressing and concealing from public view the true nature, motivation, mechanisms, and intent of Facebook's actions."  Compl. ¶ 386.

First, the Court finds that Plaintiffs have failed to sufficiently plead fraudulent concealment because they have not pled that Facebook took affirmative acts to mislead them.  To allege fraudulent concealment, Plaintiffs must establish that "its failure to have notice of its claim was the result of [Facebook's] affirmative conduct."  *Conmar*, 858 F.2d at 505.  "Passive concealment of information is not enough to toll the statute of limitations, unless the defendant had a fiduciary duty to disclose information to the plaintiff."  *Id.* (citation omitted).  "An affirmative act of denial, however, is enough if the circumstances make the plaintiff's reliance on the denial reasonable."  *Id.*  "Thus, the mere failure to own up to illegal conduct in response to an inquiry about whether the defendant engaged in illegal antitrust activity is not sufficient for fraudulent concealment, and to find otherwise would effectively nullify the statute of limitations in these cases."  *Ryan v. Microsoft Corp.*, 147 F. Supp. 3d 868, 886 (N.D. Cal. 2015) (internal quotation marks omitted).

Here, Plaintiffs have not alleged that Facebook took any affirmative acts to mislead them.  Indeed, Plaintiffs rely on "Facebook's *private* actions, communications and agreements between 2012 and 2015," arguing that Facebook's public-facing actions did not reveal any facts giving rise to their claims.  Opp. 20-21.  But this is not enough for Plaintiffs to meet their burden of showing that Facebook took affirmative acts to mislead them.  For example, Plaintiffs list the "specifics of Facebook's fraudulent concealment" in their opposition brief, which include Mark Zuckerberg's veto of a decision to make the Friends and Newsfeed APIs available and to instead selectively enforce that decision against Facebook's competitors; Zuckerberg's rejection of an approach that would include an announcement to developers about this decision; Facebook's decision not follow a suggestion by its employees to announce that the APIs were unavailable and to negotiate access; an email from a senior Facebook engineer explaining protectionist competitive concerns; Facebook's decision to enter into private whitelist and data sharing agreements; Facebook's continued evangelization of APIs to developers; and Facebook's decision to keep "tightly

United States District Court
Northern District of California

1    underwraps" the "real reason for the removal of the APIs." Opp. 21-23. These allegations,

2    however, do not include affirmative conduct on the part of Facebook to mislead Plaintiffs or the

3    market, and Plaintiffs do not explain how any of these actions were affirmative acts that misled

4    them. Indeed, there are no allegations that Facebook stated that Plaintiffs would have access to the

5    APIs forever and there are no allegations concerning Facebook's conduct after 2015.

6    Furthermore, Plaintiffs have not alleged a fiduciary relationship with Facebook or its senior

7    employees, such that Facebook would have a duty to disclose any information to Plaintiffs.

8        At the hearing, Plaintiffs relied on *In re Glumetza Antitrust Lit.*, 2020 WL 1066934 (N.D.

9    Cal. Mar 5, 2020), for the proposition that "affirmative silence," "intentional silence," or "half-

10   truths" can constitute an affirmative act of concealment. But that case is inapposite.  In *In re*

11   *Glumetza*, the Court noted that the defendants were under a duty to disclose before recognizing

12   that "[h]alf-truths – representations that state the truth only so far as it goes, while omitting critical

13   qualifying information – can be actionable misrepresentations." *Id.* at *7. The court explained

14   that "[o]ne who chooses to speak has a duty to include as much information as necessary to

15   prevent misleading others." *Id.* Here, as stated above, Plaintiffs have not alleged that Facebook

16   had a duty to disclose. Additionally, Plaintiffs have failed to allege the critical qualifying

17   information that Facebook omitted when speaking to Plaintiffs, or the market, that was necessary

18   to prevent Facebook from misleading anyone.

19       Second, the Court finds that Plaintiffs have not sufficiently pled fraudulent concealment as

20   they have not plausibly alleged that they were without actual or constructive knowledge of the

21   facts giving rise to their claim. For example, Facebook's acquisitions of Instagram and WhatsApp

22   were widely publicized in 2012 and 2014 respectively; Facebook announced in a blogpost on

23   April 30, 2014, that access to the Friends and Newsfeed APIs would be removed; and the Wall

24   Street Journal reported on the Whitelist and Data Sharing Agreements in September 2015.  Reply

25   2-3; Mot. 6; *see* Compl. ¶¶ 202, 205, 260, 290. Thus, at the very least, Plaintiffs had constructive

26   knowledge of the facts that give rise to their claims.

27       Finally, the Court finds that Plaintiffs have not sufficiently pled fraudulent concealment

28   because Plaintiffs fail to allege how they acted diligently in trying to uncover the facts giving rise

                                                10

United States District Court
Northern District of California

to their claims.  "Diligent inquiry is required where facts exist that would excite the inquiry of a reasonable person," and diligence must be pled with particularity.  *In re Glumetza*, 2020 WL 1066934, at *6 (internal quotation marks omitted).  Here, the publicly available facts regarding Facebook's allegedly anticompetitive conduct would excite the inquiry of a reasonable person, and therefore Plaintiffs must plead diligence with particularity.  They have failed to do so here.  Indeed, Plaintiffs do not appear to include any allegations on this element and it appears that they simply waited until Facebook's internal documents were release in November 2019 to uncover their claims.  This, however, is not indicative of diligence.

Accordingly, for the reasons stated above, the Court finds that Plaintiffs have not sufficiently pled fraudulent concealment as to their Sherman Act claims (Counts I, II, III, and V).

### 3.  Continuing violation

"To state a continuing violation of the antitrust laws in the Ninth Circuit, a plaintiff must allege that a defendant completed an overt act during the limitations period that meets two criteria: 1) It must be a new and independent act that is not merely a reaffirmation of a previous act; and 2) it must inflict new and accumulating injury on the plaintiff."  *Samsung Elecs. Co. v. Panasonic Corp.*, 747 F.3d 1199, 1202 (9th Cir. 2014); *accord Oliver v. SD-3C LLC*, 751 F.3d 1081, 1086 (9th Cir. 2014) (stating limitations begins to run from date of each "new overt act causing injury").

Plaintiffs argue that their Section 7 claim under the Clayton Act related to Facebook's acquisition and integration of Instagram and WhatsApp (Count IV) and their claim for injunctive relief (Count VI) are timely as the conduct and harm are ongoing "until March 2019 at the earliest" based on "the recency of both the conduct and initial revelations regarding Facebook's back-end integration."  Opp. 24.  Additionally, Plaintiffs argue that their Section 2 claims under the Sherman Act regarding the acquisition and integration of Instagram and WhatsApp (Count V) is timely as to all conduct and damages occurring since January 16, 2016.  Opp. 25.  Specifically, Plaintiffs argue that Facebook's March 2019 announcement about the ongoing back-end integration of Instagram and WhatsApp constitutes a new act that is not a reaffirmation of a previous act and inflicts a new and accumulating injury on at least Plaintiff Lenddo.  Opp. 25.

The Court disagrees.  The continuing violation doctrine does not make sense in the context

of anticompetitive mergers, and therefore it should not apply to Section 7 claims under the Clayton Act. *See Midwestern Mach. Co. v. Nw. Airlines, Inc*., 392 F.3d 265, 271 (8th Cir. 2004); *Complete Entm't Res. LLC v. Live Nation Entm't, Inc*., No. CV159814DSFAGRX, 2016 WL 3457177, at *1 (C.D. Cal. May 11, 2016). "Section 7 of the Clayton Act is the mechanism for challenging a potentially anticompetitive merger," and it has a statute of limitations within which mergers must be challenged. *Complete Entm't Res.*, 2016 WL 3457177, at *1. If the continuing violation doctrine applied, "every business decision could qualify as a continuing violation to restart the statute of limitations as long as the firm continued to desire to be merged." *Midwestern Mach.*, 392 F.3d at 271. This would write the statute of limitations out of the law by allowing a merger to be challenged indefinitely. *See Complete Entm't Res.*, 2016 WL 3457177, at *1. This cannot be the case because "[u]nlike a conspiracy or the maintaining of a monopoly, a merger is a discrete act, not an ongoing scheme, and "[o]nce the merger is completed, the plan to merge is completed, and no overt acts can be undertaken to further that plan." *Midwestern Mach.*, 392 F.3d at 271. Thus, the Court agrees with the Eighth Circuit and the Central District of California that the continuing violation doctrine does not apply in the context of Section 7 claims under the Clayton Act.

Moreover, while the Sherman Act regulates a broader swath of conduct than the Clayton Act, Plaintiffs' claim under Count V is for an acquisition-merger monopoly, which is the precise conduct governed by the Clayton Act. *See* Compl. ¶ 433 ("Through Facebook's acquisition and integration of Instagram and WhatsApp, Defendant has willfully acquired and maintained monopoly power for Facebook in the relevant markets for Social Data and Social Advertising."). "There is no reason to treat the same conduct differently in sister statutes that are designed to promote the same legislative objective." *Complete Entm't Res.*, 2016 WL 3457177, at *1 (quoting *Z Techs. Corp. v. Lubrizol Corp*., 753 F.3d 594, 603 (6th Cir. 2014)). Indeed, 15 U.S.C. § 15b provides the statute of limitations for claims under Section 2 of the Sherman Act and claims under Section 7 of the Clayton Act, and "[t]here is nothing in 15 U.S.C. § 15b that suggests it should be applied one way for merger-acquisition claims under the Sherman Act but differently for merger-acquisition claims under the Clayton Act." *Id.* (quoting *Z Techs.*, 753 F.3d at 603). Accordingly,

the Court finds that it is not appropriate to apply the continuing violation doctrine in this context.

Even assuming the continuing violation doctrine applies in this context, however, the Court notes that Plaintiffs have not plausibly alleged in a non-conclusory manner how the back-end integration of Instagram and WhatsApp constitutes new and independent acts, or how the back-end integration inflicted a new and accumulating injury on Plaintiffs.

The Court, therefore, finds that the continuing violation doctrine does not apply to Plaintiffs' Section 7 claim with respect to Facebook's acquisition and integration of Instagram and WhatsApp (Count IV); Plaintiffs' Section 2 claim with respect to Facebook's acquisition and integration of Instagram and WhatsApp (Count V); or Plaintiffs' claim for injunctive relief (Count VI).

### 4. Hold-and-use doctrine

Under the hold-and-use doctrine, "if assets are used in a different manner from the way that they were used when the initial acquisition occurred, and that new use injures the plaintiff, he or she has four years from the time that the injury occurs to sue." *Free FreeHand Corp. v. Adobe Sys. Inc.*, 852 F. Supp. 2d 1171, 1188 (N.D. Cal. 2012) (quoting *Midwestern Mach.*, 392 F.3d at 273)); *accord Complete Entm't Res.*, 2016 WL 3457177, at *2. Plaintiffs argue that their Section 7 claim under the Clayton Act is timely under the hold-and-use doctrine because, while Instagram and WhatsApp were acquired in 2012 and 2014 respectively, the companies operated independently until March 2019 when Facebook decided to integrate the companies. Opp. 25. The hold-and-use doctrine, however, "is not particularly well-developed and if interpreted too broadly could easily eviscerate the statute of limitations for section 7 of the Clayton Act." *Complete Entm't Res.*, 2016 WL 3457177, at *2. Indeed, the Court in *Complete Entm't Res.* was "skeptical of the legitimacy of the hold and use doctrine in part for this reason," and noted that it found "no Ninth Circuit opinion adopting it and . . . only two district court cases from within the Circuit that apply it, both relatively recently." *Id.* Plaintiffs do not provide any cases suggesting that the legitimacy of this doctrine, or its use in the Ninth Circuit, has changed. *See* Opp. (citing two out-of-circuit opinions and a 2012 case from the Northern District of California, which was cited by *Complete Entm't Res.*). This Court is also skeptical that the doctrine should apply in the

United States District Court
Northern District of California

context of Section 7 claims under the Clayton Act as "[i]t makes much more sense to challenge the later anticompetitive act itself, rather than to couch the challenge as one against the merger or asset acquisition." *Complete Entm't Res.*, 2016 WL 3457177, at *2.

In any event, even assuming that the hold-and-use doctrine is valid in this context, the Court finds that Plaintiffs have not plausibly alleged how the back-end integration of Instagram and WhatsApp are different uses of the assets, and Plaintiffs have not plausibly alleged that Facebook's back-end integration of Instagram and WhatsApp caused new injuries.  For example, while Plaintiffs argue that Facebook operated Instagram and WhatsApp independently after they were acquired, the Complaint contains allegations that Facebook began integrating WhatsApp as early as 2018.  Compl. ¶¶ 296-97.  Furthermore, Plaintiffs argue that the back-end integration of Instagram and WhatsApp caused injuries to Plaintiffs, specifically Lenddo; however, Plaintiffs have not described these new injuries or explained how these injuries are new.

Accordingly, the Court finds that the hold-and-use doctrine does not apply to Plaintiffs' Section 7 claim under the Clayton Act with respect to Facebook's acquisition and integration of Instagram and WhatsApp (Count IV).

### 5. Conclusion

For the reasons stated above, the Court finds that Plaintiffs claims are time-barred by the statute of limitations and doctrine of laches, and no tolling theory applies to the facts as alleged. Accordingly, the Court GRANTS Facebook's motion to dismiss the Complaint and DISMISSES the Complaint.  Because Plaintiffs may cure the defects related to fraudulent concealment with amendment, the Court DISMISSES WITH LEAVE TO AMEND the Complaint as to Plaintiffs' fraudulent concealment theory.  Because amendment would be futile as to Plaintiffs' continuing violation and hold-and-use doctrine arguments, the Court DISMISSES WITHOUT LEAVE TO AMEND the Complaint as to Plaintiffs' continuing violation and hold-and-use doctrine arguments.

### B.   Antitrust Injury

Facebook argues that Plaintiffs do not have antitrust standing because they have not plausibly alleged an antitrust injury.  Mot. 11-17.  First, Facebook argues that Plaintiffs fail to

United States District Court
Northern District of California

1   allege a causal antitrust injury because they fail to allege facts to support that they were excluded

2   from either alleged market and that they were excluded by Facebook's alleged conduct.  Mot. 11-

3   12.  Additionally, Facebook argues that Plaintiffs fail to explain why, absent Facebook's alleged

4   conduct, they would not have suffered the same injuries, and they fail to plausibly allege that they

5   were unable to compete by means other than by relying on Facebook data.  Mot. 12-13.  Second,

6   Facebook argues that Plaintiffs have not alleged antitrust injury in the Social Advertising Market.

7   Third, Facebook argues that Plaintiffs lack antitrust standing to bring their monopolization and

8   attempted monopolization claims because they do not allege that they suffered injury as a putative

9   competitor of Facebook in the relevant market when Facebook stopped making the data available,

10  and Plaintiffs provide no information about their plans to successfully enter either market.

11  Mot. 13-14.  While Plaintiffs allege significant barriers to entry in both markets, Facebook argues

12  that Plaintiffs have not alleged that Facebook did anything to create this barrier to entry or that

13  Plaintiffs have the resources to enter either purported market.  Mot. 14-15.  Fourth, Facebook

14  argues that Plaintiffs lack antitrust standing to bring their Section 1 claim under the Sherman Act

15  because the alleged injury goes solely to unilateral conduct and Plaintiffs have not explained how

16  the agreements could plausibly cause their injuries.  Mot. 15-16.  Finally, Facebook argues that

17  Plaintiffs were not injured by the acquisition and integration of Instagram and WhatsApp because

18  they have not demonstrated that they would not have suffered the identical loss absent the

19  challenged acquisition and integration.  Mot. 16.  Facebook argues that Plaintiffs' theory of injury

20  is speculative because there is no allegation that, if another firm acquired Instagram and

21  WhatsApp, they would have made their data available.  Mot. 16-17.

22          Plaintiffs disagree.  First, Plaintiffs argue they have alleged sufficient facts to support

23  antitrust injury for their Sherman Act Section 2 claim.  Opp. 16-17.  Specifically, Plaintiffs argue

24  that they were injured because Facebook eliminated them from the Social Data and Social

25  Advertising Markets, extracted social data from remaining whitelisted applications on its platform,

26  and extracted data to build up the social data barrier to entry to protect Facebook's business.  Opp.

27  16.  Plaintiffs argue that this prevented further competition in the relevant markets and allowed

28  Facebook to raise prices for social data and social advertising.  Opp. 16.  Moreover, Plaintiffs

argue that they are participants in the Social Advertising Market.  Opp. 17.  Second, Plaintiffs argue that they allege an antitrust injury for their Clayton Act Section 7 claim for the same reasons.  Opp. 18-19.

The Ninth Circuit has held that an antitrust injury consists of five elements: "(1) unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from that which makes the conduct unlawful, . . . (4) that is of the type the antitrust laws were intended to prevent," and (5) "the injured party [is] a participant in the same market as the alleged malefactors."  *Somers v. Apple, Inc.,* 729 F.3d 953, 963 (9th Cir. 2013) (internal quotation marks omitted).  That is, as to the fifth element, "the party alleging the injury must be either a consumer of the alleged violator's goods or services or a competitor of the alleged violator in the restrained market."  *Id.* (internal quotation marks omitted).

Here, Plaintiffs argue that there are at least five different types of antitrust injury including increased prices, lessening of consumer choice, direct exclusion of Plaintiffs from the relevant markets, strengthening a barrier to entry and preventing reentry; and eliminating rival platforms. *See* Compl. ¶¶ 364-95; Hearing Tr., at 36, ECF 56.  The Court, however, agrees with Facebook that Plaintiffs have failed to plausibly allege an antitrust injury such that Plaintiffs have antitrust standing.

First, the Court finds that Plaintiffs have not plausibly alleged an injury caused by unlawful conduct.  While Plaintiffs' spend several pages of the Complaint describing their alleged antitrust injury, the allegations are nothing more than "naked assertions devoid of further factual enhancement," which are insufficient to survive a motion to dismiss.  *Blantz v. Cal. Dep't of Corr. & Rehab.*, 727 F.3d 917, 927 (9th Cir. 2013).  Moreover, Plaintiffs have failed to plausibly allege in a non-conclusory manner that they themselves have been injured. *See NorthBay Healthcare Grp., Inc. v. Kaiser Found. Health Plan, Inc.*, 305 F. Supp. 3d 1065, 1076 (N.D. Cal. 2018) (recognizing that plaintiffs must allege that they themselves suffered antitrust injury).  For example, Plaintiffs allege that they have been harmed because they were excluded from the relevant markets, "had their business and assets destroyed by Facebook's anticompetitive scheme," and are prevented from entry or reentry into the relevant markets because of Facebook's

exclusionary conduct.  Compl. ¶ 385.  These allegations, however, are nothing more than conclusory allegations and the Court need not accept conclusory allegations as true.  *See In re Gilead Scis. Sec. Litig.*, 536 F.3d at 1055.

Second, it is not clear whether Plaintiffs have plausibly alleged that the fifth element of antitrust injury is satisfied as it is unclear whether Plaintiffs are consumers or competitors of Facebook, and whether Plaintiffs participate in the Social Advertising Market.  As stated at the hearing, the Court notes that Plaintiffs' 110-page Complaint includes very few allegations as to Plaintiffs' individual businesses.  Indeed, while Plaintiffs Cir.cl and Beehive Biometric have been dissolved, *see* Compl. ¶¶ 22-25, the status of Plaintiff Reveal Chat is unclear and Plaintiffs tout Plaintiff Lenddo as a "market leader," Compl. ¶¶ 18-21.  Additionally, because Plaintiffs appear to straddle the line between consumer and competitor, it is difficult to determine whether Plaintiffs have in fact plausibly alleged an antitrust injury.  For example, Plaintiffs appear to argue that they are competitors of Facebook and they allege that "Facebook's anticompetitive scheme has allowed it to raise prices . . . for social advertising."  Compl. ¶ 381.  An increase in market prices, "though harmful to competition, actually benefit[s] competitors."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 583 (1986).  Thus, because "[t]here can be no antitrust injury if the plaintiff stands to gain from the alleged unlawful conduct," Plaintiffs have failed to allege an antitrust injury in this respect if they are competitors of Facebook.  *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1056 (9th Cir. 1999).

Accordingly, the Court GRANTS Facebook's motion to dismiss for failure to allege antitrust injury.  Because this defect may be cured by amendment, the Court DISMISSES WITH LEAVE TO AMEND the Complaint.

### C.    Failure to State a Claim

The Court need not address Facebook's additional arguments as to why Plaintiffs have failed to state a claim because Plaintiffs' claims are time-barred and because Plaintiffs have not plausibly alleged an antitrust injury.  *See* Mot. 16-25.  The Court, however, briefly addresses these issues to provide Plaintiffs with guidance for their amended complaint.

### 1. Relevant product market

To state an antitrust claim under the Sherman Act, "plaintiffs must plead a relevant market." *Hicks v. PGA Tour, Inc*., 897 F.3d 1109, 1120 (9th Cir. 2018). "While plaintiffs need not plead a relevant market with specificity, 'there are some legal principles that govern the definition of an antitrust "relevant market," and a complaint may be dismissed under Rule 12(b)(6) if the complaint's "relevant market" definition is facially unsustainable.'" *Id.* (brackets and alterations omitted) (quoting *Newcal Indus., Inc. v. Ikon Office Sol*., 513 F.3d 1038, 1045 (9th Cir. 2008)). The relevant market must include a product market, and the product market "must encompass the product at issue as well as all economic substitutes for the product." *Id.* (internal quotation marks omitted). "Economic substitutes have a reasonable interchangeability of use or sufficient cross-elasticity of demand with the relevant product. *Id.* (internal quotation marks omitted).

Plaintiffs allege that there are two relevant product markets: (1) the Social Data Market, and (2) the Social Advertising Market. Facebook argues that each of Plaintiffs' alleged product markets is implausible. *See* Mot. 17-21. The Court addresses each market, in turn.

#### a. *Social Data Market*

Facebook argues that Plaintiffs' alleged Social Data Market is implausible because it fails to allege the contours of the market, who participates in the market, and why social data is not interchangeable with other forms of data. Mot. 18-20. Specifically, Facebook argues that it is "unclear just how far beyond direct engagement with the social network the 'social data' penumbra extends" because the Complaint indicates that social data can extend from contacts in smartphones and messages to friends, but not credit card statements – although Plaintiffs allege that these statements provide data. Mot. 18. Additionally, Facebook argues that Plaintiffs are not clear about who participates in the Social Data Market because their description is "vague and meandering" and the Complaint contradicts itself as to whether monetization is required for market participation. Mot. 19. Moreover, Facebook argues that the market is legally insufficient as pled because it does not encompass all economic substitutes for the product as it is not clear why other forms of data are not reasonably interchangeable for antitrust purposes with social data.

United States District Court
Northern District of California

1    Mot. 19.  Facebook further argues that the Complaint does not plausibly allege that social data is

2    economically distinct from any other form of data.  Mot. 20.  Finally, Facebook argues that

3    Plaintiffs suggest they are horizontal competitors with Facebook and could replace them, but

4    Facebook argues that Plaintiffs fail to allege facts to support this conclusion.

5            Plaintiffs, on the other hand, argue that they plausibly allege the existence and boundaries

6    of the Social Data Market.  Opp. 11-14.  According to Plaintiffs, social data "is a particular form

7    of data that arises from the interaction among users on social networks that provide users with

8    'among other things, the ability to send each other messages, signals, such as likes or pokes,

9    photos and video, view information about others in their network, and the ability to explore other

10   connections among their friends."  Opp. 11 (internal quotation marks omitted).  Plaintiffs argue

11   that not all data is social data as social data allows "fine-tuned targeting of individuals by granular

12   attributes" and "arises only from user engagement across a network of other users."  Opp. 11

13   (internal quotation marks omitted).  Plaintiffs additionally argue that Facebook identified Plaintiffs

14   as its horizontal competitors who compete with Facebook for social data.  Opp. 13.  Finally,

15   Plaintiffs argue that while other products may have been considered competitive, that was not

16   Facebook's view contemporaneous to its scheme.  Opp. 13.

17           As stated at the hearing, the Court notes that Plaintiffs need to clearly define the

18   boundaries of the market and what is included in the Social Data Market.  However, while the

19   Court recognizes that Facebook's arguments may have merit, at this stage of the proceedings, the

20   Court finds that the issues Facebook raises should be resolved on a more developed factual record.

21   *See e.g.*, *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d 1109, 1123 (N.D. Cal.

22   2008) (finding allegations sufficient for pleading purposes because, while it was unclear whether

23   parties participated in the same market, the issues should be resolved on a more developed factual

24   record).

25                      ***b.  Social Advertising Market***

26           Next, Facebook argues that Plaintiffs' Social Advertising Market is implausible because

27   many courts have rejected antitrust claims on proposed advertising markets limited to a single

28   form of advertising.  Mot. 20.  Additionally, Facebook argues that Plaintiffs' allegations are

circular and conclusory that social advertising – defined as advertising sold on social networks – is not interchangable with alternative forms of advertising because of the extensive ability to target advertisements to users on social media sites.  Mot. 20-21.  Facebook argues that there is no information about alternative advertising media's ability to target users, and "the relative ability of various advertising formats to target consumers is a variation in product quality and is insignificant for purposes of defining an antitrust market."  Mot. 21.

By contrast, Plaintiffs argue that social advertising is not interchangeable with advertising on other digital platforms "because of the extensive ability to target advertising to users on social media sites like Facebook."  Opp. 14 (internal quotation marks omitted).  Plaintiffs argue that other forms of Internet advertising, such as search and banner advertising, are not reasonable substitutes because they cannot target and track users as with social advertising.  Opp. 14-15.

As stated above, the Court will not address the merits of Facebook's issues at this time; however, the Court notes that it has real concerns over the Social Advertising Market.  As the Ninth Circuit has recognized, "many courts have rejected antitrust claims reliant on proposed advertising markets limited to a single form of advertising."  *Hicks v. PGA Tour, Inc*., 897 F.3d 1109, 1123 (9th Cir. 2018); *see Kinderstart.com LLC v. Google, Inc*., No. C06-2057JFRS, 2007 WL 831806, at *6 (N.D. Cal. Mar. 16, 2007) ("[T]here is no logical basis for distinguishing the Search Ad Market from the larger market for Internet advertising.  Because a website may choose to advertise via search-based advertising or by posting advertisements independently of any search, search-based advertising is reasonably interchangeable with other forms of Internet advertising.").  Plaintiffs' amendment should address this issue as well as clearly define the boundaries of this market and allege that Plaintiffs participate in the Social Advertising Market.

### 2.  Monopolization and Attempted Monopolization (Counts I, II, and V)

Under Section 2 of the Sherman Act, it is unlawful to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations."  15 U.S.C. § 2.  "To plausibly plead a monopolization claim, plaintiffs must allege: (a) the possession of monopoly power in the relevant market; (b) the willful acquisition or maintenance of that power; and (c)

1   causal antitrust injury." *In re Nat'l Football League's Sunday Ticket Antitrust Litig.*, 933 F.3d

2   1136, 1159 (9th Cir. 2019) (internal quotation marks omitted).  And, "[t]o state a claim for

3   attempted monopolization, a plaintiff must allege: (1) specific intent to control prices or destroy

4   competition; (2) predatory or anticompetitive conduct to accomplish the monopolization; (3)

5   dangerous probability of success; and (4) causal antitrust injury." *Catch Curve, Inc. v. Venali,*

6   *Inc.*, 519 F. Supp. 2d 1028, 1034-35 (C.D. Cal. 2007) (internal quotation marks omitted).

7          Facebook challenges Plaintiffs' allegations as to the conduct element of these claims.

8   Specifically, Facebook argues that Plaintiffs' monopolization and attempted monopolization

9   claims fail because they are premised on a theory "that Facebook was required to prop up

10  competitors by providing APIs to developers who could then create applications that might one

11  day emerge to compete with Facebook," and there is no duty to aid competitors.  Mot. 21-25.

12  Facebook argues that the general principle is that firms are not required to cooperate with rivals by

13  selling them products that would help the rivals compete, and courts are very cautious to recognize

14  exceptions to this principle.  Mot. 21-22.  Facebook, moreover, argues that the narrow exception

15  identified in *Aspen Skiing Co. v. Aspen Highlands Skiing Co.*, 472 U.S. 585 (1985), does not

16  apply.  Mot. 22-24.  Specifically, Facebook argues that Plaintiffs have not alleged the existence of

17  a cooperative venture and there was no profit sacrifice by Facebook.  Mot. 23-24.  Facebook

18  argues that Plaintiffs make only conclusory allegations to support their Section 2 claim and, in the

19  absence of a duty to deal, which is not alleged, Facebook has no obligation to justify its alleged

20  API withdrawal policy change.  Mot. 24.  Additionally, Facebook argues that Plaintiffs' claims

21  still fail even if the scheme is broader and includes the Whitelist and Data Sharing Agreements as

22  well as Facebook's acquisitions of Instagram and WhatsApp.  Reply 11-12.  Facebook argues that

23  the agreements did not bar the agreements' counterparties from providing data to Plaintiffs and

24  Plaintiffs fail to allege that they could not obtain data from any signatory to a Whitelist and Data

25  Sharing Agreement.  Reply 11-12.  Moreover, Facebook argues that the acquisitions of Instagram

26  and WhatsApp were not anticompetitive and therefore do not help Plaintiffs' claim.  Reply 12.

27         Plaintiffs oppose and lay out the alleged monopolization scheme.  Opp. 5-7.  Plaintiffs

28  argue that Facebook's argument "is an attempt to dismember the API withdrawal from the alleged

21

scheme, and to attack that by itself is a refusal to deal"; however, Plaintiffs argue that courts take a holistic look at an allegedly anticompetitive scheme.  Opp. 7.  Thus, Plaintiffs argue that Facebook must consider the Whitelist and Data Sharing Agreements, Facebook's targeting of developers for secret agreements and acquisition, and Facebook's acquisition of Instagram and WhatsApp.  Opp. 7.  Moreover, relying on *Aspen Skiing*, Plaintiffs argue that the API withdrawal itself is sufficient to plead an unlawful refusal to deal.  Opp. 7-10.  Specifically, Plaintiffs argue that Facebook voluntarily entered into profitable business arrangements with third-party developers, and Facebook profited from selling access to its social data.  Opp. 8-9.  Plaintiffs argue that Facebook stopped selling access to its social data, sacrificing significant profits, without a legitimate business or technical justification.  Opp. 9-10.

In general, there is "no duty to aid competitor," *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 411 (2004); however, "[t]he high value that we have placed on the right to refuse to deal with other firms does not mean that the right is unqualified," *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 601 (1985).  Thus, "[u]nder certain circumstances, a refusal to cooperate with rivals can constitute anticompetitive conduct and violate § 2." *Trinko*, 540 U.S. at 411.  The Supreme Court, however, has "been very cautious in recognizing such exceptions, because of the uncertain virtue of forced sharing and the difficulty of identifying and remedying anticompetitive conduct by a single firm."  *Id.*  The Supreme Court recognized such an exception in *Aspen Skiing*, but that case is "at or near the outer boundary of § 2 liability." *Id.*

In *Aspen Skiing*, the defendant owned three of the four mountains in the Aspen, Colorado ski area, the plaintiff owned the fourth mountain, and for several years the parties offered a multiple-day, multiple-area ticket that allowed skiers to ski all four mountains.  *Aspen Skiing*, 472 U.S. at 589-90.  This joint ticket was often cheaper than purchasing single-day tickets, and the revenue from the tickets was split between the parties based on the percentage that ticketholders used their tickets on each mountain.  *Id.* at 589, 592.  The defendant decided to discontinue the joint ticket, and instead offered to continue participating in the joint ticket only if the plaintiff agreed to receive a fixed percentage of the revenue that was lower than the historical average

1  based on usage.  *Id.* at 592.  After the plaintiff rejected the offer, the defendant continued to offer a

2  joint ticket to its three mountains, and the plaintiff attempted to market its own ticket package by

3  offering ski passes to the fourth mountain with vouchers equal to the retail price of a single-day

4  ticket at one of the defendant's mountains.  *Id.* at 593-94.  The defendant did not accept these

5  vouchers and refused to sell lift tickets to its mountains to the plaintiff at retail price.  *Id.* at 593.

6  The Supreme Court upheld a jury verdict in favor of the plaintiff on its claim that the defendant

7  had monopolized the market for downhill skiing services in Aspen.  *Id.* at 604-05.

8         The Supreme Court in its later *Trinko* decision and the Ninth Circuit in *MetroNet* have

9  called out significant factors present in *Aspen Skiing* that justified the exception to the "no duty to

10  deal" rule.  Those factors included: (1) "the unilateral termination of a voluntary and profitable

11  course of dealing"; (2) "the defendant's refusal to sell tickets to the plaintiff 'even if compensated

12  at retail price,' thus 'suggesting a calculation that its future monopoly retail price would be

13  higher'"; and (3) the defendant's refusal "to provide to their competitors products that were

14  already sold in a retail market to other customers."  *MetroNet Servs. Corp. v. Qwest Corp.*, 383

15  F.3d 1124, 1132-33 (9th Cir. 2004); *see Trinko*, 540 U.S. at 407-08.  In both cases, the Ninth

16  Circuit and the Supreme Court did not find facts sufficient to apply the *Aspen Skiing* exception.

17  *See Trinko*, 540 U.S. at 407-08; *MetroNet*, 383 F.3d at 1132-33.

18         The Court tends to agree with Facebook that this claim, as alleged, fails because there is no

19  duty to deal allegation and the *Aspen Skiing* exception does not apply to the allegations of

20  Facebook's refusal to deal.  While it appears that Plaintiffs have alleged a unilateral termination of

21  a voluntary and profitable course of dealing, *see, e.g.*, Compl. ¶¶ 111-23, there are no allegations

22  that Facebook refused to provide products to its competitors that were already sold in a retail

23  market to other customers.  Indeed, the Complaint alleges that Facebook "refused to sell its social

24  data to any *competitive* third-party developer," Compl. ¶ 118 (emphasis added), and does not

25  allege that this data was sold in a retail market to other customers, *see e.g.*, Opp. 6 ("Facebook

26  therefore ordered that any competitive app be denied even the ability to purchase advertising from

27  Facebook – at any price"); Compl. ¶¶ 113, 118-23.

28         In addition, Plaintiffs argue that Facebook acquired Instagram and WhatsApp because they

23

United States District Court
Northern District of California

1   were rapidly growing and could potentially compete with Facebook.  Opp. 6.  And, had the

2   acquisition not occurred, Plaintiffs argue that "Facebook would have had to compete directly with

3   Instagram and WhatsApp."  Compl. ¶ 310.  Plaintiffs also argue that Facebook is integrating

4   WhatsApp and Instagram to "consolidate its power over segmented global markets and prevent

5   effective divestiture from potential regulatory action."  Opp. 6; *see* Compl. ¶¶ 293-314.   These

6   allegations, however, are merely conclusory and Plaintiffs provide no factual support for their

7   allegations that Instagram and WhatsApp were willing to, or could, harvest and monetize social

8   data to compete with Facebook.

9          Accordingly, Plaintiffs have failed to state a claim for monopolization or attempted

10   monopolization.

### 3.   Whitelist and Data Sharing Agreements (Count III)

12          Facebook argues that Plaintiffs fail to state a claim under Section 1 of the Sherman Act for

13   the Whitelist and Data Sharing Agreements because Plaintiffs' hub-and-spoke theory is

14   incoherent.  Mot. 25.  Specifically, Facebook argues that even assuming the agreements between

15   Facebook and its horizontal competitors qualify as vertical agreements, Plaintiffs "allege no

16   agreements in the rim of the wheel."  Mot. 25.  Facebook further argues that the Court cannot infer

17   such coordination and Plaintiffs fail to plead facts pointing toward a meeting of the minds of the

18   alleged conspirators.  Mot. 25.  Plaintiffs, on the other hand, argue that the Complaint alleges the

19   existence of agreements between Facebook and its direct competitors, which is "a straightforward

20   horizontal output restriction [and] *per se* illegal."  Opp. 17.   Plaintiffs argue that they have stated

21   a claim because the Complaint explains that "the agreements between Facebook and whitelisted

22   developers lacked any legitimate business or technical basis, such that there were no

23   procompetitive justifications for these agreements to outweigh their anticompetitive effects in the

24   Social Data and Social Advertising markets."  Opp. 17-18.

25          "A traditional hub-and-spoke conspiracy has three elements: (1) a hub, such as a dominant

26   purchaser; (2) spokes, such as competing manufacturers or distributors that enter into vertical

27   agreements with the hub; and (3) the rim of the wheel, which consists of horizontal agreements

28   among the spokes."  *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1192 (9th

24

Cir. 2015).  Based on Plaintiffs' opposition, it is unclear whether they are still pursuing a hub-and-spoke theory.  As stated at the hearing, however, Plaintiffs have failed to plausibly allege a claim under this theory because Plaintiffs fail to plausibly allege the rim of the wheel – that is, Plaintiffs fail to plausibly allege horizontal agreements among the spokes.  Accordingly, the Court finds that there is no viable claim under Section 1 of the Sherman Act.

## IV.   CONCLUSION

For the foregoing reasons, the Court GRANTS Facebook's motion to dismiss and DISMISSES WITH LEAVE TO AMEND IN PART and DISMISSES WITHOUT LEAVE TO AMEND IN PART Plaintiffs' Complaint.  Plaintiffs shall file an amended complaint within thirty (30) days of the date of this Order.

**IT IS SO ORDERED.**

Dated: July 8, 2020

_____
BETH LABSON FREEMAN
United States District Judge

United States District Court
Northern District of California