SONAL N. MEHTA (SBN 222086)
  Sonal.Mehta@wilmerhale.com
WILMER CUTLER PICKERING
  HALE AND DORR LLP
2600 El Camino Real, Suite 400
Palo Alto, California 94306
Telephone:  (650) 858-6000
Facsimile:  (650) 858-6100

DAVID Z. GRINGER (*pro hac vice*)
  David.Gringer@wilmerhale.com
ARI HOLTZBLATT (*pro hac vice*)
  Ari.Holtzblatt@wilmerhale.com
MOLLY M. JENNINGS (*pro hac vice*)
  Molly.Jennings@wilmerhale.com
WILMER CUTLER PICKERING
  HALE AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006
Telephone: (202) 663-6000
Facsimile: (202) 663-6363

*Attorneys for Defendant*
FACEBOOK, INC.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| REVEAL CHAT HOLDCO, LLC, a Delaware limited liability company, USA TECHNOLOGY AND MANAGEMENT SERVICES, INC. (d/b/a Lenddo USA), a Delaware corporation, and BEEHIVE BIOMETRIC, INC., a dissolved Delaware corporation,<br><br>Plaintiffs,<br><br>v.<br><br>FACEBOOK, INC., a Delaware corporation,<br><br>Defendant. | Case No. 5:20-cv-00363-BLF<br><br>**DEFENDANT FACEBOOK, INC.'S NOTICE OF MOTION AND MOTION TO DISMISS; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEREOF**<br><br>Hearing Date: December 3, 2020<br>Time: 9:00am<br>Judge: Hon. Beth Labson Freeman |

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ...............................................................................................................ii

INTRODUCTION ........................................................................................................................... 1

BACKGROUND ............................................................................................................................. 3

ARGUMENT ................................................................................................................................. 4

I.    Plaintiffs' Claims Remain Time-Barred .................................................................. 4

      A.    Plaintiffs' Claims Accrued No Later Than April 2015 ................................... 4

      B.    The Doctrine Of Fraudulent Concealment Does Not Apply ......................... 5

            1.    The Fraudulent Concealment Doctrine Does Not Apply .................... 5

            2.    Plaintiffs Have Not Adequately Pled Fraudulent Concealment ......... 6

II.   Plaintiffs Have Not Plausibly Alleged Antitrust Injury ....................................... 11

      A.    Plaintiffs Did Not Suffer Antitrust Injury In The "Social Data" Market ..... 12

            1.    Plaintiffs Did Not Suffer Antitrust Injury As Competitors In Social Data ........ 13

            2.    Plaintiffs Did Not Suffer Antitrust Injury As Customers In Social Data .......... 16

      B.    Plaintiffs Did Not Suffer Antitrust Injury In The "Social Advertising" Market ........ 18

III.  The FAC Does Not State A Section 2 Claim ......................................................... 19

      A.    Plaintiffs Have Not Plausibly Alleged Exclusionary Conduct ................... 19

            1.    Facebook's Purported "Scheme" Was Not Plausibly Exclusionary ............. 19

            2.    Facebook Did Not Have A Duty To Deal With Plaintiffs .............................. 20

      B.    Facebook Does Not Have Monopoly Power ............................................... 23

CONCLUSION ............................................................................................................................ 25

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*American Professional Testing Service, Inc. v. Harcourt Brace Jovanovich Legal & Professional Publications, Inc.*,
108 F.3d 1147 (9th Cir. 1997) ...........................................................................................17

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
472 U.S. 585 (1985)...........................................................................................20, 21, 22

*Associated General Contractors of California v. California State Council of Carpenters*,
459 U.S. 519 (1983).........................................................................................................18

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007).....................................................................................................19, 22

*Bourns, Inc. v. Raychem Corp.*,
331 F.3d 704 (9th Cir. 2003) ........................................................................................15, 18

*Brantley v. NBC Universal, Inc.*,
675 F.3d 1192 (9th Cir. 2012) ...........................................................................................17

*Cascade Health Solutions v. PeaceHealth*,
515 F.3d 883 (9th Cir. 2008) .............................................................................................19

*Christy Sports, LLC v. Deer Valley Resort Co.*,
555 F.3d 1188 (10th Cir. 2009) ....................................................................................21, 22

*Conmar Corp. v. Mitsui & Co. (U.S.A.), Inc.*,
858 F.2d 499 (9th Cir. 1988) ...........................................................................................7, 11

*DeHoog v. Anheuser-Busch InBev SA/NV*,
899 F.3d 758 (9th Cir. 2018) .............................................................................................12

*Dimidowich v. Bell & Howell*,
803 F.2d 1473 (9th Cir. 1986) ...........................................................................................20

*Distance Learning Co. v. Maynard*,
2020 WL 2995529 (N.D. Cal. June 4, 2020) .......................................................................24

*Facebook, Inc. v. Power Ventures, Inc.*,
2010 WL 3291750 (N.D. Cal. July 20, 2010).......................................................................22

*Feitelson v. Google Inc.*,
80 F. Supp. 3d 1019 (N.D. Cal. 2015) ..................................................................4, 13, 15, 16

*Foremost Pro Color, Inc. v. Eastman Kodak Co.*,
703 F.2d 534 (9th Cir. 1983) .............................................................................................23

*Federal Trade Commission v. Qualcomm Inc.*,
　969 F.3d 974 (9th Cir. 2020) ............................................................................ *passim*

*Garrison v. Oracle Corp.*,
　159 F. Supp. 3d 1044 (N.D. Cal. 2015) .............................................................7, 11

*GO Computer, Inc. v. Microsoft Corp.*,
　508 F.3d 170 (4th Cir. 2017) ...................................................................................10

*Hexcel Corp. v. Ineos Polymers, Inc.*,
　681 F.3d 1055 (9th Cir. 2012) ......................................................................5, 6, 10

*Hicks v. PGA Tour, Inc.*,
　897 F.3d 1109 (9th Cir. 2018) .............................................................................4, 20

*Hunt-Wesson Foods, Inc. v. Ragu Foods, Inc.*,
　627 F.2d 919 (9th Cir. 1980) ...........................................................................24, 25

*Image Technical Services, Inc. v. Eastman Kodak Co.*,
　125 F.3d 1195 (9th Cir. 1997) ................................................................................24

*In re Animation Workers Antitrust Litigation*,
　123 F. Supp. 3d 1175 (N.D. Cal. 2015) ...........................................................8, 10

*In re Ciprofloxacin Hydrochloride Antitrust Litigation*,
　261 F. Supp. 2d 188 (E.D.N.Y. 2003) ......................................................................6

*In re Dual-Deck Video Cassette Recorder Antitrust Litigation*,
　11 F.3d 1460 (9th Cir. 1993) ...................................................................................14

*In re Glumetza Antitrust Litigation*,
　__ F. Supp. 3d __, 2020 WL 1066934 (N.D. Cal. Mar. 5, 2020) ..............................8

*In re Lithium Ion Batteries Antitrust Litigation*,
　2014 WL 4955377 (N.D. Cal. Oct. 2, 2014)............................................................14

*In re National Football League's Sunday Ticket Antitrust Litigation*,
　933 F.3d 1136 (9th Cir. 2019) ................................................................................23

*In re Webkinz Antitrust Litigation*,
　695 F. Supp. 2d 987 (N.D. Cal. 2010) ...................................................................16

*Liveuniverse, Inc. v. Myspace, Inc.*,
　2007 WL 6865852 (C.D. Cal. June 4, 2007), *aff'd* 304 F. App'x 554 (9th Cir.
　2008) ........................................................................................................................21

*Lucas Automotive Engineering Inc. v. Bridgestone/Firestone, Inc.*,
　140 F.3d 1228 (9th Cir. 1998) ................................................................................17

*MetroNet Services Corp. v. Qwest Corp.*,
　383 F.3d 1124 (9th Cir. 2004) ..........................................................................20, 21

*Moviecolor Ltd. v. Eastman Kodak Co.*,
    288 F.2d 80 (2d Cir. 1961)...................................................................................................6

*Novation Ventures, LLC v. J.G. Wentworth Company, LLC*,
    156 F. Supp. 3d 1094 (C.D. Cal. 2015) ..............................................................................17

*Novell, Inc. v. Microsoft Corp.*,
    731 F.3d 1064 (10th Cir. 2013) ..........................................................................................22

*NYNEX Corp. v. Discon, Inc.*,
    525 U.S. 128 (1998)............................................................................................................16

*Ohio v. American Express Co.*,
    138 S. Ct. 2274 (2018)........................................................................................................20

*Pace Industries, Inc. v. Three Phoenix Co.*,
    813 F.2d 234 (9th Cir. 1987) ................................................................................................4

*Pacific Bell Telephone Co. v. Linkline Communications, Inc.*,
    555 U.S. 438 (2009)............................................................................................................20

*Paladin Associates, Inc. v. Montana Power Co.*,
    328 F.3d 1145 (9th Cir. 2003) ......................................................................................13, 16

*Peralta v. California Franchise Tax Board*,
    124 F. Supp. 3d 993 (N.D. Cal. 2015) ..................................................................................9

*Pincay v. Andrews*,
    238 F.3d 1106 (9th Cir. 2001) ..............................................................................................6

*Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp.*,
    828 F.2d 211 (4th Cir. 1987) ..............................................................................................11

*Rebel Oil Co. v. Atlantic Richfield Co.*,
    51 F.3d 1421 (9th Cir. 1995) ...................................................................................12, 23, 25

*Reyn's Pasta Bella, LLC v. Visa USA, Inc.*,
    442 F.3d 741 (9th Cir. 2006) ................................................................................................8

*Rheumatology Diagnostics Laboratory, Inc. v. Aetna, Inc.*,
    2013 WL 3242245 (N.D. Cal. June 25, 2013).....................................................................25

*Rutledge v. Boston Woven Hose & Rubber Co.*,
    576 F.2d 248 (9th Cir. 1978) ................................................................................................7

*Ryan v. Microsoft Corp.*,
    147 F. Supp. 3d 868 (N.D. Cal. 2015) ...........................................................................10, 11

*Sambreel Holdings LLC v. Facebook, Inc.*,
    906 F. Supp. 2d 1070 (S.D. Cal. 2012)................................................................................22

*Samsung Electronics Co. v. Panasonic Corp.*,
747 F.3d 1199 (9th Cir. 2014) .................................................................................................5

*Santa Maria v. Pacific Bell*,
202 F.3d 1170 (9th Cir. 2000) .................................................................................................7

*Sidibe v. Sutter Health*,
4 F. Supp. 3d 1160 (N.D. Cal. 2013) .....................................................................................25

*Simon & Simon, PC v. Align Technology, Inc.*,
2020 WL 1975139 (D. Del. Apr. 24, 2020).............................................................................23

*Soap Opera Now, Inc. v. Network Publishing Corp.*,
737 F. Supp. 1338 (S.D.N.Y. 1990).......................................................................................15

*Somers v. Apple, Inc.*,
729 F.3d 953 (9th Cir. 2013) .....................................................................................12, 13, 18

*Stackla, Inc. v. Facebook Inc.*,
2019 WL 4738288 (N.D. Cal. Sept. 27, 2019) .......................................................................22

*United States v. Aluminum Co. of America*,
148 F.2d 416 (2d Cir. 1945)...................................................................................................23

*United States v. E.I. du Pont de Nemours & Co.*,
351 U.S. 377 (1956)..........................................................................................................23, 25

*United States v. Syufy Enterprises*,
903 F.2d 659 (9th Cir. 1990) .......................................................................................17, 19, 25

*Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP*,
540 U.S. 398 (2004)..........................................................................................................18, 20, 21

*Vess v. Ciba-Geigy Corp. USA*,
317 F.3d 1097 (9th Cir. 2003) ................................................................................................10

*Volk v. D.A. Davidson & Co.*,
816 F.2d 1406 (9th Cir. 1986) ................................................................................................11

*Von Saher v. Norton Simon Museum of Art at Pasadena*,
592 F.3d 954 (9th Cir. 2010) ..................................................................................................10

*Western Center for Journalism v. Cederquist*,
235 F.3d 1153 (9th Cir. 2000) ..................................................................................................6

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
401 U.S. 321 (1971)..................................................................................................................4

**DOCKETED CASES**

*Six4Three, LLC v. Facebook, Inc.*,
  Case No. CIV 533328 (San Mateo Super. Ct.) ...................................................................8, 9

**STATUTES AND RULES**

Fed. R. Civ. P. 9(b) .........................................................................................................................10

Fed. R. Civ. P. 12(b)(6).................................................................................................................1, 4

15 U.S.C. § 15b ...................................................................................................................................5

**OTHER AUTHORITIES**

HERBERT HOVENKAMP & PHILLIP E. AREEDA, ANTITRUST LAW, Wolters Kluwer
  (4th ed., last updated May 2020) ..................................................................................................8

## NOTICE OF MOTION AND MOTION TO DISMISS

PLEASE TAKE NOTICE THAT, on December 3, 2020 at 9:00am or as soon thereafter as the matter may be heard, in Courtroom 3 of the U.S. District Court for the Northern District of California, San Jose Division, at 280 South 1st Street, San Jose, California, this Motion to Dismiss filed by defendant Facebook, Inc. will be heard.  Pursuant to Federal Rule of Civil Procedure 12(b)(6), Facebook moves to dismiss the First Amended Complaint in the above-captioned action on the grounds that plaintiffs' claims are time-barred, no plaintiff has suffered antitrust injury, and plaintiffs have otherwise failed to state claims upon which relief can be granted.  Facebook's Motion to Dismiss is based on this Notice of Motion, the Memorandum of Points and Authorites, and the Declaration of David Z. Gringer and attached exhibits.

## STATEMENT OF REQUESTED RELIEF

Pursuant to Federal Rule of Civil Procedure 12(b)(6), Facebook requests that the Court dismiss plaintiffs' First Amended Complaint with prejudice.

## MEMORANDUM OF POINTS AND AUTHORITIES

### INTRODUCTION

*More than six years ago*, in April 2014, Facebook announced that it was changing the policy that allowed the plaintiffs' apps to access certain user data using Application Programming Interfaces, or "APIs."  *More than five years ago*, in April 2015, Facebook implemented that change.  At the time, the plaintiffs say "they" asked for an exception to the API policy from "Facebook," which was denied.  They then did *nothing* until January 2020.  The plaintiffs now assert antitrust claims, seeking to transform what is—at most—a run-of-the-mill business dispute into a federal offense.  Their claims are both too little and too late to survive a motion to dismiss.

This Court dismissed plaintiffs' original complaint, holding that each of their claims was time-barred and that the complaint failed to state a claim.  Despite its length, plaintiffs' complaint was light on meaningful details clearly within the plaintiffs' possession, including their business plans, their status as ongoing entities, and their response to the challenged conduct. Plaintiffs have now returned to this Court with an even lengthier 123-page, 509-paragraph

Amended Complaint ("FAC").  The FAC reveals why plaintiffs initially said so little about themselves:  plaintiffs were not putative competitors of Facebook's, nor were they—or competition more generally—inhibited by any of Facebook's actions.  Instead, plaintiffs were (and in one case are) "app" developers that hoped to operate on Facebook Platform, using Facebook's data to offer niche products.

The FAC should be dismissed for at least three reasons.  *First*, plaintiffs waited too long to sue and plaintiffs' attempt to toll the statute of limitations by alleging fraudulent concealment remains unavailing.  The FAC concedes that plaintiffs were aware of the challenged acts and of their injuries at the time the acts and injuries occurred.  Plaintiffs were likewise aware of Facebook's market position and purported dominance.  That is unsurprising because, as this Court emphasized, all of this was public knowledge at the time it occurred.  ECF No. 61 ("MTD Order") at 10.  Thus, nothing relevant was concealed from plaintiffs—let alone fraudulently so.  That is dispositive.  Plaintiffs' reference to statements made to the general public expressing Facebook's *reasons* for the changes at issue—most of which plaintiffs do not allege to have heard or read—are plainly insufficient under controlling Ninth Circuit authority.  And asking Facebook for "exceptions" to its API policy and then doing nothing else but reading a blog post is not "due diligence" under any sense of the term.

*Second*, plaintiffs' attempt to address the Court's concern regarding whether they are customers or competitors of Facebook's is unsuccessful, since plaintiffs now claim to be both, at the same time, in the same market.  That is illogical on its face.  The allegations make clear that plaintiffs were customers of Facebook's and had no plans or ability to compete with Facebook.  The challenged conduct plainly did not impact competition in the relevant markets, and thus plaintiffs have still not adequately alleged antitrust injury and cannot do so.

*Third*, plaintiffs' unlawful monopolization and attempted monopolization claims fail across every dimension.  Even accepting plaintiffs' fanciful relevant markets as true, Facebook is not plausibly alleged to have monopoly power—or anything close.  And plaintiffs took no steps to modify their previously deficient refusal-to-deal theory, which cannot meet the stringent standard for such claims.  The FAC also highlights the implausibility of plaintiffs' claims,

2

whereby, according to plaintiffs, Facebook designed a scheme to strengthen its largest competitors while killing off smaller firms that only "planned" to compete in the future.

At the hearing on Facebook's initial motion to dismiss, plaintiffs were challenged repeatedly to come forward with facts that would support their conclusory allegations. It is now abundantly clear that plaintiffs not only did not do so, but that they cannot do so because their theories suffer not from mere pleading defects, but fundamental factual and legal flaws that cannot be cured. The FAC should therefore be dismissed with prejudice.

## BACKGROUND

Facebook was founded in a college dorm room by Mark Zuckerberg in 2004. FAC ¶ 75. Since then, and in the face of vigorous competition, it has succeeded in providing a platform for connectivity and sharing among its over two billion users worldwide. *Id.* ¶¶ 67, 75-84. In addition to "core" Facebook, it operates a portfolio of products that includes the photo-sharing app Instagram, which it acquired in 2012, and the messaging product WhatsApp, which it acquired in 2014. *Id.* ¶ 67. In April 2014, Facebook publicly announced that it would no longer make generally available certain APIs that allowed third-party app developers to access user data that users had consented to share. *Id.* ¶ 242. Facebook implemented this change in April of 2015. *Id.* ¶ 245. Plaintiffs allege that between the 2014 annoucement and the 2015 implementation, Facebook entered into data sharing agreements with certain competitors allowing those companies to retain API access. *Id.* ¶ 247.

Five years later, plaintiffs filed this lawsuit alleging various antitrust violations. This Court dismissed plaintiffs' original complaint, holding, as relevant to this motion, that all claims were time-barred, plaintiffs had failed to establish an antitrust injury, and had not adequately alleged a cognizable refusal to deal. MTD Order at 9-11, 16-17, 23. The FAC accuses Facebook of both monopolizing *and* attempting to monopolize "social data" and "social advertising" markets. FAC ¶¶ 492-509. Plaintiffs' other claims in the original complaint, along with former plaintiff Cir.cl, Inc., have been dropped, the latter without explanation.

The FAC has three principal differences from the original. First, it alleges that Facebook assumed various duties to disclose information to plaintiffs about API availability and

Facebook's reasons for modifying its API policies. *Id.* ¶¶ 450-453, 460. Second, plaintiffs claim to have exercised diligence to discover their antitrust claims by requesting exemptions from Facebook's new API policy. *Id.* ¶ 476. Finally, the FAC alleges plaintiffs are simultaneously Facebook's customers, potential competitors, and actual competitors in the "social data" market. *Id.* ¶ 9.

## ARGUMENT

On a Rule 12(b)(6) motion to dismiss a private antitrust complaint, "it is one thing to be cautious before dismissing an antitrust complaint in advance of discovery, but quite another to forget that proceeding to antitrust discovery can be expensive. As such, a district court must retain the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed." *Feitelson v. Google Inc.*, 80 F. Supp. 3d 1019, 1025-1026 (N.D. Cal. 2015) (Freeman, J.) (quotations and citations omitted). Thus, to "survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1117 (9th Cir. 2018). "Applying this standard is a 'context-specific task' that requires drawing on 'judicial experience and common sense.'" *Id*. Applying this standard, this Court should dismiss both of plaintiffs' claims. First, each claim is time-barred because the challenged conduct occurred over four years ago. Second, plaintiffs have not adequately alleged antitrust injury. Third, both of plaintiffs' claims are premised on theories that are either implausible, noncognizable, or both.

## I.     PLAINTIFFS' CLAIMS REMAIN TIME-BARRED

### A.     Plaintiffs' Claims Accrued No Later Than April 2015

It is black-letter law that "a[n] [antitrust] cause of action accrues … when a defendant commits an act that injures a plaintiff's business." *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971); *see also Pace Indus., Inc. v. Three Phoenix Co.*, 813 F.2d 234, 237 (9th Cir. 1987). Under this "injury rule," the statute of limitations for an antitrust claim begins to run the moment the plaintiff was injured, regardless of whether the plaintiff realizes at the moment of injury that it has an antitrust claim; there is no requirement that a "plaintiff [] actually discover its antitrust claims before the statute of limitations begins to run." *Hexcel*

4

*Corp. v. Ineos Polymers, Inc.*, 681 F.3d 1055, 1060 (9th Cir. 2012).  The rule is simple:  once the injury occurs, the limitations period begins.

There is no question (and no dispute) that plaintiffs' injury occurred no later than April 2015.  The FAC challenges a purported "scheme" that Facebook allegedly executed from "September 2012 through April 2015."  FAC ¶ 6.  The last act in that "scheme" was Facebook's restriction of developer access to certain APIs on which the plaintiffs allegedly depended, *id.* ¶ 13—more than four years and eight months before plaintiffs filed their original complaint on January 16, 2020, *see* ECF No. 1.  Plaintiffs continue to allege that they were injured by Facebook's conduct "immediately."  FAC ¶ 181; *see also id.* ¶¶ 260, 307, 331-332.

Because the statute of limitations under the Sherman Act is four years, *see* 15 U.S.C. § 15b, plaintiffs' claims are untimely unless a tolling doctrine applies.  And, to the extent plaintiffs are seeking injunctive relief, this Court has already held that "the doctrine of laches applies to the instant case," MTD Order at 7, and already noted that "the four-year statute of limitations in 15 U.S.C. § 15b furnishes a guideline for computation of the laches period," *id.* (quoting *Samsung Elecs. Co. v. Panasonic Corp.*, 747 F.3d 1199, 1205 (9th Cir. 2014)).  All of plaintiffs' claims are therefore barred unless some doctrine tolls the Sherman Act statute of limitations.  None does.

### B.    The Doctrine Of Fraudulent Concealment Does Not Apply

In both their original complaint and the FAC, plaintiffs seek to rely on the doctrine of fraudulent concealment to toll the applicable limitations period.  This Court already held that the original complaint did not adequately plead the necessary predicates for fraudulent concealment.  *See* MTD Order at 8-11.  Because the FAC does not fix the deficiencies of the original complaint, the FAC should be dismissed with prejudice.

#### 1.    *The fraudulent concealment doctrine does not apply*

To begin, the doctrine does not apply because plaintiffs have not alleged that Facebook's purported concealment prevented them from learning of the challenged acts and their injury.  To the contrary:  plaintiffs allege that they knew of Facebook's changes to the APIs (and their resulting injury) no later than April 30, 2015.  *See* FAC ¶¶ 24, 43-44, 60, 245.  By that point, "at

the very least, plaintiffs had constructive knowledge of the facts that give rise to their claims." MTD Order at 10. And that they knew of their injury, and had at least constructive knowledge of their claims, by April 2015, means that the "doctrine of fraudulent concealment does not apply." *Hexcel*, 681 F.3d at 1060; *see also Pincay v. Andrews*, 238 F.3d 1106, 1110 (9th Cir. 2001) ("[Plaintiffs] had constructive notice of their injuries prior to 1985 as a matter of law. Thus, they cannot prevail on their fraudulent concealment claim."). "[C]ourts have found that '[a]ny fact that should excite [a plaintiff's] suspicion is the same as actual knowledge of his entire claim.'" *In re Ciprofloxacin Hydrochloride Antitrust Litig.*, 261 F. Supp. 2d 188, 225 (E.D.N.Y. 2003).

Plaintiffs do not dispute this Court's holding that they had notice of their injuries no later than 2015 as a matter of law. In fact, they now concede as much when they newly allege (*e.g.*, FAC ¶ 476) that they pursued an investigation of their claims; a "plaintiff is deemed to have had constructive knowledge if it had enough information to warrant an investigation," *Hexcel*, 681 F.3d at 1060. As before, plaintiffs suggest that their delay was because they were unaware that Facebook's changes to the APIs were motivated by anticompetitive intent. *See, e.g.*, FAC ¶¶ 447-448. But that they were allegedly unaware of Facebook's intent does not change the fraudulent-concealment analysis above. So long as a plaintiff has notice of the wrongful conduct and its injury, "it is not necessary that [it] have knowledge of all of the details or all of the persons involved in order for [the] cause of action to accrue." *Western Ctr. for Journalism v. Cederquist*, 235 F.3d 1153, 1157 (9th Cir. 2000). In other words: "Mere ignorance of evidence on which to establish a claim is not enough." *Moviecolor Ltd. v. Eastman Kodak Co.*, 288 F.2d 80, 87 (2d Cir. 1961) (Friendly, J.). "[I]gnorance of evidence"—*i.e.*, evidence of Facebook's alleged intent behind its actions concerning the APIs—is exactly what plaintiffs claim here. This alone is enough to dismiss all claims without regard to plaintiffs' allegations about fraudulent concealment or diligence.

### 2. *Plaintiffs have not adequately pled fraudulent concealment*

Even if the fraudulent concealment doctrine did apply, plaintiffs have now confirmed that, after multiple opportunities, they cannot satisfy the relevant standard. For one, they have not adequately pleaded facts showing that "Facebook took affirmative acts to mislead them."

6

MTD Order at 9.  Though the FAC identifies several categories of behavior by Facebook, none of it amounts to affirmative activity that misled the plaintiffs.

*First*, plaintiffs say that Facebook "made false statements about the availability of the API functionality."  FAC ¶¶ 450-453.  But not one of the named plaintiffs is alleged to have heard or relied on any of the quoted statements, which alone precludes the use of those statements to toll the statute of limitations.  *See Santa Maria v. Pacific Bell*, 202 F.3d 1170, 1176 (9th Cir. 2000); *Garrison v. Oracle Corp.*, 159 F. Supp. 3d 1044, 1078 n.11 (N.D. Cal. 2015) (collecting cases).  Moreover, those statements occurred between 2011 and April 2015, FAC ¶ 453, and any confusion they created about the availability of the APIs (as well as any purported duty to speak to cure that confusion, *see id.*) was resolved no later than April 30, 2015, when Facebook publicly removed API access, *id.* ¶ 13.  The statements are thus entirely irrelevant to whether anything Facebook did *after* April 2015 tolls the statute of limitations.  *See Garrison*, 159 F. Supp. 3d at 1062, 1084.

*Second*, plaintiffs contend that Facebook executives adhered to a "code of silence" that tolls the statute of limitations.  FAC ¶¶ 454-458.  But these allegations of silence are not materially different from those in the original complaint, and this Court has already held that "Facebook's decision to keep 'tightly underwraps' the 'real reason for the removal of the APIs'" did not involve *affirmative* conduct of the type necessary to support a claim for fraudulent concealment.  *See* MTD Order at 9-10.  That was correct; mere "[s]ilence or passive conduct of the defendant is not deemed fraudulent, unless the relationship of the parties imposes a duty upon the defendant to make disclosure."  *Rutledge v. Boston Woven Hose & Rubber Co.*, 576 F.2d 248, 250 (9th Cir. 1978).  Though plaintiffs suggest that Facebook's statements "about the Platform and its available functionality created a duty to speak fully and truthfully," FAC ¶ 458, they do not plead any facts that establish that Facebook "had a fiduciary duty to disclose information" to them, let alone that such a duty existed with regard to product changes that Facebook was considering, *see Conmar Corp. v. Mitsui & Co. (U.S.A.), Inc.*, 858 F.2d 499, 505 (9th Cir. 1988); *see also* MTD Order at 10.  No case supports such an expansive theory of fiduciary duty.  Nor do plaintiffs plead any other cognizable duty to disclose the so-called "true"

reasons for the API changes, beyond conclusory statements that such a duty was created, for example, when a Facebook employee "recounted conversations with developers during which he did not disclose the truth about the APIs." FAC ¶ 458.

Neither *In re Animation Workers Antitrust Litigation*, 123 F. Supp. 3d 1175 (N.D. Cal. 2015) ("*Animation Workers II*"), nor *In re Glumetza Antitrust Litigation*, __ F. Supp. 3d __, 2020 WL 1066934 (N.D. Cal. Mar. 5, 2020), on which plaintiffs relied in opposing dismissal of the original complaint, supports a different conclusion. Both cases were price-fixing cases. *Animation Workers II* involved an alleged conspiracy to fix the salaries paid to animators, 123 F. Supp. 3d at 1179, and *In re Glumetza* involved an alleged conspiracy to artificially inflate the prices of prescription drugs, 2020 WL 1066934, at *4. In a price-fixing case, concealing the reasons a price is set at a given level obscures not only the defendant's intent but also the fact that a potential plaintiff has been injured at all—*i.e.*, that prices are the result of collusion rather than market forces. *See, e.g.*, *In re Glumetza*, 2020 WL 1066934, at *7 (in light of fraudulent concealment, public facts were insufficient to "excite the reasonable plaintiffs' curiosity"). Here, by contrast, the plaintiffs allege that Facebook's removal of the APIs affected them in ways that were immediately clear to them once the APIs were withdrawn in April 2015, and that should have been clear upon Facebook's announcement the year before. *See* FAC ¶¶ 29, 49, 60, 445. Indeed, another app developer filed suit on April 10, 2015, arguing that the API removal harmed its business. *See* Declaration of David Z. Gringer, Ex. 1, Complaint, *Six4Three, LLC v. Facebook*, No. CIV 533328 (San Mateo Super. Ct. Apr. 10, 2015) ("*Six4Three* Complaint").[1] As the leading antitrust treatise explains, "in the typical refusal to deal, tying, or exclusive dealing case, the injured party and likely plaintiff has virtually immediate knowledge of the unlawful act." Areeda & Hovenkamp, *Antitrust Law* ¶ 320a (4th ed., last updated May 2020).

*Third*, plaintiffs contend that statements Facebook made about the reasons for the removal of the APIs tolled the statute of limitations, because those statements did not disclose

---

[1] Publicly available court filings are subject to judicial notice and may be considered on this motion. *See Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006).

No. 5:20-cv-00363-BLF            NOTICE OF MOTION & MOTION TO DISMISS; MEMO. ISO MOTION

the "true" reasons for the removal. FAC ¶¶ 459-475. But those statements are irrelevant to whether Facebook fraudulently concealed plaintiffs' claims from them. The reasons for Facebook's conduct had no impact on whether the plaintiffs knew they were injured by that conduct, whether they were able to understand the impact of Facebook's conduct on their ability to compete, or whether they were able to allege that Facebook's conduct lacked a valid, competitive motivation. *See, e.g.*, *Six4Three* Complaint ¶ 83 (alleging that "[n]o countervailing benefits of Facebook's decision to consumers or competitors exist."). This means that plaintiffs cannot rely on any of Facebook's purported "lies" about the reasons for the API removal to establish that fraudulent concealment occurred, including Facebook's April 2015 blog post describing the "goal" of the withdrawal and related FAQs, *see* FAC ¶¶ 467-469, or purported statements about the reasons "exceptions" were granted to individual developers, *see id.* ¶¶ 464-465. Nor can they rely on the allegedly undisclosed fact that Facebook had "internally audited apps to determine whether they were competitive," *id.* ¶ 462; there is no allegation that these actions had any bearing on whether plaintiffs could discover their injuries or claims.

Other statements on which plaintiffs hope to rely have no apparent relation to the timeliness of their suit—meaning that, even if the statements were false, it is unclear how they could have prevented plaintiffs from discovering that they were injured by the API removal and thus tolled the statute of limitations. *See, e.g.*, *Peralta v. California Franchise Tax Bd.*, 124 F. Supp. 3d 993, 1003 (N.D. Cal. 2015) (discovery of facts after discovery of claim "does not undo [the plaintiff's] discovery of her claim and re-start the statute of limitations"). This includes the statements Facebook allegedly made about the availability of exceptions to Facebook's API policy after April 30, 2015. *See* FAC ¶ 476. Plaintiffs nowhere explain how, if Facebook had told them exceptions were available to other companies, but not to them, that would have enabled them to sue within the limitations period. In fact, this Court already held that plaintiffs had constructive notice of the data sharing agreements by September 2015, *see* MTD Order at 10, and, in any event, plaintiffs' allegations strongly suggest they knew exceptions might be

available, because they knew enough to ask for them, *see* FAC ¶ 476.[2]

Beyond being irrelevant, several of the statements on which plaintiffs hope to rely have additional defects. A number are not alleged to have been made to the named plaintiffs, nor have the named plaintiffs alleged that they knew of or relied on those statements to assess whether they had a claim. *See* FAC ¶¶ 464-465 (statements to Airbiquity and Microsoft). Others fall far short of satisfying Rule 9(b)'s particularity requirement, in that neither the speaker nor the recipient are identified. *See Ryan v. Microsoft Corp.*, 147 F. Supp. 3d 868, 887-888 (N.D. Cal. 2015) (without "specific information as to who spoke to Plaintiffs when," complaint did not give defendant "sufficient notice of what conversations Plaintiffs allege were fraudulent"). For example, the allegations about statements made to "LikeBright" (Reveal Chat's predecessor) and "Beehive," by "Facebook" or an "acquaintance" of a plaintiff who worked at Facebook, *see* FAC ¶¶ 25-27, 61, contain none of the specificity Rule 9(b) requires; they do not identify any of the people involved, any of the specific representations made, or when or where they occurred, *see Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1107 (9th Cir. 2003). One statement is even alleged to have occurred *after* the complaint was filed, on May 6, 2020. *See* FAC ¶ 46.

None of the statements described above, or pleaded in ¶¶ 459-475, amounted to a denial of anticompetitive conduct. But even if they did, "[t]o permit a claim of fraudulent concealment to rest on no more than an alleged failure to own up to illegal conduct upon … timid inquiry would effectively nullify the statute of limitations in these cases." *GO Computer, Inc. v. Microsoft Corp.*, 508 F.3d 170, 179 (4th Cir. 2017), *cited in Hexcel*, 681 F.3d at 1060, 1063. Courts require more—like the affirmative conduct pleaded in *Animation Workers II*, which included detailed allegations that the defendants "took efforts to avoid sending emails related to the non-solicitation agreements, to avoid writing down the details of the non-solicitation

---

[2] The Court's ruling referenced a 2015 *Wall Street Journal* article describing the data-sharing agreements (attached as Gringer Declaration Exhibit 2). *See* MTD Order at 10. That article is judicially noticeable "as an indication of what information was in the public realm at the time." *Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 960 (9th Cir. 2010).

10

agreements, and to eliminate any paper trail relating to the agreements by using a code name for the agreements." *Ryan*, 147 F. Supp. 3d at 890. If nothing else, the many emails referenced in the FAC make clear that Facebook did not eliminate a paper trail. By contrast, where a defendant's alleged conduct consists of little more than allegations that discussions of particular business decisions were restricted to a particular set of executives, where there is ample evidence that the business decision was discussed inside the company, and where there is no contention that defendants "marked an email as confidential, stated that the recipient should not forward or discuss the contents of the email, or took efforts to discuss the alleged agreements in code," there is no "affirmative conduct" sufficient to trigger the fraudulent-concealment doctrine. *See id.* at 889; *see also Garrison*, 159 F. Supp. 3d at 1077 (same).

*Fourth*, plaintiffs' fraudulent concealment theory independently fails because they have not adequately alleged that they conducted a diligent investigation after learning of their injuries. *See* MTD Order at 10-11. The only "diligence" plaintiffs reference are their boilerplate attempts to determine whether they might qualify for an exemption from the 2015 API policy, or reading blog posts three-and-a-half years after the API policy change went into effect. FAC ¶¶ 25-27, 43-46, 61, 476. Asking for an exception to a policy is not diligence, it is seeking preferential treatment; reading publicly-available statements years later is the epitome of passivity. Certainly, none of these actions are pleaded with particularity, *see* MTD Order at 11, and none comprise an investigation reasonably calculated "to uncover the facts giving rise to [a] claim," *Ryan*, 147 F. Supp. 3d at 885. Due diligence requires more than "timid" or "unpursued inquir[ies]," as "[i]t can hardly be imagined that illegal activities would ever be so gratuitously revealed." *Pocahontas Supreme Coal Co., Inc. v. Bethlehem Steel Corp.*, 828 F.2d 211, 219 (4th Cir. 1987); *see also Conmar*, 858 F.2d at 505 (citing *Pocahontas* favorably). That is particularly true here, because plaintiffs were acutely aware of the effects of Facebook's conduct; in light of such clear knowledge, "it was not reasonable for them to rely on reassuring comments" from Facebook. *Volk v. D.A. Davidson & Co.*, 816 F.2d 1406, 1416 (9th Cir. 1986).

## II.    PLAINTIFFS HAVE NOT PLAUSIBLY ALLEGED ANTITRUST INJURY

Both of plaintiffs' remaining claims require them to plead and prove antitrust injury.

*FTC v. Qualcomm Inc.*, 969 F.3d 974, 990 (9th Cir. 2020) (monopolization); *Rebel Oil Co., Inc. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1432-1433 (9th Cir. 1995) (attempted monopolization). Antitrust injury has five elements: "(1) unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from that which makes the conduct unlawful, [] (4) that is of the type the antitrust laws were intended to prevent," and (5) that the plaintiff is a "consumer … or a competitor of the alleged violator in the restrained market." *Somers v. Apple, Inc.*, 729 F.3d 953, 963 (9th Cir. 2013). For any claimed antitrust injury to be cognizable under Section 2, the harm alleged must flow from a reduction in competition in the relevant market. *See Qualcomm*, 969 F.3d at 999-1000. This Court previously dismissed plaintiffs' claims for failure to adequately allege antitrust injury, explaining that plaintiffs did not provide sufficient "allegations as to Plaintiffs' individual businesses" or "non-conclusory" allegations that plaintiffs "themselves have been injured." MTD Order at 16-17. On amendment, the Court requested information about whether "Plaintiffs are consumers or competitors of Facebook" and whether they even "participate in the Social Advertising Market." *Id.* at 17. Plaintiffs' attempts to remedy these deficiencies fall far short.

**A.    Plaintiffs Did Not Suffer Antitrust Injury in the "Social Data" Market**

The FAC now alleges that plaintiffs were Facebook's actual *and* potential competitors, as well as its customers, all at the same time, and in the same purported social data market. FAC ¶ 9.[3] Contradictory allegations like these are inherently implausible. *See DeHoog v. Anheuser-Busch InBev SA/NV*, 899 F.3d 758, 764 (9th Cir. 2018) (allegation that firms "were actual competitors … undermine[s] [] assertion that [they] were potential competitors"). But regardless of how plaintiffs characterize themselves, they have not suffered a cognizable antitrust injury in the supposed social data market. Plaintiffs must show an injury, suffered as either a competitor or a customer in social data, that flows from a reduction in competition. *Somers*, 729 F.3d at 963. They have not done so.

*First*, plaintiffs have not pled that they were competitors in social data. According to

---

[3] Facebook continues to dispute the viability of plaintiffs' contrived product markets, but has not reargued the issue here given the Court's preference to resolve it on a more developed record.

12

plaintiffs, competitors in this supposed market produce social data.  FAC ¶ 354.  None of the FAC's allegations about plaintiffs' businesses demonstrate that plaintiffs produced "social data." And even assuming plaintiffs competed, or intended to compete, the FAC reveals no plausible means by which plaintiffs could have done so in any meaningful way such that they could have suffered an antitrust injury as a competitor.  *Feitelson*, 80 F. Supp. 3d at 1029 ("conclusory and speculative" claims of antitrust injury insufficient).

*Second*, while plaintiffs have alleged that they were customers in social data, they have not shown an injury "that is of the type the antitrust laws were intended to prevent."  *Somers*, 729 F.3d at 963.  The fact that plaintiffs may have been injured by Facebook's revocation of their access to certain APIs is not sufficient to establish an antitrust injury.  *Paladin Assocs., Inc. v. Montana Power Co.*, 328 F.3d 1145, 1158 (9th Cir. 2003).  Instead, plaintiffs are required to allege that Facebook's conduct impaired competition in social data, and that *as a result of the lost competition* plaintiffs were deprived of access to social data that would have been available in a more competitive market.  *Id.*; *see also Qualcomm*, 969 F.3d at 1000 (antitrust injury must flow from a "less competitive market").  They have not done that either.

### 1.    Plaintiffs did not suffer antitrust injury as competitors in social data

Plaintiffs allege that they suffered antitrust injury as "horizontal … competitors" of Facebook in social data.  FAC ¶ 430.  But the allegations that plaintiffs were nascent or actual competitors in social data are implausible and directly contradicted elsewhere in the FAC.

The FAC's description of the social data market purports to explain how firms compete in this alleged market.  It claims that firms like Facebook compete to generate information about user interactions on a "social" *platform*.  The product in this "market" is, apparently, "data resulting from user-to-user or user-to-content interactions."  FAC ¶ 341.  Competitors "acquire social data from their users," *id.* ¶ 336, which is "generated when users in a network interact with each other and with content," *id.* ¶ 350.  In short:  competitors in social data "*produce* social data" through a platform that allows user interaction.  *Id.* ¶ 354 (emphasis added).

The FAC contains no non-conclusory allegations that any of plaintiffs' businesses did these things.  None acquired social data from their users or operated a platform that generated, or

13

was capable of generating, social data. And only Reveal Chat suggests that it even "planned" to do so. FAC ¶ 22. Instead, plaintiffs uniformly allege that they produced narrow, limited-interest apps that "*consume[d]* social data from Facebook" and used that data to provide services utilizing the data consumed. *Id.* ¶¶ 21, 39, 59 (emphasis added).

For example, plaintiff Beehive's "business model was to authenticate user identities using their Facebook accounts." FAC ¶ 57. The service it provided was based entirely on analyzing data generated by Facebook, and it sold the results of that analysis to other firms. *Id.* ¶¶ 55-56, 58. The FAC makes no allegation that Beehive provided a "network" or any kind of platform upon which users could "interact with each other" or with "content." *Id.* ¶ 350. And the FAC provides no facts or other explanation supporting the conclusory allegation that, in the process, Beehive "generated" social data. *Id.* ¶ 59; *see In re Lithium Ion Batteries Antitrust Litig.*, 2014 WL 4955377, at *12 (N.D. Cal. Oct. 2, 2014) (plaintiff may not "merely recit[e] in a conclusory manner" that it satisfies market participation requirement).

The same is true of plaintiff Lenddo, which analyzed "Facebook data provided with the consent of users to assess their creditworthiness." FAC ¶ 33. Its "business model was … making loans" based on credit analytics derived from Facebook's data. *Id.* ¶ 39. Lenddo never alleges that it operated a "network" capable of hosting user "interactions" of any kind. Indeed, the only "interaction" that could have happened on Lenddo's platform was the exchange of "financial data," which plaintiffs exclude from their definition of social data. *Id.* ¶ 346.

Only plaintiff Reveal Chat claims that it planned to operate a platform capable of hosting user interactions. *See* FAC ¶¶ 19-22. But these allegations never explain how Reveal Chat's unsuccessful dating service would have generated social data, let alone on a scale that would compete with Facebook—or even with other dating services. This is insufficient to plausibly establish that Reveal Chat competed or intended to compete in the social data market. *In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 11 F.3d 1460, 1466 (9th Cir. 1993) (requiring "substantial demonstrable steps to enter into production of any product in competition with defendants"). Indeed, the FAC elsewhere effectively concedes that dating services like Reveal Chat's are not *platforms* capable of generating social data. For example, the FAC makes

14

repeated reference to Tinder, a widely-used, *mobile-app* based dating service. *See* FAC ¶¶ 144, 230, 235, 252, 356. But Tinder is not identified in the list of apps that were supposedly "competitive" with Facebook, *id.* ¶ 167, and the FAC attributes no market share to it, *id.* ¶ 356. If Tinder is not in the social data market, Reveal Chat's failed app certainly was not either.

The FAC claims that plaintiffs were dependent on the "social data" generated by Facebook for critical inputs, and without those inputs were unable to compete. FAC ¶¶ 29, 49, 64. Firms like plaintiffs—that create products that are only valuable if used "*in addition* to" Facebook and other social data-generating products—"are not competitors as that term is understood in the context of the antitrust laws." *Soap Opera Now, Inc. v. Network Pub. Corp.*, 737 F. Supp. 1338, 1346 (S.D.N.Y. 1990).

But even accepting as true plaintiffs' implausible allegations that they competed, or even hoped to compete, in social data, their purported injuries remain "entirely too conclusory and speculative" to constitute antitrust injuries. *Feitelson*, 80 F. Supp. 3d at 1029. The FAC still discloses almost nothing about plaintiffs' actual business plans, and nothing at all about their competitive positioning before the challenged conduct occured. Reveal Chat, for instance, provides no information suggesting that its dating service had attracted any interest from users or investors. *See* FAC ¶¶ 18-31. And the conclusory allegation that Lenddo "began to scale its business," *id.* ¶ 41, or that Beehive "raised venture capital," *id.* ¶ 57, does not suggest that either was "an actual competitor or one ready to be a competitor" such that it could "suffer antitrust injury," *Bourns v. Raychem Corp.*, 331 F.3d 704, 711 (9th Cir. 2003). "[A] 'nascent' business— one that is merely a gleam in the eye and a hope in the heart of its promoters—does not possess the property to which antitrust injury can be done." *Id.* at 712.

This is particularly true given that the FAC continues to allege that significant barriers to entry "effectively exclude[] entry by a new competitor" in this market, irrespective of anything that Facebook did beyond innovate and compete. FAC ¶ 415; *see also id.* ¶ 414 ("A new entrant must … expend significant amounts of investments … to create a network large enough to create the network effects necessary to compete"). According to plaintiffs, to "compete with Facebook" in social data, "a competitor would not only have to build its own vast network, but

15

would have to draw active social engagement on a massive scale." *Id.* ¶ 95. Plaintiffs' narrow interest, single-function apps could not plausibly do this. The FAC provides no explanation of how any plaintiff would have amassed the resources necessary to enter the market—let alone at a scale that would "threaten Facebook[]." *Id.* ¶ 445. It remains wholly implausible that an identity verification service or a lending platform would have generated the "strong reach and strong engagement" needed to meaningfully compete. *Id.* ¶ 268.

Thus, "there are no facts alleged that would render these [supposed] injuries more concrete than hypothetical, as there are no facts alleged to indicate that [Facebook's] conduct has prevented [plaintiffs] from" entering the market. *Feitelson*, 80 F. Supp. 3d at 1029.

        2.      *Plaintiffs did not suffer antitrust injury as customers in social data*

Whatever injuries plaintiffs allegedly suffered as customers in social data are not antitrust injuries. "[A]ntitrust injury must represent an adverse effect on competition as a whole in the relevant market," rather than simply a harm to a particular plaintiff. *In re Webkinz Antitrust Litig.*, 695 F. Supp. 2d 987, 998 (N.D. Cal. 2010). Conduct that "harms customers, 'but does so without harming competition, [] is beyond the antitrust laws' reach.'" *Qualcomm*, 969 F.3d at 1000. If "consumer injury" does not "naturally flow[] … from a less competitive market," it is not a cognizable antitrust injury. *Id.* (quoting *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 136 (1998)). Thus, to plausibly establish antitrust injury as consumers, plaintiffs must plausibly allege both a reduction in competition in social data and that they suffered injury from the loss of that competition. *Id.* at 990. They have not done so.

Nothing in the FAC suggests that any of the challenged conduct limited competition from an alternative provider of social data. And "[w]here the defendant's conduct harms the plaintiff without adversely affecting competition generally, there is no antitrust injury." *Paladin*, 328 F.3d at 1158. The FAC sets forth a series of allegations regarding barriers to entry that exist apart from the challenged conduct, extensively describing Google+'s failed entry into the market, FAC ¶¶ 101-113, and attributing that failure to an ambiguously-defined "Social Data Barrier to Entry," *see id.* ¶ 415. The FAC appears to define this purported entry barrier as the need "to draw active social engagement on a massive scale" and "create even more value for users,

16

developers, and advertisers." *Id.* ¶ 95. These words describe only the need to compete aggressively in the market. Facing "aggressive competition" is not "a structural barrier to entry." *United States v. Syufy Enters.*, 903 F.2d 659, 667-668 (9th Cir. 1990). But taking as true plaintiffs' allegations that barriers to entry are high in social data, the failure of Google+, released in 2011, confirms that the barriers existed before the challenged conduct. FAC ¶ 108.

None of the conduct that supposedly strengthened these barriers is plausibly alleged to have impaired competition. Facebook's revised API policy concededly had no effect on "entirely independent apps, which did not rely on Facebook's social data." FAC ¶ 435. And vertical contracts like the alleged data-sharing agreements can only "injure competition" if they "foreclose competitors from entering or competing in a market" or "facilitate[e] horizontal collusion." *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1198 (9th Cir. 2012). Plaintiffs never allege that those data-sharing agreements were exclusive or that signatories were otherwise barred from providing data to, or obtaining data from, other entities. Similarly, plaintiffs have not adequately alleged any reduction in competition arising out of the acquisitions because the FAC contains no new allegations suggesting that "Instagram and WhatsApp were willing to, or could, harvest and monetize social data to compete with Facebook." MTD Order at 24. The FAC's recognition (at ¶ 356) that new entrants like TikTok are competitors in social data further confirms that none of Facebook's conduct excluded competition in this purported market. *See, e.g.*, *American Prof'l Testing Serv., Inc. v. Harcourt Brace Jovanovich*, 108 F.3d 1147, 1154 (9th Cir. 1997) (presence of competitors in market suggests challenged conduct not exclusionary).

Plaintiffs also do not allege that their injuries were plausibly *caused by* any purported reduction in competition. *See Lucas Auto. Eng'g, Inc. v. Bridgestone/Firestone, Inc.*, 140 F.3d 1228, 1233 (9th Cir. 1998) (no antitrust injury if, absent conduct, plaintiff "would have suffered the same injury"). Any injuries from Facebook's revised API policy were caused by plaintiffs' adopting business models that they admit were dependent on Facebook's ongoing provision of data with user consent. FAC ¶¶ 29, 36, 55. As plaintiffs concede (at ¶ 264), apps could continue to compete without using Facebook's data. This is independently fatal to plaintiffs' theories. *See, e.g.*, *Novation Ventures, LLC v. J.G. Wentworth Co., LLC*, 156 F. Supp. 3d 1094, 1102

17

(C.D. Cal. 2015) (no antitrust injury where plaintiff failed to plausibly allege facts "demonstrating that it has actually been foreclosed from the opportunity of competing in the relevant product market."). Plaintiffs do complain that Facebook's conduct deprived them of "alternative platforms" on which to build their apps. FAC ¶¶ 434, 438. But, as with Instagram and WhatsApp, the FAC contains no non-conclusory allegations that other firms would have emerged as alternatives but for the challenged conduct. Indeed, plaintiffs elsewhere allege that data from other competitors was insufficiently "robust" to support their apps. *Id.* ¶¶ 49, 64. In any event, this "injury" is thus insufficient because "nothing but speculation informs the [] claim of injury by reason of the alleged" exclusionary conduct. *Associated Gen. Contractors of Calif. v. California State Council of Carpenters*, 459 U.S. 519, 543 (1983).

**B.      Plaintiffs Did Not Suffer Antitrust Injury in the "Social Advertising" Market**

No plaintiff claims to have been a current or future competitor in social advertising. FAC ¶ 372. Thus, their purported "foreclosure" from this market as competitors, *id.* ¶ 433, is not sufficient to allege an antitrust injury, *see Bourns*, 331 F.3d at 711; *supra* pp.15-16.

Nor can plaintiffs claim antitrust injury as customers. Reveal Chat is the only plaintiff to even allege (without any detail about when the purchases were made) that it purchased advertising from Facebook. FAC ¶ 23. While the FAC does allege that Facebook raised non-quality adjusted advertising prices, *id.* ¶¶ 97-98 (alleging price increases in 2011), it does not allege that Reveal Chat (or any other plaintiff) paid more for social advertising because of the challenged conduct. Thus, plaintiffs cannot claim antitrust injury. *Qualcomm*, 969 F.3d at 990 (quoting *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004)). And as complete non-participants in this market, Lenddo and Beehive necessarily suffered no antitrust injury. *See Somers*, 729 F.3d at 963.

The FAC also provides no non-conclusory allegations that any of Facebook's conduct caused a reduction in competition in social advertising that injured any of the plaintiffs because there is no reason to believe that any of the purportedly excluded apps would have emerged as competitors to Facebook in the social advertising market, thereby lowering the price for social advertising. *See Qualcomm*, 969 F.3d at 990 (increased prices amount to antitrust injury only

18

where they are "the result of a less competitive market"). Indeed, plaintiffs do not even attempt to allege otherwise, limiting their putative class definition to those app developers who were purportedly excluded from the social *data* market. FAC ¶ 478.

### III. THE FAC DOES NOT STATE A SECTION 2 CLAIM

#### A. Plaintiffs Have Not Plausibly Alleged Exclusionary Conduct

Exclusionary conduct is an element of both of plaintiffs' Section 2 claims, *Cascade Health Solutions v. PeaceHealth*, 515 F.3d 883, 903 (9th Cir. 2008), and plaintiffs' theory must be "enough to raise a right to relief above the speculative level," *Bell Altantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Plaintiffs allege Facebook embarked upon a broad-reaching "scheme" to "exclude rivals and potential entrants" from the relevant markets. FAC ¶ 428. This theory fails for multiple independent reasons. First, the scheme itself is implausible. Second, none of the conduct challenged as part of this so-called scheme is anticompetitive as a matter of law because it is all premised on Facebook's violation of a non-existent duty to deal with plaintiffs.

##### 1. Facebook's purported "scheme" was not plausibly exclusionary

"[A]ll antitrust cases … must make economic sense." *Syufy*, 903 F.2d at 663. The "scheme" plaintiffs allege does not. Plaintiffs' theory is that Facebook modified its API policies so as to provide access solely to "useful apps" that were producing "valuable social data." FAC ¶ 226. According to plaintiffs, the 40,000 apps that were supposedly excluded as part of this scheme "did not have any useful data." *Id.* ¶ 181. Plaintiffs contend that Facebook "horizontally competes with companies that produce social data." *Id.* ¶ 354. This supposed scheme thus allowed only those firms that were successfully competing with Facebook to remain in the market, while firms exerting no competitive pressure were targeted. Common sense dictates that a firm seeking to reduce competition should target its most successful competitors, not "anoint" them as "winners," as plaintiffs claim Facebook did. *Id.* ¶ 451.

The FAC's attempt to close this obvious logical gap fares little better. Plaintiffs claim that Facebook "attempted to coopt" its most successful competitors by bartering for "those apps' … social data," *id.* ¶ 5, so that Facebook could "serve as a 'data pass-through' among competitors," *id.* ¶ 250. Obscurity aside, the alleged method through which this occurred—the

19

alleged data-sharing agreements—were not exclusive and thus provided no means by which Facebook could plausibly "control the supply and sale of social data." *Id.* ¶ 260.  The application of "judicial experience and common sense," *Hicks*, 897 F.3d at 1117, compels the conclusion that a business strategy allowing Facebook's most successful competitors to remain in the market—unrestrained by exclusive contracts and aided by inputs provided to it by Facebook—is not exclusionary.  If anything, the FAC alleges Facebook increased output of "social data" by supposedly "s[elling] data obtained from one competitor to another [] competitor."  FAC ¶ 250.  This fact alone compels dismissal of plaintiffs' claims.  *Ohio v. American Express Co.*, 138 S. Ct. 2274, 2288 (2018) ("This Court will 'not infer competitive injury … absent some evidence that tends to prove that output was restricted or prices were above a competitive level.'").

### 2.    Facebook did not have a duty to deal with plaintiffs

The Ninth Circuit reiterated last month that "the Sherman Act 'does not restrict the long recognized right'" of a firm to "'freely exercise [its] own independent discretion as to parties with whom [it] will deal.'" *Qualcomm*, 969 F.3d at 993 (quoting *Trinko*, 540 U.S. at 408).  "As a general rule, businesses are free to choose the parties with whom they will deal." *Pacific Bell Tel. Co. v. Linkline Commc'ns, Inc.*, 555 U.S. 438, 448 (2009).  Firms "may refuse to deal with a … customer for business reasons without running afoul of the antitrust laws." *Dimidowich v. Bell & Howell*, 803 F.2d 1473, 1478 (9th Cir. 1986).  And "there is no duty to aid competitors." *MetroNet Servs. Corp. v. Qwest Corp.*, 383 F.3d 1124, 1131 (9th Cir. 2004).

"The one, limited exception to this general rule comes under the Supreme Court's decision in" *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985). *Qualcomm*, 969 F.3d at 993.  That exception exists "at or near the outer boundary of § 2 liability." *Trinko*, 540 U.S. at 409.  It requires, at minimum, a showing that a firm "(1) [] unilateral[ly] terminat[es] … a voluntary and profitable course of dealing; (2) the only conceivable rationale or purpose is to sacrifice short-term benefits in order to obtain higher profits in the long run from the exclusion of competition; and (3) the refusal to deal involves products that the defendant already sells in the existing market to other similarly situated customers." *Qualcomm*, 969 F.3d at 993-994 (quotations and citations omitted) (citing

20

*MetroNet*, 383 F.3d at 1132 (requiring that firm refuse "to provide to [its] competitors products that were already sold in a retail market")).  And the Supreme Court has "warn[ed] … that the *Aspen Skiing* exception should be applied only in rare circumstances."  *Id.* at 994.  Particular caution is warranted "in technology markets."  *Id.* at 990.

In dismissing plaintiffs' original complaint, this Court recognized that "the *Aspen Skiing* exception does not apply to the allegations of Facebook's refusal to deal."  MTD Order at 23.  The Court's opinion rested primarily on the third prong of the *Aspen Skiing* exception.  Here, the FAC's allegations about Facebook's prior course of dealing with third-party application developers like plaintiffs are unchanged.  There remain "no allegations that Facebook refused to provide products to its competitors that were already sold in a retail market to other customers."  *Id.*  And the FAC continues to allege that Facebook "refused to sell its social data to any *competitive* third-party developer," FAC ¶ 162 (emphasis added), and still does not allege that this data was sold to other, similarly-situated customers, *compare* ECF No. 1 ¶¶ 113, 118-123 *with* FAC ¶¶ 153, 158-163.  *See* MTD Order at 23.  Dismissal on this basis remains appropriate.

Moreover, plaintiffs have not alleged the requisite "profitable course of dealing" between competitors to state a viable Section 2 claim.  In *Aspen Skiing*, as in the few other cases to recognize a duty to deal, the plaintiff and defendant cooperated to put forward a joint offering.  472 U.S. at 587-595.  Here, "the FAC contains no allegations of an affirmative decision or arrangement between [Facebook] and [plaintiffs] to cooperate in any way."  *Liveuniverse, Inc. v. Myspace, Inc.*, 2007 WL 6865852, at *13 (C.D. Cal. June 4, 2007), *aff'd*, 304 F. App'x 554, 556 (9th Cir. 2008) (rejecting "mistaken" view that "a refusal-to-deal claim does not require 'an affirmative decision or agreement to cooperate' between competitors").  Facebook and the plaintiffs had no direct relationship beyond the plaintiffs accessing Facebook's APIs for their own economic benefit.  Thus, unlike the plaintiff in *Aspen Skiing*, the plaintiffs "should have been aware that the relationship was temporary and subject to [Facebook's] business judgment."  *Christy Sports, LLC v. Deer Valley Resort Co.*, 555 F.3d 1188, 1197 (10th Cir. 2009).  Furthermore, Plaintiffs did not pay Facebook to access the APIs, and thus changing the terms for access does not suggest, let alone permit, an inference that Facebook lost any profits.  *Trinko*,

21

540 U.S. at 409. The allegation that Facebook allowed other, more serious competitors continued access to the APIs is directly to the contrary. FAC ¶ 247. Indeed, plaintiffs allege that Facebook's revenues doubled between 2014 and 2016, *id.* ¶ 406; *see also id.* ¶ 69, directly after the challenged conduct took place, which precludes any inference that the API removal involved the required short-term profit sacrifice.

Finally, the FAC fails to plausibly allege that the *only* conceivable rationale for removing the APIs was the sacrifice of short-term benefits to exclude competition. The FAC makes plain another equally conceivable rationale—Facebook took action for reasons of privacy and data security. *Id.* ¶ 474; *see, e.g.*, *Stackla, Inc. v. Facebook Inc.*, 2019 WL 4738288, at *5-6 (N.D. Cal. Sept. 27, 2019) ("the public has a strong interest" in "allowing Facebook to exclude those who act impermissibly on its platform and jeopardize user privacy"). A plaintiff cannot state an antitrust claim by alleging conduct that is equally "consistent with" anticompetitive activity as with a "rational and competitive business strategy." *Twombly*, 550 U.S. at 554. To be sure, the FAC says this was not the actual basis for Facebook's actions, but it fails to offer any factual allegations supporting the conclusion—as the law requires—that Facebook's stated rationale was not even "conceivable." *Qualcomm*, 969 F.3d at 993; *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1077 (10th Cir. 2013) (Gorsuch, J.) (*Aspen Skiing* requires "conduct that has *no* possible efficiency justification"); *Port Dock & Stone Corp. v. Oldcastle Northeast, Inc.*, 507 F.3d 117, 124-125 (2d Cir. 2007) (refusal to deal claim must fail if "[t]he facts pleaded" even "sugges[t] … the purpose of increasing efficiency in some way"). Were the law otherwise, "the antitrust laws [would] stifle a business's ability to experiment in how it operates, [and] forbid it to change course upon discovering a more profitable path." *Christy*, 555 F.3d at 1198. Courts have already recognized that "Facebook has the right to determine the terms on which it will permit its Application Developers to use the Facebook Platform," and that changing those terms is not an antitrust violation. *Sambreel Holdings LLC v. Facebook, Inc.*, 906 F. Supp. 2d 1070, 1080, 1082 (S.D. Cal. 2012); *see also Facebook, Inc. v. Power Ventures, Inc.*, 2010 WL 3291750, at *13 (N.D. Cal. July 20, 2010) ("Facebook is [not] somehow obligated to allow third-part[ies] [] unfettered access to its own website").

22

The challenged data-sharing agreements and acqusitions do not help plaintiffs either.  As noted, neither is plausibly alleged to have reduced competition.  *See supra* p.17.  Any attempt by plaintiffs to urge a "holistic" theory of exclusionary conduct like that advanced in *In re NFL's Sunday Ticket Antitrust Litig.*, 933 F.3d 1136, 1152 (9th Cir. 2019), thus falls flat, as aggregating the competitive effects of actions that are not plausibly anticompetitive "is of no assistance to [plaintiffs'] efforts to state a claim for relief for monopolization or attempted monopolization," *Foremost Pro Color, Inc. v. Eastman Kodak Co.*, 703 F.2d 534, 543-544 (9th Cir. 1983); *see also Simon & Simon, PC v. Align Techs.*, 2020 WL 1975139, at *7 (D. Del. Apr. 24, 2020) ("plaintiffs proceeding under an anticompetitive scheme theory must plead at least one instance of conduct that is not protected from antitrust scrutiny").

Furthermore, any harms attributable to the agreements and acquisitions are non-cognizable because they, too, depend on a duty-to-deal theory.  Plaintiffs claim that these actions deprived them of alternative platforms upon which they could have built their apps.  FAC ¶¶ 434, 438.  This claim is implausible.  The data-sharing agreements are not alleged to have prevented signatory firms from sharing data with plaintiffs, and the FAC contains no facts suggesting that standalone Instagram and WhatsApp were, or had any path to becoming, viable platform alternatives.  *See* MTD Order at 24; FAC ¶ 302 ("Instagram had not at the time of the merger meaningfully monetized its user engagement and social data").  But, in any event, this purported deprivation depends on the unsupported assumption that Instagram, WhatsApp, or any of the data-sharing signatories would have shared data with plaintiffs when they were concededly under no duty to have done so.

**B.    Facebook Does Not Have Monopoly Power**

"Monopoly power is the power to control prices or exclude competition."  *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956).  A "show[ing] that the defendant owns a dominant share of [the] market" can sometimes support an inference of monopoly power. *Rebel Oil*, 51 F.3d at 1434.  As a general matter, "it is doubtful whether [a] sixty or sixty-four percent" market share "would be enough" to support such an inference, *United States v. Aluminum Co. of Am.*, 148 F.2d 416, 424 (2d Cir. 1945), although "market shares on the order of

23

60 per cent to 70 per cent have supported findings of monopoly power," *Hunt-Wesson Foods, Inc. v. Ragu Foods, Inc.*, 627 F.2d 919, 924-925 (9th Cir. 1980); *see also Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1206 (9th Cir. 1997) ("Courts generally require a 65% market share to establish a prima facie case"). Plaintiffs allege that across all of its products—and likely double-counting—Facebook is on the low end of this spectrum in social data, with a "user share … of more than 60% of users on comparable social networks" and that in October 2019 that share was "approximately 66%." FAC ¶¶ 356-357. "[A]n inference" of monopoly power based on these allegations would be, on multiple levels, "implausible on its face." *Hunt-Wesson*, 627 F.2d at 925.

As an initial matter, treating "user share" as equivalent to market share contradicts plaintiffs' own allegations. According to plaintiffs, social data market share is "best measured by the share of active users" to capture "the level of engagement on [the] platform or the extent to which [the] service or product is used." FAC ¶¶ 351, 353. Plaintiffs elsewhere recognize the significance of the distinction between "user bases" and "*active* users." *Id.* ¶ 364 (emphasis in original). The FAC's allegation as to the relative size of Facebook's user base therefore provides no information about the relative degree of "engagement on [Facebook's] platform" that plaintiffs contend is required to assess market power. *Id.* ¶ 353; *see Distance Learning Co. v. Maynard*, 2020 WL 2995529, at *7-8 (N.D. Cal. June 4, 2020) (dismissing monopolization claim where complaint provided no plausible allegation that "[o]perating 53.8% of online traffic schools … mean[t] Defendants conduct 53.8% of all online traffic school *business*").

Moreover, it is clear that plaintiffs' market share allegations do not include all competitors in the purported social data market. Facebook allegedly has over 60% user share among "comparable social networks." FAC ¶ 356. "Comparable social networks" is not the alleged relevant market. The social data market, as pled, includes "companies that produce social data," regardless of whether their products are "comparable" to Facebook's. *Id.* ¶ 354 ("Social networks can form in many contexts.").

This arbitrary limitation is significant. Facebook has "many competitors." FAC ¶ 186. Elsewhere in the FAC, plaintiffs present a list of companies that Facebook allegedly saw as

"direct, horizontal competitors," including Amazon, Yelp, and Flickr.  *Id.* ¶ 167-168.  These firms are notably absent from plaintiffs' market share allegations.  *Id.* ¶ 356.  The FAC also makes clear that "social network[s]" can be "derived directly from smartphone user's contact list."  *Id.* ¶ 326.  Apple and Google, which produce smartphone operating systems iOS and Android, are also inexplicably excluded from plaintiffs' market share allegations.  Including these firms would push Facebook's market share well below the threshold required to state a monopolization claim.  Because "[p]laintiffs' only market share allegation does not establish [Facebook's] market share in the actual market[] defined by the Complaint," the FAC cannot support an inference of monopoly power in social data based on market share.  *Rheumatology Diagnostics Lab., Inc. v. Aetna, Inc.*, 2013 WL 3242245, at *14 (N.D. Cal. June 25, 2013).

The FAC provides no "direct evidence" of monopoly power either.  *Rebel Oil*, 51 F.3d at 1434.  To be sure, plaintiffs repeatedly incant "exclusion," *see, e.g.*, FAC ¶¶ 151, 208, 310, but these "conclusory allegations do not establish direct evidence of [monopoly] power," *Sidibe v. Sutter Health*, 4 F. Supp. 3d 1160, 1180 (N.D. Cal. 2013).  Further, it is clear from the FAC that Facebook, in fact, lacks power to "control prices or exclude competition."  *du Pont*, 351 U.S. at 391.  For example, plaintiffs allege that TikTok, which only recently entered the market, has become a significant competitor.  FAC ¶¶ 356, 358.  The successful entry of a new competitor demonstrates the absence of monopoly power.  *See Syufy*, 903 F.2d at 664-665.  Further, plaintiffs do not and cannot make any plausible allegation that Facebook can exclude competition from "independent competitor[s] that [do] not rely on Facebook's Platform," FAC ¶ 262, and instead leverage alternative sources of social data, such as smartphone contacts—a data source over which Facebook plainly has no control, *id.* ¶ 316.  Accordingly, plaintiffs' allegation that Facebook has monopoly power in social data is "implausible on its face," *Hunt-Wesson*, 627 F.2d at 925.  And because only firms that compete in social data are "capable of delivering social advertising," FAC ¶ 392, and Facebook lacks monopoly power in social data, Facebook necessarily lacks monopoly power in social advertising too.

## CONCLUSION

This Court should grant Facebook's motion to dismiss with prejudice.

25

Dated:  September 11, 2020                    Respectfully submitted,


                                             By:   /s/ Sonal N. Mehta
                                             SONAL N. MEHTA (SBN 222086)
                                             sonal.mehta@wilmerhale.com
                                             WILMER CUTLER PICKERING HALE
                                             AND DORR LLP
                                             2600 El Camino Real, Suite 400
                                             Palo Alto, CA 94306
                                             Telephone: (650) 858-6000

                                             DAVID Z. GRINGER (*pro hac vice*)
                                             david.gringer@wilmerhale.com
                                             ARI HOLTZBLATT (*pro hac vice*)
                                             ari.holtzblatt@wilmerhale.com
                                             MOLLY M. JENNINGS (*pro hac vice*)
                                             molly.jennings@wilmerhale.com
                                             WILMER CUTLER PICKERING HALE
                                             AND DORR LLP
                                             1875 Pennsylvania Avenue, NW
                                             Washington, DC 20006
                                             Telephone: (202) 663-6000

**CERTIFICATE OF SERVICE**

I hereby certify that on this 11th day of September 2020, I electronically transmitted the foregoing document to the Clerk's Office using the CM/ECF System.

/s/ Sonal N. Mehta
Sonal N. Mehta