UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| REVEAL CHAT HOLDCO LLC, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>FACEBOOK, INC.,<br><br>Defendant. | Case No. 20-cv-00363-BLF<br><br>**ORDER GRANTING MOTION TO DISMISS**<br><br>[Re: ECF 71] |

Three web developers—Reveal Chat Holdco LLC ("Reveal Chat"), USA Technology and Management Services, Inc. ("Lenddo"), and Beehive Biometric, Inc. ("Beehive") (collectively "Plaintiffs")—have brought this lawsuit against Defendant Facebook, Inc. ("Facebook") for removing access to a set of application programming interfaces ("APIs") in 2015 that Plaintiffs relied on for their mobile applications. *See* Am. Compl., ECF 62. Plaintiffs allege that Facebook's removal of these APIs was part of an elaborate scheme that violates Section 2 of the Sherman Act. *See id.* The Court previously found that Plaintiffs' claims were time-barred and granted them leave to amend their complaint. *See* Order ("Prior MTD order"), ECF 61. Facebook has again filed a motion to dismiss that includes the threshold issue of whether Plaintiff's claims are time-barred. *See* Mot., ECF 71. Plaintiffs oppose this motion. *See* Opp'n, ECF 73. The Court held a two-hour oral argument on December 3, 2020, giving Plaintiffs ample opportunity to discuss the viability of their claims. *See* Min Entry, ECF 78. For the reasons detailed below, the Court GRANTS Facebook's motion.

**I.   BACKGROUND**

Plaintiffs allege that between 2004 and 2010, Facebook vanquished a number of rivals in order to emerge as the dominant social network in the United States. Am. Compl. ¶ 76. "By 2010,

Facebook stood alone as the dominant player in the newly emergent market for social data (the 'Social Data Market')—a market in which Facebook's own users provided Facebook with a constant stream of uniquely valuable information, which Facebook in turn monetized through the sale of social data (for example, through advertising, monetizing APIs, or other forms of commercializing access to Facebook's network)." Am. Compl. ¶ 90. Facebook sold access to social data to developers and sold advertisements targeting Facebook's network of engaged and active users. Am. Compl. ¶ 91. Because user data made Facebook's network more valuable and thus attracted more customers, which then led to more data and more customers, a feedback loop emerged. Am. Compl. ¶¶ 92-95. Data provided by users made Facebook's network more valuable, thereby attracting more users to the network. Am. Compl. ¶ 92. A barrier to entry emerged from this feedback loop—to compete with Facebook, a new entrant would have to rapidly replicate both the breadth and value of the Facebook network by building its own vast network and duplicating the active user engagement on the same massive scale. Am. Compl. ¶ 95. Plaintiffs allege that this "Social Data Barrier to Entry" allows Facebook to control and increase prices in the Social Data and Social Advertising Markets without the pressures of price competition from existing competitors or new entrants. Am. Compl. ¶ 96.

In 2012, Facebook coined the term "Open Graph" "to describe a set of tools developers could use to traverse Facebook's network of users, including the social data that resulted from user engagement." Am. Compl. ¶ 131. Open Graph contained a set of APIs, which "allowed those creating their own social applications to query the Facebook network for information." Am. Compl. ¶ 132. Beginning in the fall of 2011, to allegedly address the threat posed by mobile applications, Facebook devised a scheme to attract third-party developers to build for their platform and then remove access to the APIs that were central to these applications. Am. Compl. ¶ 157. For example, the "Friends API" allowed third-party developers to search through a user's friends, as well as their friends of friends. Am. Compl. ¶ 158. Plaintiffs consider the Friends API, News Feed API, and certain Messaging APIs the "Core APIs." Am. Compl. ¶ 5. Without access to this data, third-party applications "would be abruptly left with none of the social data they needed to function." Am. Compl. ¶ 159. By August 2012, Facebook planned to prevent competitive third-

party applications from buying social data from Facebook. Am. Compl. ¶ 167. Facebook even identified direct, horizontal competitors in the Social Data and Social Advertising Markets. Am. Compl. ¶ 168. In November 2012, Facebook announced that it would block competitors or require full data reciprocity for continued access to its data. Am. Compl. ¶ 176. Plaintiffs allege that Facebook's statements from September 2011 through April 2014 about the functionality of the Core APIs were false, half-truths that created a duty to speak fully and truthfully about the Core APIs. Am. Compl. ¶ 450.

In April 2014, Facebook announced that it would remove access to several "rarely used" APIs, including the Friends and News Feed APIs. Am. Compl. ¶ 242. Plaintiffs allege that these APIs were in fact quite popular and relied on by tens of thousands of third-party applications. Am. Compl. ¶ 243. After this announcement and through the full removal of the APIs in April 2015, Facebook entered into Whitelist and Data Sharing Agreements with certain third-party developers that allowed continued access to the Friends or News Feed APIs and included a provision acknowledging that the covered APIs were not available to the general public. Am. Compl. ¶¶ 247-248. These agreements "were only offered in exchange for massive purchases of Facebook's social data through mobile advertising and/or through the provision of the developer's own social data back to Facebook (so-called 'reciprocity')." Am. Compl. ¶ 249. Plaintiffs allege that Facebook covered up the real reason for the removal of the APIs—while Facebook publicly stated that the change was made to give users more control over their data, Plaintiffs allege that the real reason for the change was to kill applications that were competitive or potentially competitive with Facebook. Am. Compl. ¶¶ 461-62, 469. Plaintiffs allege that they first learned that Facebook's purported reasons for the removal of the APIs was false on November 6, 2019, when NBC News posted a trove of internal Facebook documents seized by the United Kingdom Parliament that allegedly showed that Facebook internally viewed the purported withdrawal as lacking any legitimate business or technical justification and that the scheme had a broad impact on competition. Am. Compl. ¶ 475.

### A.   Reveal Chat

Plaintiff Reveal Chat[1] was a dating platform whose business model was to consume social data through Facebook's APIs to provide match-making services and create a platform from which it could sell advertising. Am. Compl. ¶ 21. Reveal Chat learned in late 2014 that Facebook had slated APIs it relied on for removal. Am. Compl. ¶ 24. In 2015, Reveal Chat allegedly contacted Facebook "to determine if there was a way forward." Am. Compl. ¶ 25. Facebook allegedly referred Reveal Chat to its official policy documents and developer documentation, which suggested that the APIs were being removed for user control and privacy reasons. Am. Compl. ¶ 25. Reveal Chat then allegedly "contacted acquaintances that worked at Facebook to get more clarity as to the APIs and to determine whether [Reveal Chat] could obtain an exemption from the decision." Am. Compl. ¶ 26. Reveal Chat never obtained an exception and accepted Facebook's explanation that the APIs were being removed due to user privacy concerns. Am. Compl. ¶ 27. One of Reveal Chat's founders reviewed Facebook's blog post in December 2018, which responded to documents released as part of a United Kingdom Parliament investigation that again allegedly misled him into believing the APIs had been removed due to user privacy and control concerns. Am. Compl. ¶ 30. Reveal Chat alleges that it did not and could not learn the true reasons for the removal of the APIs until November 6, 2019, when internal Facebook documents were publicly released. Am. Compl. ¶ 31.

### B.   Lenddo

Plaintiff Lenddo developed a mobile application that used social data to assess a user's creditworthiness based on studies showing that a person's network of associations is predictive as to credit risk, fraud, and likelihood of loan repayment. Am. Compl. ¶¶ 32-33. Lenddo's business model was based on consuming social data from Facebook. Am. Compl. ¶ 39. Lenddo learned in April 2015 that Facebook was eliminating the Core APIs and the Messaging APIs for all companies that were not given exemptions. Am. Compl. ¶ 43. On April 23, 2015, Lenddo entered a developer ticket, seeking to obtain an exemption from the new policy. Am. Compl. ¶ 44. Lenddo

---

[1] Reveal Chat is the successor in interest to Reveal Chat, Inc. (f/k/a LikeBright, Inc.), pursuant to an April 2015 merger between Reveal Chat and Reveal Chat, Inc. Am. Compl. ¶ 18. The Court will refer to this company both pre- and post-merger as Reveal Chat.

alleges it communicated with Facebook's Neil Hiltz and Simon Cross, and Cross informed Lenddo that it could not have access to the Core APIs and the Messaging APIs because the its application was credit-related and was part of a business that provided credit. Am. Compl. ¶¶ 45-46. Lenddo alleges that this explanation is false, as Royal Bank of Canada had allegedly obtained an exemption after having purchased large amounts of advertising from Facebook. Am. Compl. ¶ 47. Lenddo allegedly spoke with other developers, reviewed documentation from Facebook, and spoke to "other acquaintances at Facebook" and concluded that Facebook's policy change was for legitimate reasons. Am. Compl. ¶ 48. Lenddo alleges that it did not and could not learn the true reasons for the removal of the APIs until 2019 when internal Facebook documents were publicly released. Am. Compl. ¶ 52.

### C. Beehive

Plaintiff Beehive had devised an algorithm that would analyze a user's social connections and interactions to determine whether the individual's identification was authentic and thus establish whether a Facebook user was a real person. Am. Compl. ¶¶ 55-56. Beehive targeted its product to dating sites, and as a result, the dating sites saw immediate increases in reliability of users on their platforms and a significant drop in fraud risk. Am. Compl. ¶ 58. Beehive's business was halted in 2015 when it discovered that Facebook was removing the APIs, including the Friends and News Feed APIs, that Beehive's business depended on for its functionality. Am. Compl. ¶ 60. Beehive sought an exemption from Facebook but never received a response. Am. Compl. ¶ 61. "Beehive sought an exemption from Facebook but received no answer. Beehive then contacted an acquaintance that worked at Facebook, who advised them that they would never receive an exemption." Am. Compl. ¶ 61. Beehive allegedly spoke to other developers, read documentation by Facebook, and viewed developer message boards and did not find any explanation other than the one Facebook had offered regarding user privacy for the API removals. Am. Compl. ¶ 63. Beehive alleges that it did not and could not learn the true reasons for the removal of the APIs until 2019 when internal Facebook documents were publicly released. Am. Compl. ¶ 65.

### D. Prior Order Granting Facebook's Motion to Dismiss

This Court previously granted a motion to dismiss filed by Facebook on July 8, 2020. *See* Prior MTD Order; *see also Reveal Chat Holdco, LLC v. Facebook, Inc.*, 471 F. Supp. 3d 981 (N.D. Cal. 2020). The Court found as a matter of law that Plaintiffs' claims were time-barred by the four-year statute of limitations for antitrust claims and that Plaintiffs had not adequately pled fraudulent concealment in part because they had not plausibly alleged they were without actual or constructive knowledge of the facts giving rise to their claims. Prior MTD Order 10, 14. The Court found that, "[t]o allege fraudulent concealment, Plaintiffs must establish that 'its failure to have notice of its claim was the result of [Facebook's] affirmative conduct.'" Prior MTD Order 9 (quoting *Conmar Corp. v. Mitsui & Co. (U.S.A.)*, 858 F.2d 499, 505 (9th Cir. 1988)). The Court found that Plaintiffs had notice as of April 30, 2014, that access to the Friends and News Feed APIs would be removed, and Plaintiffs had notice of the Whitelist and Data Sharing Agreements in September 2015 via an article published in the Wall Street Journal. Prior MTD Order 10. "Thus, at the very least, Plaintiffs had constructive knowledge of the facts that give rise to their claims." Prior MTD Order 10. The Court also found that Facebook's decision to keep "tightly underwraps" the "real reason for the removal of the APIs" is not affirmative conduct that necessarily tolls the statute of limitations. Prior MTD Order 10.

The Court further found that Plaintiffs had failed to allege how they had acted diligently in trying to uncover facts giving rise to their claims. Prior MTD Order 10-11. "Here, the publicly available facts regarding Facebook's allegedly anticompetitive conduct would excite the inquiry of a reasonable person, and therefore Plaintiffs must plead diligence with particularity. They have failed to do so here." Prior MTD Order 11. The Court granted Plaintiffs leave to amend on the issue of fraudulent concealment, which if applicable, would toll the statute of limitations. Prior MTD Order 14.

## II. LEGAL STANDARD

### A. Rule 12(b)(6)

"A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a

claim upon which relief can be granted 'tests the legal sufficiency of a claim.'" *Conservation Force v. Salazar*, 646 F.3d 1240, 1241-42 (9th Cir. 2011) (quoting *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001)). When determining whether a claim has been stated, the Court accepts as true all well-pled factual allegations and construes them in the light most favorable to the plaintiff. *Reese v. BP Exploration (Alaska) Inc.*, 643 F.3d 681, 690 (9th Cir. 2011). However, the Court need not "accept as true allegations that contradict matters properly subject to judicial notice" or "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (internal quotation marks and citations omitted). While a complaint need not contain detailed factual allegations, it "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when it "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "However, as the Supreme Court has noted precisely in the context of private antitrust litigation, 'it is one thing to be cautious before dismissing an antitrust complaint in advance of discovery, but quite another to forget that proceeding to antitrust discovery can be expensive.'" *Feitelson v. Google Inc.*, 80 F. Supp. 3d 1019, 1025 (N.D. Cal. 2015) (quoting *Twombly*, 550 U.S. at 558-59). "As such, 'a district court must retain the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed.'" *Feitelson*, 80 F. Supp. 3d at 1025–26 (quoting *Associated Gen. Contractors of Cal., Inc. v. Carpenters*, 459 U.S. 519, 528 n.17 (1983) *quoted with approval in Twombly*, 550 U.S. at 559). On a motion to dismiss, the Court's review is limited to the face of the complaint and matters judicially noticeable. *MGIC Indem. Corp. v. Weisman*, 803 F.2d 500, 504 (9th Cir. 1986); *N. Star Int'l v. Ariz. Corp. Comm'n*, 720 F.2d 578, 581 (9th Cir. 1983).

In deciding whether to grant leave to amend, the Court must consider the factors set forth by the Supreme Court in *Foman v. Davis*, 371 U.S. 178 (1962), and discussed at length by the Ninth Circuit in *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048 (9th Cir. 2009). A district court ordinarily must grant leave to amend unless one or more of the *Foman* factors is present: (1)

7

undue delay, (2) bad faith or dilatory motive, (3) repeated failure to cure deficiencies by amendment, (4) undue prejudice to the opposing party, or (5) futility of amendment. *Eminence Capital*, 316 F.3d at 1052. "[I]t is the consideration of prejudice to the opposing party that carries the greatest weight." *Id.* However, a strong showing with respect to one of the other factors may warrant denial of leave to amend. *Id.*

### B. Rule 9(b)

Claims sounding in fraud are subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b), which require that a plaintiff alleging fraud "must state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b); *see also Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009). To satisfy the heightened standard under Rule 9(b), the allegations must be "specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." *Semegen v. Weidner*, 780 F.2d 727, 731 (9th Cir. 1985). Thus, claims sounding in fraud must allege "an account of the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentations." *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007) (per curiam) (citation omitted). "A plaintiff must set forth what is false or misleading about a statement, and why it is false." *In re GlenFed, Inc. Secs. Litig.*, 42 F.3d 1541, 1548 (9th Cir. 1994) (en banc), *superseded by statute on other grounds as stated in SEC v. Todd*, 642 F.3d 1207, 1216 (9th Cir.2011). However, "intent, knowledge, and other conditions of a person's mind" need not be stated with particularity, and "may be alleged generally." Fed. R. Civ. P. 9(b).

### III. DISCUSSION

#### A. Request for Judicial Notice

Defendants request judicial notice of three documents: the Complaint in *Six4Three, LLC v. Facebook, Inc*, No. CIV 533328 (San Mateo Cnty. Super. Ct. April 10, 2015), *see* Ex. 1, State Court Complaint, ECF 71-2; a September 21, 2015 *Wall Street Journal* article, *Facebook's Restrictions on User Data Cast a Long Shadow*, *see* Ex. 2, Data Sharing Article, ECF 71-3; and an

October 20, 2020 *Wall Street Journal* article, *Snapchat Nears 250 Million Daily Users as Advertisers Lift Spending on Platform*, *see* Ex. 1, Snapchat Article, ECF 74-2. Courts may take judicial notice of matters either that are "generally known within the trial court's territorial jurisdiction" or that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). "Specifically, a court may take judicial notice: (1) of matters of public record, (2) that the market was aware of information contained in news articles, and (3) publicly accessible websites whose accuracy and authenticity is not subject to dispute." *In re Facebook, Inc. Sec. Litig.*, 405 F. Supp. 3d 809, 827 (N.D. Cal. 2019) (internal citations and quotation marks omitted). Plaintiffs do not object to judicial notice of these documents. The Court grants Defendants' request and finds the state court complaint judicially noticeable as a publicly available court document, *see Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006) and the *Wall Street Journal* articles judicially noticeable "as an indication of what information was in the public realm at the time," *see Van Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 960 (9th Cir. 2010).

### B. Statute of Limitations

Facebook argues that Plaintiffs' claims are time-barred, as the Court found in its prior order, and the amendments do not cure the identified deficiencies in the pleading. Mot. 4-5. Plaintiffs chose to not address this threshold issue until the last section of their brief and argue that there is an intra-circuit split as to whether a "discovery rule" or an "injury rule" applies to antitrust claims, and if this Court chooses the discovery rule, then Plaintiffs' claims have not accrued. Opp'n 20-21.

The Court disagrees with Plaintiffs and finds that the Supreme Court and Ninth Circuit have clearly stated that the injury rule applies to antitrust cases. *See Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 188 (1997) (finding that the ordinary Clayton Act rule, applicable in private antitrust treble damages actions holds "a cause of action accrues and the statute begins to run when a defendant commits an act that injures a plaintiff's business.") (quoting *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971)); *Hexcel Corp. v. Ineos Polymers, Inc.*, 681 F.3d 1055, 1060 (9th Cir. 2012) ("We do not require a plaintiff to actually discover its antitrust

claims before the statute of limitations begins to run.") (citing *Beneficial Standard Life Ins., Co. v. Madariaga*, 851 F.2d 271, 274–75 (9th Cir. 1988)). The statute of limitations under the Sherman Act is four years. *Hexcel*, 681 F.3d at 1057 (citing 15 U.S.C. § 15b). To the extent that Plaintiffs are seeking injunctive relief, the Court reiterates its previous finding that "the doctrine of laches applies to the instant case", Prior MTD Order 7, and the same "four-year statute of limitations in 15 U.S.C. § 15b furnishes a guideline for computation of the laches period." Prior MTD Order 7 (quoting *Samsung Elecs. Co. v. Panasonic Corp.*, 747 F.3d 1199, 1205 (9th Cir. 2014)).

Plaintiffs admit that they had notice of their injury by April 30, 2015 when the Core APIs that their businesses relied on were withdrawn. Am. Compl. ¶¶ 6, 13, 245.[2] Plaintiffs did not commence this lawsuit until January 16, 2020. *See* Compl., ECF 1. Therefore, Plaintiffs' claims are time barred unless the Sherman Act statute of limitations is properly tolled. The Court finds that it is not.

### i. Continuing Violation

Plaintiffs argue that Facebook's conduct restarted the statute of limitations under the "continuing violation" doctrine. Opp'n 21-22. Plaintiffs argue that Facebook continued to operate its Onavo spyware to spy on mobile application users as part of its scheme to prevent the advent of a rival social advertising platform or generator of social data. Opp'n 21. This allegedly prevented Snapchat from evolving into a viable platform that would allow Plaintiffs to reacquire the social data they needed for their original business models, as Facebook "cloned" Snapchat's functionality in 2016. Opp'n 21-22. Plaintiffs also argue that Facebook continued to operate under Whitelist and Data Sharing Agreements that allowed some companies to continue having access to the necessary APIs in exchange for social data sharing or advertising purposes. Opp'n 22.

Facebook argues that Plaintiffs did not allege in their complaint that Facebook's purported "cloning" of Snapchat's features caused them injury. Reply 4, ECF 74. Facebook argues that since Plaintiffs were already allegedly excluded from the social data market as of April 2015, when they

---

[2] Plaintiffs do not allege that they signed any Whitelist or Data Sharing Agreements with Facebook, but they had notice of those agreements by September 2015. *See* Prior MTD Order 10; Ex. 2, Data Sharing Article, ECF 71-3.

lost access to the Core APIs, Plaintiffs have failed to plead how any alleged cloning in 2016 somehow worsened their pre-existing injury or constituted a new injury. Reply 4. Facebook also argues that the continued existence of the Data Sharing Agreements, which Plaintiff had notice of by September 2015, do not establish a continuing violation. Reply 4.

"To state a continuing violation of the antitrust laws in the Ninth Circuit, a plaintiff must allege that a defendant completed an overt act during the limitations period that meets two criteria: 1) It must be a new and independent act that is not merely a reaffirmation of a previous act; and 2) it must inflict new and accumulating injury on the plaintiff." *Samsung Elecs. Co. v. Panasonic Corp.*, 747 F.3d at 1202 (9th Cir. 2014); *accord Oliver v. SD-3C LLC*, 751 F.3d 1081, 1086 (9th Cir. 2014) (stating limitations begins to run from date of each "new overt act causing injury").

Here, Plaintiffs were allegedly injured when they were excluded from the social data market by virtue of losing access to the Core APIs by April 30, 2015. Am. Compl. ¶¶ 6, 13, 245 The Court has reviewed the allegations concerning Facebook cloning Snapchat features, *see* Am. Compl. ¶¶ 311-12 and agrees with Facebook that Plaintiffs have not pled facts demonstrating that this alleged cloning inflicted any new and accumulating injury on Plaintiffs beyond their pre-existing injury via exclusion in April 2015. Accordingly, these allegations do not constitute a "continuing violation."

The Court also agrees with Facebook that the relevant act concerning the Data Sharing Agreements occurred in April 2015, the latest start date Plaintiffs allege for the agreements. Am. Compl. ¶¶ 247, 256. Accordingly, the continued existence of these Data Sharing Agreements does not constitute new and independent acts that restart the statute of limitations. *See Ryan v. Microsoft Corp. ("Ryan II")*, 147 F. Supp. 3d 868, 884 (N.D. Cal. 2015) (where the defendant entered into an allegedly unlawful contract prior to the limitations period, the defendant still must take an unlawful 'new and independent act that is not merely a reaffirmation of a previous act' during the limitations period.") (citing *Pace Indus. v. Three Phoenix Co.*, 813 F.2d 234, 237 (9th Cir.1987)).

In conclusion, the Court does not find that the continuing violation doctrine applies here to toll the statute of limitations. Plaintiffs already received an opportunity to amend their complaint

11

1  to properly plead this theory, and they have not suggested that a third attempt would be more
2  productive than the first two. The Court finds that further amendment would be futile and
3  accordingly dismisses this theory with prejudice.

### ii. Fraudulent Concealment

Plaintiffs argue that the doctrine of fraudulent concealment applies to toll the statute of limitations in this case. Opp'n 22-25. Plaintiffs allege that Facebook had a duty to speak fully and truthfully about its plans for removing the APIs, and Facebook affirmatively lied about the real reasons for removing the APIs. Opp'n 22-24. Plaintiffs also argue that, if the Court finds that "facts exist that would excite the inquiry of a reasonable person" regarding Facebook's misconduct, they were diligent in trying to discover the misconduct. Opp'n 25. Facebook argues that Plaintiffs have not cured the deficiencies the Court identified in its prior order finding that the doctrine of fraudulent concealment does not apply. Mot. 5-11, Reply 5-8. Specifically, Facebook argues that Plaintiffs have not pled affirmative acts Facebook took to mislead them Mot. 5-11. Facebook argues that Plaintiffs knew of their injuries by April 2015, and the fact that they were allegedly unaware of Facebook's motives for the removal of the APIs does not impact the fraudulent concealment analysis. Mot. 6, 8-9. Facebook also argues that Plaintiffs have not adequately alleged that they were diligent after learning of their injuries. Mot. 11.

"A statute of limitations may be tolled if the defendant fraudulently concealed the existence of a cause of action in such a way that the plaintiff, acting as a reasonable person, did not know of its existence." *Hexcel*, 681 F.3d at 1060. "The plaintiff carries the burden of pleading and proving fraudulent concealment." *Id.* (brackets and internal quotation marks omitted). "To plead fraudulent concealment, the plaintiff must allege that: (1) the defendant took affirmative acts to mislead the plaintiff; (2) the plaintiff did not have 'actual or constructive knowledge of the facts giving rise to its claim'; and (3) the plaintiff acted diligently in trying to uncover the facts giving rise to its claim." *In re Animation Workers Antitrust Litig. ("Animation Workers II")*, 123 F. Supp. 3d 1175, 1194 (N.D. Cal. 2015) (quoting *Hexcel*, 681 F.3d at 1060)). Thus, "[a] fraudulent concealment defense requires a showing both that the defendant used fraudulent means to keep the plaintiff unaware of his cause of action, and also that the plaintiff was, in fact, ignorant of the

12

existence of his cause of action." *Wood v. Santa Barbara Chamber of Commerce, Inc.*, 705 F.2d 1515, 1521 (9th Cir. 1983). "The plaintiff is deemed to have had constructive knowledge if it had enough information to warrant an investigation which, if reasonably diligent, would have led to discovery of the fraud." *Beneficial Standard Life Ins. Co. v. Madariaga*, 851 F.2d 271, 275 (9th Cir. 1988). "It is enough that the plaintiff should have been alerted to facts that, following duly diligent inquiry, could have advised it of its claim." *Hexcel*, 681 F.3d at 1060 (internal quotation marks omitted).

"Moreover, allegations of fraudulent concealment must be pled with particularity." *Ryan II*, 147 F. Supp. 3d at 885. "Although it is generally inappropriate to resolve the fact-intensive allegations of fraudulent concealment at the motion to dismiss stage, Plaintiffs nevertheless must allege specific factual allegations of fraudulent concealment to survive a motion to dismiss," *Garrison v. Oracle Corp. ("Garrison II")*, 159 F. Supp. 3d 1044, 1073 (N.D. Cal. 2016) (granting a motion to dismiss with prejudice and finding that plaintiffs had failed to adequately plead fraudulent concealment). "Conclusory statements are not enough." *Conmar Corp.*, 858 F.2d at 502.

In *Hexcel*, the Ninth Circuit emphasized that if a plaintiff has actual or constructive knowledge of the facts giving rise to his claim, then fraudulent concealment does not apply. *Hexcel*, 681 F.3d at 1060. Plaintiffs do not attempt to contest that they knew of their alleged exclusion by Facebook by April 30, 2015, when Facebook removed access to the Core APIs. Rather, Plaintiffs argue that without the knowledge of Facebook's true motives for removing the APIs, they could not know they were injured. However, the "failure to own up to illegal conduct" is not sufficient for fraudulent concealment, "and to find otherwise 'would effectively nullify the statute of limitations in these cases.'" *Garrison II*, 159 F. Supp. 3d at 1077 (quoting *Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp.*, 828 F.2d 211, 218–19 (4th Cir. 1987)); *see also Conmar*, 858 F.2d at 505 (citing favorably *Pocahontas*, 828 F.2d at 218); *In re Animation Workers Antitrust Litig. ("Animation Workers I")*, 87 F. Supp. 3d 1195, 1216 (N.D. Cal. 2015) ("That Defendants did not affirmatively disclose the details of their allegedly unlawful conspiracy

13

to Plaintiffs is neither surprising nor sufficient to constitute 'affirmative steps to mislead.'")[3] (citing *Conmar*, 858 F.2d at 505)). Under *Hexcel*, what is important is the facts that give rise to Plaintiffs' claims. The critical fact was losing access to the Core APIs in April 2015.

The Court finds the primary cases Plaintiffs rely on, *Animation Workers II* and *In re Glumetza Antitrust Lit.*, 2020 WL 1066934, at *6 (N.D. Cal. Mar 5, 2020), distinguishable from this case. As Facebook notes, these cases involve allegations of illegal price-fixing, a different antitrust violation than what Plaintiffs have alleged here. Both cases allege a conspiracy, which is also absent in this case. These different factual scenarios are meaningful in terms of evaluating whether Plaintiffs have sufficiently pled fraudulent concealment. The Court agrees with Facebook that "In a price-fixing case, concealing the reasons a price is set at a given level obscures not only the defendant's intent but also the fact that a potential plaintiff has been injured at all—i.e., that prices are the result of collusion rather than market forces." Mot. 8. Here, by contrast, the injury of lost API access was clear to Plaintiffs when it occurred. *See* Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 320a (4th ed., last updated Sept. 2020) ("[I]n the typical refusal to deal, tying, or exclusive dealing case, the injured party and likely plaintiff has virtually immediate knowledge of the unlawful act.").

The Court also finds that Plaintiffs have failed to plead affirmative conduct on the part of Facebook with the requisite particularity that Rule 9(b) requires. "[T]o plead fraudulent concealment in accordance with Rule 9(b), Plaintiffs must allege an account of the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentations." *Garrison II*, 159 F. Supp 3d at 1075 (internal quotation and citation omitted). Many of the statements cited by Plaintiffs were not made to these particular Plaintiffs. *See, e.g.*, Am. Compl. ¶¶ 464-65 (statements to developers at Microsoft and Airbiquity); Am. Compl. ¶ 466 (statements to unspecified, unnamed developers). Statements made before Plaintiffs were

---

[3] The Court acknowledges that the *Animation Workers* plaintiffs were ultimately able to plead sufficient facts to establish fraudulent concealment at the motion to dismiss stage after Judge Koh gave them one opportunity to amend their complaint. *See Animation Workers II*, 124 F. Supp 3d at 1193-1205. Even under *Animation Workers II*, the facts pled by Plaintiffs after their opportunity to amend are not sufficient to plausibly plead fraudulent concealment.

allegedly injured in April 2015 necessarily cannot toll the statute of limitations, *see* Am. Compl. ¶¶ 459-60. Plaintiffs also allege a "code of silence" internally at Facebook, Am. Compl. ¶¶ 454-58, but this Court has already rejected Plaintiffs' attempts to rely on Facebook's private actions as affirmative misconduct that specifically misled them. Prior MTD Order 9-10.

Plaintiffs allege that Facebook misrepresented the real goal of the API withdrawal in an April 30, 2015 blog post, Am. Compl. ¶ 467, but Plaintiffs do not allege that any of them read or relied on this statement. The March 26, 2018 statement of senior executive Ime Archibong, Am. Compl. ¶ 472, suffers from the same deficiency. Plaintiffs also refer to unspecified Facebook "documentation and FAQ," publicized by Facebook employee Simon Cross on an unspecified message board on an unspecified date, that was false and misleading, Am. Compl. ¶ 468, but this type of allegation is wholly insufficient under Rule 9(b). *See Animation Workers I*, 87 F. Supp. 3d at 1217 ("Plaintiffs offer no specific facts showing the 'who, what, where, when' of these alleged incomplete or materially false statements.") (citing *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007) (per curiam)). Plaintiffs' allegations that Reveal Chat and Beehive "frequented those sources of information as a matter of course" and read the posts and accepted the pretextual reason for the API removal, Am. Compl. ¶ 471, is not the type of allegation of fraud "specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge." *Garrison II*, 159 F. Supp 3d at 1075 (citing *Swartz*, 476 F.3d at 764). Defendants also allege that December 5, 2018 blog post by Facebook misrepresented the reasons for the API withdrawal and Data Sharing Agreements, and this post was read by one of the founders of Reveal Chat. Am. Compl. ¶¶ 30, 474. However, the Complaint does not specifically identify this founder, or how many founders Reveal Chat and its predecessor company claim. These allegations are significantly less particular than those held sufficient in *Animation Workers II*, where those plaintiffs alleged facts such as "Lucasfilm made 'affirmative efforts to eliminate a paper trail regarding its code-named 'DNR' agreements,' including a requirement that "all discussions of 'DNR' needed to be conducted over the phone ... [i]f you see an email forward to Steve and one of our lawyers." 123 F. Supp. 3d at 1201. Despite a previous warning from the Court that the alleged affirmative acts need to be specifically pled, *see* Prior

15

MTD Order 9-10, Plaintiffs have still not cured this deficiency.

Finally, Plaintiffs have failed to plead their diligence in trying to uncover the facts giving rise to its claim with particularity. "Diligent inquiry is required where facts exist that would excite the inquiry of a reasonable person," and diligence must be pled with particularity. *Glumetza*, 2020 WL 1066934, at *6 (citing *Conmar*, 858 F.2d at 502, 504). Allegations such as "[Reveal Chat] then contacted *acquaintances that worked at Facebook* to get more clarity as to the APIs and to determine whether [Reveal Chat] could obtain an exemption from the decision," Am. Compl. ¶ 26 (emphasis added) fall woefully short of the particularity required to plead diligence. Beehive likewise "contacted an *acquaintance that worked at Facebook*, who advised them that they would never receive an exemption." Am. Compl. ¶ 61 (emphasis added). Lenddo alleges that it spoke with Facebook's Simon Cross and Neil Hiltz about an exemption to the policy withdrawing access to the Core APIs, and Cross told them they would not be receiving an exemption. Am. Compl. ¶¶ 44-46, 476. Plaintiff has not pled how seeking an exemption to a policy constitutes diligence in attempting to determine if the API withdrawal was unlawful. Plaintiffs also claim they read two Facebook blog posts from 2015 and 2018 and unspecified message board posts, but "[o]nce [parties] had clear knowledge of their claims, it was not reasonable for them to rely on reassuring comments from [Defendant]." *Volk v. D.A. Davidson & Co.*, 816 F.2d 1406, 1416 (9th Cir. 1987) (citation omitted). Accordingly, the Court finds that Plaintiffs have failed to plead sufficient facts alleging they acted diligently in trying to uncover the facts giving rise to their claim.

### iii. Conclusion

The Court is mindful that resolution of statute of limitations challenges are generally deferred until a presentation of a more developed record, but this is one of the rare cases where Plaintiffs' entire theory of liability is based on completed acts by Facebook beyond the limitations period. By their own pleading, Plaintiffs have exposed the tardiness of their claims, their knowledge of their injury, and the absence of diligence.  Thus, the Court finds that the four-year statute of limitations applies to this case, and Plaintiffs have not adequately pled a tolling theory under the continuing violation or fraudulent concealment doctrines. The Court put Plaintiffs on notice in its first order granting Facebook's motion to dismiss that "allegations of fraudulent

16

concealment must be pled with particularity." Prior Order 8 (citing *Ryan II*, 147 F. Supp. 3d at 885). Despite this notice, Plaintiffs' allegations are wholly inadequate to meet the pleading standard for fraud claims under Rule 9(b). Given Plaintiffs' adequate notice of the need to plead with particularity and their continued failure to do so, the Court finds that further amendment would be futile and will GRANT Facebook's motion to dismiss WITH PREJUDICE.

### C. Facebook's Remaining Arguments

Facebook argues several other grounds for dismissal, including that Plaintiffs have not plausibly alleged an antitrust injury and have failed to state a claim establishing a violation of Section 2 of the Sherman Act. Mot. 11-25. However, because this case is being dismissed under the statute of limitations, the Court need not reach these arguments.

## IV. ORDER

For the foregoing reasons, IT IS HEREBY ORDERED that Facebook's motion to dismiss is GRANTED WITH PREJUDICE.

Dated: April 26, 2021

_____
BETH LABSON FREEMAN
United States District Judge

17